Aldine ™ Enviro-Tab ™

Exhibit B

## PURCHASE AGREEMENT

PURCHASE AGREEMENT ("Agreement"), made this 23rd day of February 1972 between Riegel Products Corporation, a Delaware corporation ("RPC"), and Federal Paper Board Company, Inc., a New York corporation ("Federal");

WHEREAS, Federal owns and is engaged in the business of operating certain paper mills and related facilities located in Warren and Hunterdon Counties, New Jersey and desires to sell such business and the properties and assets of such business and operations upon the terms and conditions hereinafter set forth; and

WHEREAS, RPC desires to purchase such business and operations and the properties and assets thereof upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

1. <u>Transfer of Properties by Federal to RPC.</u> Federal shall, at the Closing hereinafter referred to, convey, sell, assign and transfer to RPC, and RPC shall purchase, the assets and properties (the "Properties") consisting of and including all of Federal's business and related operations (the "New Jersey Operations") which are conducted in and/or from its mills, plants, offices and facilities located at the four New Jersey mills described in Paragraph A(1) of Schedule A attached hereto and made a part hereof, together with all assets and properties of Federal, real and personal, tangible and intangible, directly attributable to the New Jersey Operations on the Closing Date, including, but not by way of limitation, the properties and assets described in Paragraphs A and C(2) through C(7) of Schedule A and the properties and assets allocated to the New Jersey Operations in Paragraphs B and C(1) of said Schedule A (to the extent that the items so described or allocated are legally recognized as property or assets); except that the following shall not be included in or constitute a part of the Properties:

2

    (i)   Cash on hand and in banks; and

    (ii)  Real Property (and the buildings thereon
        and improvements thereof) not listed in
        Schedule A.

The consideration to be paid by RPC for the transfer of
the Properties to it shall be (i) the payment by RPC to
Federal of $6,770,018.00 (subject to adjustment as pro-
vided in Section 3 hereof); and (ii) the assumption by
RPC of the liabilities of Federal directly attributable
to the New Jersey Operations on the Closing Date, including,
but not by way of limitation, those listed in Schedule B
attached hereto and made a part hereof but excluding those
expressly excluded in this Agreement or listed in Schedule C
attached hereto and made a part hereof.  In addition, RPC
will assume performance and discharge of the duties and
obligations to be performed and discharged by Federal after
the Closing Date under (i) the contracts, agreements and
commitments of Federal existing on January 3, 1972 and
directly attributable to the New Jersey Operations, includ-
ing, but not by way of limitation, those listed or described
in Schedule B but excluding those listed or described in
Schedule C and (ii) the contracts, agreements and commitments
entered into on or after January 3, 1972 by those officers
or employees of Federal who were employed in the New Jersey
Operations on or subsequent to January 3, 1972.  Subject
to Section 16(f) hereof, to the extent that such contracts,
agreements and obligations of Federal may be assigned by
Federal to RPC, they will be so assigned; to the extent
that such contracts and agreements may not be so assigned,
RPC and Federal agree that RPC shall perform such contracts
on Federal's behalf and for RPC's account.  Federal will not
assign and RPC will not assume any insurance policies.
Federal may cancel such policies following the Closing and
retain any refunded premiums applicable thereto.

    2.   The Closing.  The completion of the transac-
tions provided for in Section 1 hereof (such completion
being herein referred to as the "Closing") shall take place
at 10:00 A.M. on April 3, 1972 at the offices of Shearman &
Sterling, 53 Wall Street, New York, New York 10005, or such
other date as the parties hereto may mutually agree upon,
provided, however, either party may unilaterally postpone
the Closing to a date not later than May 31, 1972 in order
to enable either party to meet the conditions set forth in
Sections 16 and 17 hereof.  As used herein, the day of
Closing is referred to as the "Closing Date".  Upon comple-
tion of the Closing it shall be deemed to have taken place

3

effective as of 7:00 A.M. on the Closing Date.  At the
Closing (a) Federal shall, by delivery of appropriate
bargain and sale deeds with covenants against grantor's
acts since January 3, 1972, assignments, bills of sale or
other documents of transfer, with any required tax stamps
affixed thereto (or otherwise provided for) transfer to
RPC the properties; (b) Federal shall turn over and deliver
to RPC all leases, contracts, and agreements to be assumed
hereunder which are written and known to Federal, and shall
take all such action as may be necessary or required to deliver
the Properties to RPC and to place RPC in actual possession
and operating control of the Properties and the New Jersey
Operations; (c) RPC shall deliver to Federal (i) a certified
or bank cashier's check in the amount of $6,770,018.00 payable
to the order of Federal, and (ii) a written instrument of
assumption by RPC of the liabilities and obligations of
Federal to be assumed pursuant to Section 1 hereof in the
form attached hereto as Annex A.


         3.  Adjustment of Purchase Price.  The amount of
$6,770,018.00 has been tentatively fixed as the purchase
price ("Tentative Purchase Price") on the basis of the
amount by which the book values of certain classes of assets
of the former Riegel Paper Corporation ("Riegel") as of
January 3, 1972 exceeded the book values of certain classes
of liabilities of Riegel as of that date, all as set forth
and reflected in the schedule of such assets and liabilities
as at 7:00 A.M. on January 3, 1972, attached hereto as
Schedule D, which schedule has been reported upon by Haskins
& Sells in their letter delivered the date hereof.  The
classes of assets and liabilities used and the computation
made in determining such Tentative Purchase Price are set
forth in Paragraph 1 of Schedule D.  Promptly after the
Closing Date RPC and Federal will cooperate to cause to be
prepared a schedule (the "Closing Schedule") similar to
Schedule D which shall reflect the book values as of the
Closing Date of the same classes of assets and liabilities
as were used in determining the Tentative Purchase Price.
Promptly following the preparation of the Closing Schedule
RPC and Federal shall cause an audit to be made thereof by
the firm of Haskins & Sells.  The expenses of such audit will
be shared equally by RPC and Federal.  In conducting such
audit Haskins & Sells shall ascertain in particular that
the procedures set forth in Paragraph 2 of Schedule D have
been followed.  Such audit hereinafter is referred to as
the "Adjustment Audit".

         Promptly following the completion of the Adjustment
Audit Haskins & Sells will prepare and deliver to Federal and
RPC an audit report which, among other things, shall set forth
the following:

4

(i)  The book value as of the Closing Date of the classes of assets net of reserves used in determining the Tentative Purchase Price and set forth in Part A of Paragraph 1 Schedule D.

*between January,*
*1972 and the*
*Closing Date*

(ii)  The amount, if any, by which the increase in the amount referred to in Paragraph A(4)(b) of Schedule A exceeds $200,000.00 (such amount of $200,000.00 to be increased by $2,222.00 for each day that the Closing Date is subsequent to April 3, 1972); and

(iii)  The book value as of the Closing Date of the classes of liabilities used in determining the Tentative Purchase Price and set forth in Part B of Paragraph 1 Schedule D.

In the event that the sum of items (i) and (ii) above exceeds item (iii) above and (a) such excess shall be more than the Tentative Purchase Price then such excess, to the extent it exceeds the Tentative Purchase Price, shall be promptly paid by RPC to Federal, or (b) such excess shall be less than the Tentative Purchase Price then Federal will promptly pay such difference to RPC.  Any payment to be made pursuant to the preceding sentence may be made in the form of a promissory note, in negotiable form, payable within 6 months following the Closing Date and bearing interest from the Closing Date at the prime rate of interest in effect at Morgan Guaranty Trust Company of New York on the due date.

4.  Agreements with respect to the Properties.

(a)  Federal hereby agrees that at the Closing it will give to RPC, its successors and assigns, full right, power and authorization to collect, receive and give acquittance of any sum or sums due or to become due under, by virtue of or in connection with any right, interest, property or assets assigned, trans- ferred or conveyed to RPC as a part of the Properties and in RPC's name, to commence action, prosecute or withdraw any suit or proceedings at law or in equity and to do all other things as RPC may deem necessary or proper in connection with such rights, interests, properties and assets.

(b)  RPC and Federal hereby agree that, pursuant to record retention schedules to be delivered by each party to the other RPC and Federal will retain and make available to each other, for inspection and copying, such of the records held by them relating to the New Jersey Operations as may reasonably be requested.

5

5.  <u>Further Assurances</u>.  Federal will, from time
to time at the request of RPC, whether at or after the
Closing Date, execute and deliver such other and further
instruments of conveyance, assignment and transfer of any
of the Properties as RPC shall reasonably request, and Federal
will use all reasonable and proper efforts to assist RPC in the
collection, vesting and reduction to possession of the Properties.

6.  <u>Employees of New Jersey Operations</u>.  Federal
will use all reasonable and proper efforts to procure the
transfer to the employment of RPC on the Closing Date of
all personnel then employed by Federal primarily in con-
nection with the New Jersey Operations.  RPC will, on or
before the Closing Date, assume the collective bargaining
agreements with the unions representing the employees of
the New Jersey Operations, and on the Closing Date RPC will
assume all financial and other responsibility for any exist-
ing grievances.

7.  <u>Pensions</u>.

(a)  Federal shall use all reasonable and proper
efforts to have transferred from the funding agency under
its pension plan to provide the accrued vested benefits
attributable to Employer Contributions for the Vested Par-
ticipants (as defined in the fourth paragraph of Paragraph
2(a) of the Memorandum of Agreement (the "Memorandum of
Agreement")  dated September 23, 1971 between Riegel, Fed-
eral and Rexham Corporation ("Rexham"))  that portion of
the amount transferred to such funding agency in accordance
with the fifth paragraph of Paragraph 2(a) of the Memorandum
of Agreement which is attributable to the Vested Participants
in the employ of Federal whose employment is transferred to
RPC on the Closing Date, plus any earnings thereon while
held by such funding agency, to a funding agency designated
by RPC under a pension plan established by RPC  which pro-
vides that the amount transferred shall be used exclusively
to fund such accrued vested benefits.  The accrued vested
benefits attributable to Employer Contributions  for such
Vested Participants shall thereafter, but only in the event
of such transfer, be payable  through such pension plan
or otherwise and Federal shall have no liability for
such benefits.  RPC agrees that it will not change the
benefit provisions of such pension plan with respect to
such accrued vested benefits without the consent of Federal.

6

(b)  Members of the Salaried Employees' Retirement
Plan of Federal (the "Plan") in the employ of Federal whose
employment is transferred to RPC on the Closing Date (the
"transferred Members") shall not be eligible for benefits
thereunder for any period of service after the Closing Date.
Federal shall cause to be transferred, on or before March 31,
1973, from the Trust under the Plan to a funding agency de-
signated by RPC under a pension plan established by RPC to
provide benefits for such transferred Members, an amount, as
determined on the basis set forth in Paragraph 2(a) of the
Memorandum of Agreement, equal to the actuarial liability
for the total benefits which such transferred Members would
have accrued had they remained Participants in the Retire-
ment Income Plan for Salaried Employees of Riegel Paper
Corporation, as in effect on January 2, 1972 (the "Riegel
Plan"), during the period from January 3, 1972 to the Clos-
ing Date.  RPC agrees that its pension plan will provide
for such transferred Members benefits reasonably comparable
to those provided for in the Riegel Plan for the period
from January 3, 1972 to the Closing Date.

(c)  RPC shall be substituted for Federal as the
Principal Employer and the Employer under the Federal Pen-
sion Plan for Hourly Employees at the New Jersey Plants (the
"Hourly Plan") as of the Closing Date.  RPC shall designate
a new funding agency (the "RPC Fund") for the Hourly Plan
as of the Closing Date.  Federal shall cause to be trans-
ferred as of the Closing Date from the New Trust Fund (as
defined in Paragraph 2(j) of the Memorandum of Agreement)
to the RPC Fund cash and/or marketable securities having a
market value equal to the market value of that portion of
the cash and/or assets transferred to the New Trust Fund
pursuant to Paragraph 2(j) of the Memorandum of Agreement
which is attributable to each actively employed Employee in
the Hourly Plan (excluding employees employed at the Flem-
ington Plant) plus any earnings thereon while held in the
New Trust Fund.

(d)  Federal shall also cause to be transferred,
on or before March 31, 1973, from the New Trust Fund to the
RPC Fund an amount as determined on the basis set forth
in Paragraph 2(j) of the Memorandum of Agreement, equal
to the actuarial liability for benefits accrued by each
actively employed Employee in the Hourly Plan (excluding
Employees employed at the Flemington Plant) between January
3, 1972 and the Closing Date.

7

8.  Patent Licenses.  Without limiting its agreement in Section 1 hereof Federal agrees to assign or cause to be granted to RPC on the Closing Date the patent licenses and licenses of unpatented know-how listed as Items 12,and 13 of Exhibit 1 to Schedule B.

9.  Rights to the Name Riegel.  On the Closing Date, Federal will transfer to RPC all of its right, title and interest in and to the name "Riegel" and Federal's right to use such name, subject to any rights to such name which Rexham may have under the Agreement and Plan of Reorganization dated as of September 23, 1971 among Federal, Riegel and Rexham, except that Federal may continue to (1) use the name "Riegelwood" and (2) use the name "Riegel" on products manufactured at Riegelwood, North Carolina and presently bearing that name for a period of two years and for so long thereafter as the parties may otherwise agree.

10.  Investigation by RPC.  RPC may, prior to the Closing Date, make or cause to be made such investigation of the New Jersey Operations as RPC deems necessary or advisable to familiarize itself with the properties constituting the New Jersey Operations and their financial and legal condition, provided that such investigation shall not interfere with normal operations.  Federal agrees to permit RPC and its authorized representatives to have, after the date of execution hereof, full access to the Properties and to all of its books and records related to the New Jersey Operations at reasonable hours and its officers will furnish RPC with such information with respect to the Properties and the New Jersey Operations as RPC shall from time to time reasonably request.  Subject to the provisions of Section 18 hereof, no investigation by RPC shall affect the representations and warranties of Federal and such representations and warranties shall survive any such investigation.

11.  The Business of the New Jersey Operations Pending the Closing.  Pending the Closing and except as may be approved in writing by RPC or contemplated by this Agreement:

(a)  Federal shall conduct the business of the New Jersey Operations only in the normal course.

(b)  Federal will not enter into any material contract, commitment or agreement relating to the New Jersey Operations except for (i) purchases of

8

raw materials and supplies for use in the normal
course of the business related to the New Jersey
Operations, (ii) sales of finished goods from stock
in such normal course of business, and (iii) con-
tracts or commitments for capital improvements
relating to the New Jersey Operations consistent
with the existing capital expenditure budget for
the New Jersey Operations.

(c)  Federal will not discontinue any portion
of the New Jersey Operations or modify the author-
ity to make contracts or commitments of any of the
present officers or employees in such operations
or grant such authority to persons other than such
present officers and employees and will use all
reasonable and proper efforts to preserve the New
Jersey Operations intact, to keep available the ser-
vices of the present employees of the New Jersey
Operations and to maintain satisfactory relationships
between the New Jersey Operations and their suppliers,
customers and others having business relationships
with them.

(d)  Federal will not sell, lease, mortgage,
pledge or otherwise materially encumber or dispose
of any of the Properties except for sales of inventory
items and collection of receivables in the normal course
of business.

(e)  Federal will operate and conduct the busi-
ness, operations and activities of the New Jersey
Operations and take or cause to be taken all such
actions as may be necessary or required to assure
that (i) the books of account and records of the
New Jersey Operations will be kept and maintained
on a basis consistent with those used in prepara-
tion of Schedule D, (ii) none of the material leases,
contracts or agreements included in the Properties
will be modified, amended or supplemented in any
material manner and (iii) none of the material leases,
contracts, licenses and other agreements directly
related to the New Jersey Operations will be mater-
ially breached.

(f)  Federal will use all reasonable and proper
efforts to obtain as promptly as practicable all
consents and approvals which are required to author-
ize and permit the assignment, transfer and conveyance

9

to RPC of the Properties including (i) any and all
material leases, contracts, licenses and other
agreements which are included in the Properties and
(ii) the approval of local and New Jersey authorities
referred to in Section 14(k) hereof.

(g)  Federal will not voluntarily undertake any
course which causes it to violate the provisions of
this Agreement, and it will use all reasonable and
proper efforts to obtain the tax ruling referred
to in Section 13 hereof.

(h)  Federal will indemnify RPC against any dam-
ages which RPC may suffer and any expense which RPC
may incur arising out of any claim for a brokerage
commission, finder's fee or other like payment which
arises as a result of any act of Federal or any per-
son presently an officer of Federal other than as
provided in the letter referred to in Section 15(e)
hereof.

12.  Agreements of RPC.

(a)  RPC will use all reasonable and proper efforts
to (i) consummate the transactions contemplated by the sub-
scription agreement referred to in Section 15(g) of this
Agreement and (ii) obtain satisfaction of the condition set
forth in Section 16(e) of this Agreement.

(b)  RPC will indemnify Federal against any dam-
ages which Federal may suffer and any expense which Federal
may incur arising out of any claim for a brokerage commission,
finder's fee or other like payment which arises as a result
of any act of RPC or any person presently an officer of RPC.

13.  Tax Ruling. Federal will use all reasonable
efforts to obtain, as promptly as practicable, a ruling
from the United States Internal Revenue Service to the
effect that the consummation of the transactions contem-
plated by this Agreement will have no adverse effect upon
the rulings set forth in the letter from the United States
Internal Revenue Service dated December 27, 1971 to Riegel.

14.  Representations of Federal.  Federal repre-
sents and warrants to RPC as follows:

(a)  Federal is a corporation duly incorporated
and validly existing under the laws of the State of
New York, is in good standing under the laws of said
State with full corporate powers to own its properties

10

and conduct the business presently being conducted by it, and is duly qualified to do business in, and is in good standing under the laws of, the State of New Jersey.

(b)  Federal has good and marketable title in fee simple to all of the real property, including improvements and fixtures, described in Paragraph A of Schedule A, subject only to taxes and special assessments for the current year, if any, due and payable on and after the Closing Date, questions of survey, if any, building lines and building restrictions of record, if any, zoning laws or ordinances, streets, highways, rights of way, existing easements, liens, encumbrances, and other imperfections of title, all of which are not substantial in character, amount or extent and do not materially detract from the value or interfere with the present use of the Properties, and, in the case of Milford Mill site, and subject to the title problem described in a letter dated December 21, 1971 from Herr & Fisher to White & Case.

(c)  Federal has good and marketable title to all of the personal property described in Paragraph A of Schedule A subject only to liens, mortgages, pledges, charges, leases or other encumbrances or conditional sales agreements or title retention agreements which do not in the aggregate materially detract from the value thereof.

(d)  Federal has in all material respects performed all obligations to be performed by it under all material contracts, agreements and commitments to which it is a party and which relate to the New Jersey Operations and there is not under any such contracts, agreements or commitments any existing material default or event of default or event which with notice or lapse of time or both would constitute a material default.  So far as is known to Federal all material contracts, agreements and commitments relating to the business, operations and products of the New Jersey Operations (other than purchase orders for raw materials and supplies and sales orders for finished goods entered into in the ordinary course of business) are identified or described in Schdules B and C.

11

(e)  So far as is known to Federal all material patents, trademarks, trade names and copyrights used in or relating to the New Jersey Operations are identified or described in Exhibits 4, 5 and 6 to Schedule A.

(f)  Paragraph 1 of Schedule D was prepared in accordance with generally accepted accounting principles and accurately and truly reflects at January 3, 1972 the book values of the certain classes of assets of Federal's New Jersey Operations which are to be transferred to RPC and certain classes of liabilities of Federal's New Jersey Operations which are to be assumed by RPC and is true and correct at the date hereof except for changes occurring in the normal course of business since January 3, 1972 and except for changes arising out of events contemplated hereby or permitted hereunder; none of which changes has had a material and adverse effect upon the financial condition of the New Jersey Operations.

(g)  Since January 3, 1972 there has been no material damage to or destruction of any of the four New Jersey mills described in Paragraph A(1) of Schedule A.

(h)  Since January 3, 1972 Federal has, except for acts permitted by this Agreement or consented to in writing by RPC;

(i)      conducted the business of its New Jersey Operations in the manner in which such business had theretofore been conducted; has not incurred any indebtedness, liabilities or obligations with respect to its New Jersey Operations other than in the normal course of such business; and has not entered into any agreements or transactions whatsoever with respect to the New Jersey Operations other than in the normal course of such business and except for this Agreement;

(ii)     not sold, leased, mortgaged, pledged or otherwise materially encumbered or disposed of any of the Properties except for sales of inventory items and collection of receivables in the normal course of business; and

12

    (iii)      not purchased or agreed to purchase or leased or agreed to lease or acquired or agreed to acquire any additional assets or properties for its New Jersey Operations except purchases of materials and supplies for use in the normal course of business and except as permitted under Section 11(b) of this Agreement.

    (i) Except as set forth in a letter dated as of the date of this Agreement and separately delivered to RPC, Federal is not in violation of or in default with respect to any law or rule, regulation, order, writ or decree of any court or any governmental department, commission, board, bureau, agency or instrumentality, which violation or default materially affects the New Jersey Operations, nor is it in default with respect to any tax or other return or report payable to or required to be filed with any governmental department, commission, board, bureau, agency or instrumentality with respect to the Properties or the New Jersey Operations, which violation or default might materially and adversely affect the New Jersey Operations.

    (j) Except as set forth in a letter dated as of the date of this Agreement and separately delivered to RPC, there are no actions, suits or proceedings pending or, so far as is known to Federal, threatened, affecting or against Federal and relating to the Properties or the New Jersey Operations, in any court or by or before any governmental department, commission, committee, board, bureau, agency or instrumentality, other than actions, suits or proceedings of the kind normally incident to the New Jersey Operations none of which if adversely determined would result in any substantial liability (not covered by insurance or a reserve) or any material adverse change in the Properties or the New Jersey Operations or in their condition, financial or otherwise, and none of such actions, suits or proceedings adversely or materially affects or might adversely or materially affect any of the transactions contemplated by this Agreement or which would prevent the carrying out of this Agreement. Except as stated in such letter Federal is not subject to any presently existing regulation, order, writ, injunction or decree and is not a party to any agreement or instrument or subject to any charter restriction

13

which in the opinion of Federal would materially and
adversely affect the New Jersey Operations after
the Closing.

(k)  No authorizations, approvals or consents of
any governmental department, bureau or agency or other
public board or authority are required for the consumma-
tion by Federal of the transactions contemplated by
this Agreement except (i) the tax ruling referred to in
Section 13 hereof, (ii) the approval of certain local
authorities required for subdivision and the transfer
of the real property being transferred hereunder and (iii)
the approval of the New Jersey Board of Public Utility
Commissioners to the transfer of certain contracts for
the supply of natural gas.

(1)  The execution and delivery of this Agreement
does not and the consummation of the transactions herein
contemplated will not create any encumbrances on the New
Jersey Operations in favor of third parties.  All material
properties, interests in properties, assets and rights
(to the extent legally recognized as property or assets)
specifically described in Schedule A are fully transfer-
able to RPC without the necessity of consents by others
(except as set forth in Section 14(k) of this Agreement)
and without creating any preferential rights of others.

(m)  All negotiations by Federal relative to this
Agreement and the transactions contemplated hereby have
been carried out by Federal directly with RPC without the
intervention of any person as the result of any act of
Federal in such manner as to give rise to any valid claim
against any of the parties hereto for a brokerage commission,
finder's fee or other like payment, provided, however, that
Federal makes no representation relative to actions of
officers or employees employed in the New Jersey Operations.

(n)  This Agreement and the transactions contem-
plated hereby have been duly authorized by the Board
of Directors of Federal.

15.  Representations of RPC.  RPC represents and
warrants to Federal as follows:

(a)  RPC is a corporation duly incorporated and
validly existing under the laws of the State of Dela-
ware, is in good standing under the laws of such
State with full corporate powers to own the properties

14

and conduct the business being acquired by it
pursuant to this Agreement, and will be on the
Closing Date duly qualified to do business as a
foreign corporation in, and in good standing under
the laws of, the State of New Jersey.

(b)   There are no actions, suits or proceedings
pending or, so far as is known to RPC, threatened, affect-
ing or against RPC.   RPC is not subject to any presently
existing regulation, order, writ, injunction or decree
or a party to any agreement or instrument or subject to
any charter restriction or presently existing corporate
restriction which in the opinion of RPC materially or
adversely affects its business or the present or pros-
pective condition, financial or otherwise, of the New
Jersey Operations or which would or might adversely
materially affect any of the transactions contemplated
by this Agreement or which would prevent the carrying
out of this Agreement.

(c)   No authorizations, approvals or consents of
any governmental body, bureau or agency or other
public board or authority are required for the con-
summation by RPC of the transactions contemplated by
this Agreement.

(d)   RPC is not in default under any of the pro-
visions of its certificate of incorporation or by-laws;
and the execution and delivery of this Agreement does
not and the consummation of the transactions herein
contemplated will not conflict with or result in a
default under or accelerate RPC's obligation to per-
form any indenture, contract or agreement to which
RPC is a party or to which it is subject or by which
any of its properties or assets is or may be bound.

(e)   All negotiations by RPC relative to this
Agreement and the transactions contemplated hereby have
been carried out by RPC directly with Federal without
the intervention of any person as the result of any
act of RPC or any person presently an officer of RPC in
such manner as to give rise to any valid claim against
any of the parties hereto for a brokerage commission,
finder's fee or other like payment.   RPC has informed
Federal in writing that a claim has been asserted
against it for payment of a finder's fee in connection
with the subscription agreement referred to in Section
15(q) hereof and that such claim is being contested
by RPC.

15

(f)  This Agreement and the transactions contemplated hereby have been duly authorized by the Board of Directors of RPC.

(g)  RPC has entered into a subscription agreement relating to the issue by RPC of additional shares of common stock, and it has received a commitment for a bank loan.  The copies of such subscription agreement and bank loan commitment which have been delivered to Federal are true and correct copies of the originals.

16.  <u>Conditions to RPC's Obligations</u>.  The obligations of RPC to effect the transactions contemplated by this Agreement are subject to the fulfillment prior to or on the Closing Date of each of the following conditions:

(a)  No one of the four New Jersey mills described in Paragraph A(1) of Schedule A shall have been adversely affected to any material extent as a result of any fire, accident or other casualty (whether or not covered by insurance).

(b)  There shall not have occurred and be continuing a major work stoppage affecting the New Jersey Operations.

(c)  The representations of Federal contained in Section 14 of this Agreement shall have been true and correct in all material respects on and as of the date of this Agreement and shall be true and correct in all material respects on and as of the Closing Date as though made on and as of such date except to the extent waived hereunder or affected by the transactions contemplated or permitted by this Agreement, and Federal shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing Date.

(d)  The representations of Federal contained in Section 14(d) of this Agreement shall have been true and correct in all material respects as to the predecessors in interest of Federal on and as of the date of this Agreement and shall be true and correct in all material respects as to such predecessors in interest on and as of the Closing Date as though made on and as of such date except to the extent waived hereunder or affected by the transactions contemplated

or permitted by this Agreement; RPC shall not have found that there is any material contract, agreement, or commitment or liability to be assumed by RPC which materially and adversely affects the New Jersey Operations other than those referred to in Sections 6 and 7 of this Agreement, or in Schedule B hereto, or entered into or incurred between January 3, 1972 and the Closing Date as permitted by this Agreement, or those which Federal agrees to pay, perform or discharge with no liability or obligation to RPC; and none of the contracts, agreements or commitments listed on Schedule B which is material to the New Jersey Operations as a whole shall have been found not to be a valid and binding agreement.

(e)   RPC shall have been able to obtain a mortgagee's title binder and/or policy in form and substance satisfactory to The Equitable Life Assurance Society of the United States (or, if disapproved by The Equitable Life Assurance Society of the United States, another long-term lender satisfactory to RPC) covering the real property and improvements thereon described in Paragraph A of Schedule A.

(f)   All consents and approvals referred to in subsection (f) of Section 11 hereof shall have been obtained except for consents or approvals to the assignment of leases, contracts, licenses or other agreements which, without material adverse effect on RPC can be legally performed by RPC on Federal's behalf and for RPC's account.

(g)   RPC shall have received an opinion of Messrs. White & Case, counsel for Federal, dated the Closing Date in form and substance satisfactory to RPC and its counsel, to the effect that

(i)   Federal is duly incorporated and is validly existing in good standing under the laws of the State of New York and is duly qualified and in good standing as a foreign corporation in the State of New Jersey;

(ii)  This Agreement and the consummation of the transactions contemplated hereby have been duly authorized by proper corporate action of Federal and this Agreement has been duly executed by a duly authorized officer of Federal and constitutes the valid and legally binding obligation of Federal in accordance with its terms except as limited by applicable bankruptcy, insolvency or similar laws;

(iii) No provisions of the certificate of incorporation or the by-laws of Federal or of any contract known to such counsel to which Federal is a party, or any law, ruling or

regulation prevents Federal from delivering all of its right, title and interest in and to the Properties to be conveyed and transferred hereunder;

(iv)    The instruments of assignment, transfer and conveyance to RPC are valid acts and deeds of Federal and are effective to vest in RPC Federal's right, title and interest to the properties and assets purported to be assigned, transferred and conveyed thereby, subject to the due recording and/or filing of the deeds and other instruments of assignment, transfer and conveyance where and to the extent required to make such transfer effective; and

(v)    There is no material action or proceeding, known to such counsel, pending or threatened against Federal and relating to the New Jersey Operations or the transactions contemplated by this Agreement other than as specifically set forth in the letter referred to in Section 14(i) and (j) of this Agreement.

Such opinion of Messrs. White & Case shall also cover such other matters incident to the transactions herein contemplated as RPC may reasonably request in the circumstances. In rendering their opinion with respect to the laws of any jurisdictions other than the laws of New York, Messrs. White & Case may rely on the opinion or opinions of other counsel retained by Federal and satisfactory to RPC and its counsel, provided that said opinion of Messrs. White & Case shall state that RPC is justified in relying upon the opinion or opinions of such other counsel.

(h)    Between the date hereof and the Closing Date Federal shall not have been subject to any order which (a) arises out of an aspect of the New Jersey Operations not the subject of a pollution order existing on the date hereof, (b) would have the effect of closing any of the four New Jersey mills, and which (c) Federal has not agreed to cure in a manner reasonably acceptable to RPC.

17.    Conditions to Federal's Obligations. The obligations of Federal to effect the transactions contemplated by this Agreement are subject to the fulfillment prior to or on the Closing Date of each of the following conditions:

(a)    The representations of RPC contained in Section 15 hereof shall have been true and correct in all material respects on and as of the date of this Agreement and shall be true and correct in all material respects on and as of the Closing Date as though made on and as of such date

except to the extent waived hereunder or affected
by the transactions contemplated or permitted by
this Agreement; and RPC shall have performed and
complied in all material respects with all agree-
ments and conditions required by this Agreement
to be performed or complied with by it prior to
or at the Closing Date.

(b)  The tax ruling referred to in Section 13 hereof
shall have been received and shall be satisfactory
to counsel for Federal.

(c)  Federal shall have received an opinion of Messrs.
Shearman & Sterling, counsel for RPC, dated the
Closing Date, in form and substance satisfactory
to Federal and its counsel, to the effect that

(i)  RPC is duly incorporated and is validly
existing in good standing under the laws
of the State of Delaware and is duly
qualified as a foreign corporation in
the State of New Jersey;

(ii)  This Agreement, the instrument of assumption
and the consummation of the transactions con-
templated hereby have been duly authorized
by proper corporate action of RPC and this
Agreement and such instrument of assumption
have been duly executed by a duly authorized
officer of RPC and constitute the valid and
legally binding obligations of RPC in accord-
ance with their terms except as limited by
applicable bankruptcy, insolvency or similar
laws; and RPC has duly assumed the liabilities
and obligations of Federal to be assumed by
it pursuant to this Agreement; and

(iii)  There is no material action or proceeding
known to such counsel pending or threatened
against RPC and relating to the New Jersey
Operations or the transactions contemplated
by this Agreement.

Such opinion of Messrs. Shearman & Sterling shall
also cover such other matters incident to the trans-
actions herein contemplated as Federal may reasona-
bly request in the circumstances.  In rendering
their opinion with respect to the laws of any juris-
diction other than the laws of New York, Messrs.
Shearman & Sterling may rely upon the opinion or
opinions of other counsel retained by RPC and satis-
factory to Federal and its counsel, provided that
said opinion of Messrs. Shearman & Sterling shall
state that Federal is justified in relying upon the
opinion or opinions of such other counsel.

19

18.    <u>Termination of Warranties and Certain Covenants.</u>
The warranties and representations of RPC and Federal contained
herein shall not survive the Closing; provided, however, that
this Section shall have no effect upon any other agreement or
obligation of RPC or Federal contained in this Agreement
whether to be performed before or after the Closing Date.
Federal shall not be liable in damages to RPC for breaches of
its various covenants and agreements contained herein unless
such breaches shall have been caused by officers or employees
of Federal other than those actively employed in the New Jersey
Operations.

19.    <u>Termination and Amendment.</u>

(a)    Anything contained in this Agreement to the con-
trary notwithstanding, this Agreement may be
terminated

   (i)    by either RPC or Federal if there shall
          have been instituted or threatened any
          suit, action or other proceeding by any
          governmental agency, commission, bureau
          or body in which it is sought to restrain
          or prohibit the transactions contemplated
          by this Agreement, which in the judgment of
          the party electing to terminate makes it
          inadvisable to proceed with the transac-
          tions contemplated by this Agreement;

  (ii)    at any time by the mutual consent of RPC
          and Federal;

 (iii)    by RPC, if on the Closing Date any of the
          conditions set forth in Section 16 hereof
          have not been met and have not been waived
          by RPC;

  (iv)    by Federal, if on the Closing Date any of
          the conditions set forth in Section 17
          hereof have not been met and have not been
          waived by Federal;

   (v)    by Federal or by RPC if the Closing shall
          not have taken place on or before May 31,
          1972, unless such date is extended by the
          mutual consent of their Boards of Directors.

20

(b) An election by RPC or by Federal to terminate this Agreement as hereinabove provided in Section 19(a) of this Agreement shall be exercised on behalf of such corporation by its Board of Directors or President.

(c) In the event of the termination of this Agreement pursuant to Section 19(a) of this Agreement, the same shall become void and have no effect and there shall be no liabilities on the part of either RPC or Federal in respect of this Agreement, except the liabilities of each of the parties hereto to pay the costs and expenses incurred by it or on its behalf.

(d) Any of the terms and conditions of this Agreement may be waived at any time prior to the Closing Date by the party which is entitled to the benefit thereof by action taken by its Board of Directors, its executive committee, its Chairman of the Board its President or in the case of Federal any Vice President.

(e) Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be amended, modified or supplemented but only in writing signed by the parties hereto at any time prior to the Closing Date.

20.  **Miscellaneous.**

(a) Any notice or other communication under or in connection with this Agreement shall be in writing and if to Federal, shall be addressed to

Federal Paper Board Company, Inc.
75 Chestnut Ridge Road
Montvale, New Jersey 07645
Attn.: President

and shall be effective when delivered to that address and if to RPC, shall be addressed to

Riegel Products Corporation
Milford, New Jersey
Attn.: President

21

and shall be effective when delivered to that
address; or in case of notices or communications
to either Federal or RPC to such other address as
it shall have designated by notice to the other.

(b)    This Agreement may be executed simultaneously in
any number of counterparts, each of which shall be
deemed an original, but all of which together shall
constitute but one and the same instrument.

(c)    The section headings contained in this Agreement
are for reference purposes only and shall not
affect in any way the meaning or interpretation
of this Agreement.

(d)    This Agreement embodies the entire agreement between
the parties and there are no agreements, understand-
ings, representations or warranties between the
parties other than those set forth herein or in the
Schedules or other instruments delivered or to be
delivered pursuant to the terms hereof.

(e)    This Agreement shall be governed by and construed
in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, RPC and Federal have each caused
this Agreement to be executed on its behalf in New York City by
a duly authorized officer as of the day and year first above
mentioned.

RIEGEL PRODUCTS CORPORATION


By _William M. Riegel_____
                    President


FEDERAL PAPER BOARD COMPANY, INC.


By _____
       Vice President

Schedule A

Assets and Properties

Note:  All the terms used in this Schedule A which
are defined in the Purchase Agreement have the same meaning
assigned to such terms in the Purchase Agreement and the
Schedules thereto, and such definitions are incorporated
herein by reference.  References to "Account No." in this
Schedule A are to the number of the account in which each
asset described in this Schedule A was carried on the books
of account of Riegel as of January 3, 1972.

A.   FIXED ASSETS

(1)  Plants and Plant Sites

(a)  Milford Mill - The plant site situated
on the Delaware River in the Borough of Milford,
New Jersey, consisting of approximately 116 acres
on which is situated a paper mill, warehouse
facilities, and coating and converting facilities,
such site, mill and facilities being generally re-
ferred to as the "Milford Mill".

(b)  Warren Mill - The plant site situated on
the Musconetcong River in Hunterdon County, New
Jersey (including lands on the north bank of such
river situated in Warren County) consisting of
approximately 136 acres on which is situated a
paper mill, such site and mill being generally re-
ferred to as the "Warren Mill".

(c)  Hughesville Mill - The plant site situ-
ated on the Musconetcong River in Hughesville,
Hunterdon County, New Jersey, consisting of approxi-

mately 140.5 acres on which is situated a paper mill, such site and mill being generally referred to as the "Hughesville Mill".

(d) <u>Riegelsville Mill</u> - The plant site situated on the Delaware River at the confluence of the Delaware River and the Musconetcong River in Warren and Hunterdon Counties, New Jersey, consisting of approximately 39.25 acres on which is situated a paper mill, such site and mill being generally referred to as the "Riegelsville Mill".

(2) <u>Additional Land</u>

Five additional parcels of land situated in Warren and Hunterdon Counties, New Jersey and amounting in the aggregate to approximately 74.75 acres, as more specifically identified by the red shaded portions of the maps affixed hereto as Exhibit 1 and made a part hereof.

(3) <u>Improvements and Appurtenances</u>

All buildings, structures and improvements and all rights of way, easements, mineral and other rights and privileges of Federal appurtenant to all lands owned by Federal which are identified in items A(1) and (2) above.

All of Federal's title to and right to use the electrical transmission line or power grid running from the Milford Mill to the Warren Glen, Hughesville,

3

and Riegelsville Mills, including all easements
and rights-of-way appurtenant thereto (which
line or grid is more particularly shown on the
plat entitled "Riegel Paper Corporation Engineer-
ing Department, Map of Electrical Transmission
Line Running from Milford to Riegelsville via
Warren and Hughesville Plant", Drawing No.
M-591-11 by E. L. Wean, dated February 4, 1959).

An easement and right-of-way over all lands
now owned by Federal sufficient to enable RPC
to install, erect, operate, maintain, inspect,
test, service, repair, and replace, and recon-
struct in their present location in accordance
with improved practice and/or the requirements
of law from time to time, any and all poles, towers,
ducts, and wires, braces, guys, and crossarms, con-
ductors, transformers, and switches, and all other
and related fixtures and apparatus necessary for
such purposes and for the uninterrupted and con-
tinued use by RPC of the aforementioned electrical
transmission line or power grid now connecting the
four plants identified in items A(1) and (2) above,
including the Riegel Ridge substation, provided
that in any such reconstruction RPC will not remove
any of Federal's improvements without Federal's
prior written consent.

4

(4)  <u>Other</u>

(a)  All machinery, equipment, vehicles, tools, spare parts, furniture, fixtures, furnishings and similar tangible personal property of Federal, which are located on the properties identified in items A(1)-(3) above or which are directly and primarily used in connection with the New Jersey Operations, including, but not limited to, that reflected in the Machinery sections relating to the New Jersey plants (as described in Paragraph A(1) hereof) of the Report (C-87), as of January 3, 1972, prepared by the Corporate Accounting Department of Federal and affixed hereto as Exhibit 2 and made a part hereof (hereinafter referred to as "Report C-87").

(b)  All construction or work in progress (Account No. 284) as reflected in the Riegel trial balance as of January 3, 1972 (affixed hereto as Exhibit 3 and made a part hereof) under the column heading "Paper-N.J." (hereinafter referred to as the "New Jersey Ledger"). This account amounted to $550,281.54 on January 3,1972.

B.  CURRENT ASSETS

(1)  <u>Accounts Receivable</u>

5

(a)   Account No. 130 - Accounts Receivable - Customer

The customer accounts receivable of the New Jersey Operations are recorded on the Riegel trial balance as of January 3, 1972 (affixed hereto as Exhibit 3 and made a part hereof) under the column heading "Controller" (hereinafter referred to as the "Corporate Ledger") and are supported by a computer listing of gross customer receivables itemized by billing location.   The computer listing has been utilized to allocate to the New Jersey Operations the amount shown on the Corporate Ledger which is allocable to the New Jersey Operations on a specific identification basis.

(b)   Account No. 131 - Reserve for Discounts - Customer

The reserves for discounts - customer are recorded on the Corporate Ledger and are allocated to the New Jersey Operations in the manner described in the next sentence.   From the computer listing of gross customer accounts receivable for the New Jersey Operations described in Paragraph B(1)(a) above is deducted the net customer accounts receivable as derived from the computer listing in Paragraph B(1)(a) above attributable to the same customers.

(c)   Account No. 132 - Reserve for Contingency - Customer

6

The reserve for contingency - customer recorded on the New Jersey Ledger is allocated to the New Jersey Operations.

(d)    Account No. 133 - Notes Receivable - Customer

The notes receivable recorded on the Corporate Ledger are allocated to the New Jersey Operations on a specific identification basis.

(e)    Account No. 135 - Accounts Receivable -
                            Miscellaneous

1.    The miscellaneous accounts receivable recorded on the New Jersey Ledger are allocated to the New Jersey Operations.

2.    The miscellaneous accounts receivable recorded on the Corporate Ledger are allocated to the New Jersey Operations on a specific identification basis.

(f)    Account No. 136 - Accounts Receivable -
                            Freight Claim

The accounts receivable for freight claims recorded on the New Jersey Ledger are allocated to the New Jersey Operations.

(g)    Account No. 138 - Accounts Receivable - Employees

Accounts receivable for employees recorded on the New Jersey Ledger are allocated to the New Jersey Operations.

7

(h)   Account No. 140 - Accounts Receivable -
                         Insurance Claims

Accounts receivable for insurance claims
for loss of or damage related to the New Jersey
plants (as defined in Paragraph A(1) hereof)
recorded on the New Jersey Ledger are allocated to
the New Jersey Operations including those claims
for loss of or damage to buildings, equipment, machines,
tools, spare parts, furniture, furnishings, fixtures,
inventory (including that billed and held) and goods
in transit and insurance claims for interruption of
the business.

(2)   Inventories

(a)   Account No. 150 - Raw Materials Inventory

Raw material inventories recorded on the New
Jersey Ledger (excluding the value of any inventory
which is owned by Rexham as of January 2, 1972  and,
therefore, is not billable to Rexham) are allocated
to the New Jersey Operations.

(b)   Account No. 155 - Operating Supplies

1.  Inventories of operating supplies recorded
on the New Jersey Ledger are allocated to the New
Jersey Operations.

8

2.   Inventories of operating supplies re-
corded on the Corporate Ledger are allocated to
the New Jersey Operations on a specific identi-
fication basis.

(c)   Account No. 160 - Product Inventories

1.   Product inventories recorded on the New
Jersey Ledger (excluding the value of any inventory
which is owned by Rexham as of January 2, 1972
and, therefore, is not billable to Rexham) are
allocated to the New Jersey Operations.

2.   Product inventories recorded on the Cor-
porate Ledger are allocated to the New Jersey
Operations on a specific identification basis.

(d)   Account No. 166 - Materials in Transit

Inventories for materials and supplies in
transit recorded on the New Jersey Ledger are allo-
cated to the New Jersey Operations.

(e)   Account No. 167 - Reserve for Change in
                        Standard Cost

The reserve for change in standard costs re-
corded on the New Jersey Ledger is allocated to the
New Jersey Operations.

(f)   Account No. 168 - Reserve for Price Variance

The reserve for price variances recorded on
the New Jersey Ledger is allocated to the New
Jersey Operations.

9

(g)   Account No. 170 - Reserve for LIFO

The reserve for LIFO on the Corporate Ledger is allocated to the New Jersey Operations on a specific identification basis.

(h)   Account No. 171 - Reserve for Intra-Division Profit on Inventory

The reserve for intra-division profit on inventory recorded on the New Jersey Ledger that is attributable to items manufactured at the New Jersey plants described in Paragraph A(1) hereof is allocated to the New Jersey Operations, and the reserve for intra-division profit on inventory recorded on the New Jersey Ledger that is attributable to items manufactured at Riegelwood, North Carolina.

(3)  Prepaid Expenses

(a)   Account No. 181 - Prepaid Rents

1.  Prepaid rents recorded on the New Jersey Ledger are allocated to the New Jersey Operations.

2.  Prepaid rent recorded on the Corporate Ledger is allocated to the New Jersey Operations on a specific identification basis.

(b)   Account No. 183 - Employee Cash Advances

Cash advances recorded on the New Jersey Ledger are allocated to the New Jersey Operations.

10

    (c)   <u>Account No. 184</u> - Vouchers Undistributed -
                              <u>Short Term</u>

        Items in this account recorded on the New
Jersey Ledger are allocated to the New Jersey Operations.

C.   <u>OTHER ASSETS</u>

    (1)  Items reflected in Account No. 312 - Vouchers
Undistributed - Long Term recorded on the New Jersey
Ledger are allocated to the New Jersey Operations.

    (2)  All right, title and interest of Federal in
and to the United States and foreign patents and
patent applications set forth in Exhibit 4 to this
Schedule A, together with the right of Federal to
sue and collect for, and retain damages from, any
infringements of such patents committed before the
Closing Date.

    (3)  All right, title and interest of Federal in and to
inventions not covered by the patents or patent applications
described in Exhibit 4 to this Schedule A made or con-
ceived prior to the Closing Date by employees of, or con-
sultants to, Federal relating exclusively or principally
to the product lines, products or services provided by
the New Jersey Operations.

    (4)  All right, title and interest of Federal
in and to the registered and common law trademarks
identified and enumerated in Exhibit 5 to this
Schedule A.

11

(5)  All right, title and interest of Federal
in and to the copyrights identified and enumerated
in Exhibit 6 to this Schedule A.

(6)  All right, title and interest of Federal in and
to the common law trademarks, trade names and service marks,
trade secrets, know-how and process technology in con-
nection with the products, product lines, and services
provided by the New Jersey Operations including, but
not limited to, all records, prints, drawings, specifica-
tions, bills of material and other documentary represen-
tation of such trademarks, trade names, trade secrets,
know-how and process technology, except as modified by
Section 9 of the Purchase Agreement.


(7)  The right to have the New Jersey Operations'
state unemployment reserves and experience rating,
developed in prior years, transferred to RPC.

EXHIBIT 1
TO
SCHEDULE A





2

# HUGHESVILLE MILL



P₁ – WARREN COUNTY – Pasture Land & Woods
P₂ – HUNTERDON    Co. – Spray Irrigation Farm Land    52    "
P₃ – "    " – Cultivated Farm Land & Woods    52    "
P₄ – " – Mill Proper    25½    "
P₅ – " – Cultivated Farm Land    10    "
R₆ – Hunterdon Co. – Spray Irrigation Land    21 Acres
R₇ – " – Pond Line & Wooded Area    17½    "

SCALE: 1" = ACC.
18" = 3.67 Acres
Sept. 1965

3



RIEGELSVILLE MILL

Exhibit 2 to Schedule A

REPORT NO. 96312

FIXED ASSETS   C-87    BATCH NO. 07   1971 C2-2-72    PAGE NO. 5

| COST CENTER / PAPER DIV.- N.J. | COST — Opening Balance | Additions | Retirements | Transfers Adjust. Re-Class. | Closing Balance | DEPRECIATION RESERVE — Opening Balance | Depreciation Depletions | Retirements | Transfers Adjust. Re-Class. | Closing Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **WARREN** | | | | | | | | | | |
| L | 20,576 | | | | 20,576 | | | | | |
| B | 1,758,395 | 56,636 | 12,521 | 74,160 | 1,576,670 | 988,501 | 40,840 | 12,521 | 9,856 | 1,026,682 |
| M | 5,070,576 | 58,920 | 115,836 | 54,119- | 5,259,541 | 2,848,637 | 228,741 | 115,836 | 5,804 | 2,967,345 |
| C | | | | | | | | | | |
| W | 37,988 | 4,987- | | | 33,001 | | | | | |
| **TOTAL** | 6,887,535 | 110,569 | 128,357 | 20,041 | 6,889,788 | 3,837,144 | 269,581 | 128,357 | 15,660 | 3,994,128 |
| **MOORESVILLE** | | | | | | | | | | |
| L | 2,802 | | | | 2,802 | | | | | |
| B | 551,498 | 23,982 | 9,495 | 14- | 565,971 | 425,343 | 13,751 | 9,495 | 14- | 429,552 |
| M | 2,095,202 | 43,451 | 13,227 | 11,649 | 2,134,975 | 1,034,323 | 106,436 | 13,227 | 1,771- | 1,125,761 |
| C | 25,749 | 74,039 | | | 102,588 | | | | | |
| W | | | | | | | | | | |
| **TOTAL** | 2,675,951 | 141,372 | 22,722 | 11,635 | 2,806,236 | 1,459,666 | 120,187 | 22,722 | 1,785- | 1,555,346 |
| **AIRORELSVILLE** | | | | | | | | | | |
| L | 4,312 | | | | 4,312 | | | | | |
| B | 572,363 | 84,687 | | 551 | 657,601 | 260,128 | 16,355 | | 17 | 276,500 |
| M | 1,824,369 | 131,690 | 34,174 | 10,208 | 1,933,003 | 979,926 | 98,925 | 34,174 | 4,292 | 1,048,969 |
| C | | | | | | | | | | |
| W | 290,273 | 56,227- | | | 34,106 | | | | | |
| **TOTAL** | 2,691,317 | 160,120 | 34,174 | 10,759 | 2,628,022 | 1,240,054 | 115,280 | 34,174 | 4,309 | 1,325,469 |
| **MILFORD** | | | | | | | | | | |
| L | 15,665 | | | | 15,665 | | | | | |
| B | 6,512,081 | 135,791 | 22,817 | 6,422- | 6,616,633 | 3,286,483 | 186,632 | 22,817 | 745- | 3,451,549 |
| M | 16,532,459 | 861,094 | 751,483 | 73,089- | 16,567,581 | 8,843,090 | 660,934 | 736,286 | 34,154- | 8,731,588 |
| C | | | | | | | | | | |
| W | 447,174 | 184,213- | | | 262,956 | | | | | |
| **TOTAL** | 23,505,379 | 813,267 | 774,300 | 81,511- | 23,462,835 | 12,129,573 | 847,566 | 759,103 | 34,899- | 12,183,137 |
| **WAX PLANT** | | | | | | | | | | |
| L | | | | | | | | | | |
| B | 322,280 | 45,094 | 14,589 | 4,940- | 352,785 | 214,892 | 12,165 | 14,589 | 3,264- | 212,408 |
| M | 1,213,559 | 107,452 | 47,729 | | 1,266,272 | 610,084 | 65,147 | 44,913 | | 627,054 |
| C | 224,682 | 59,179 | | | 83,661 | | | | | |
| W | | | | | | | | | | |
| **TOTAL** | 1,558,301 | 211,675 | 62,318 | 4,940- | 1,702,718 | 824,976 | 77,312 | 59,502 | 3,264- | 839,522 |

2

PLANT NO. 96312     FIXED ASSETS C-R7     BATCH NO. 07 1971 02-72-72     PAGE NO. 6

|  | | COST | | | | RESERVE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| COST CENTER PAPER DIV-- N.J. | OPENING BALANCE | ADDITIONS | RETIREMENTS | TRANSFERS ADJUST. RE-CLASS. | CLOSING BALANCE | OPENING BALANCE | DEPRECIATION DEPLETIONS | RETIREMENTS | TRANSFERS ADJUST. RE-CLASS. | CLOSING BALANCE |
| **COATING** | | | | | | | | | | |
| L | 518,545 | | | | 551,675 | 226,419 | | | | 242,903 |
| B | 1,131,592 | 34,394 | 1,664 | 400 | 1,323,036 | 689,088 | 17,745 | 1,664 | 400 | 762,554 |
| M | 138,030 | 8,097 | | 61,511 | | 59,002 | | 8,097 | 22,511 | |
| C | 92,348 | 56,278- | | | 36,070 | | | | | |
| T | | | | | | | | | | |
| TOTAL | 1,742,485 | 116,145 | 9,761 | 61,911 | 1,910,781 | 915,207 | 76,747 | 9,761 | 22,911 | 1,005,764 |
| **SERVICES** | | | | | | | | | | |
| L | 244,827 | 5,255 | 22,992 | 3,204- | 223,886 | 208,113 | 13,339 | 22,992 | | 198,460 |
| B | 1,110,271 | 18,103 | 48,934 | 18,707- | 1,120,733 | 817,975 | 75,324 | 48,934 | 50,768 | 838,417 |
| M | | | | | | | | | | |
| C | | | | | | | | | | |
| T | | | | | | | | | | |
| TOTAL | 1,415,098 | 23,418 | 71,926 | 21,971- | 1,344,619 | 825,186 | 88,663 | 71,926 | 50,246 | 836,877 |
| **SUMMARY** | | | | | | | | | | |
| L | 43,355 | | | | 43,355 | | | | | |
| B | 10,179,989 | 385,039 | 84,078 | 83,471- | 10,545,221 | 5,609,885 | 302,827 | 84,078 | 9,510 | 5,838,144 |
| M | 29,333,948 | 1,359,220 | 1,019,480 | 67,547- | 29,606,141 | 15,622,221 | 1,392,509 | 1,019,467 | 11,024 | 16,021,039 |
| C | 718,774 | 108,492 | | | 550,282 | | | | | |
| T | | | | | | | | | | |
| TOTAL | 40,276,066 | 1,576,567 | 1,103,558 | 4,076- | 40,744,999 | 21,232,106 | 1,695,336 | 1,103,545 | 21,114- | 21,839,783 |

Exhibit 3 to Schedule A

RIEGEL PAPER CORPORATION
TRIAL BALANCE
PERIOD 13  DATE 1/2/72

| Account | CONTROLLER | PAPER-NJ |
|---|---|---|
| **CASH** | | |
| 087 Nat'l Comm. Bank | 087 289 01 | |
| 088 State Bk. of Albany | | |
| 090 Marine Midland Bk. - Reg. | 5 903 448 66 | |
| 091 Marine Midland Bk. - Sal. | | |
| 092 Marine Midland Bk. - Hour. | | |
| 093 Illinois Nat'l Bk. - Reg. | | |
| 094 C.& S. National Bk. | | |
| 096 Illinois Nat'l Bk. - Hour | | |
| 100 M. H. T. Co. - Reg. | | |
| 101 Chemical Bk. - Reg. | 483 870 28 | |
| 102 Other Bank Accounts | 293 001 62 | |
| 103 F. N. C. Bank | 777 347 96 | |
| 104 Wachovia Bank | | |
| 105 Chemical Bk. - Cks. Pay. | (44 392 00) | |
| 106 M. H. T. Co. - Cks. Pay. | | |
| 107 F. N. C. B. - Cks. Pay. | (573 821 57) | (1 983 759 88) |
| 108 Wachovia Bk. - Cks. Pay. | | |
| 125 Ind. Nat'l Bk. - Freight | | |
| 127 Petty Cash | 4 100 00 | 9 433 45 |
| Total Cash | 8 130 844 16 | (1 974 326 43) |
| **TEMPORARY INVESTMENTS** | | |
| 129 Temporary Investments | | |
| 139 Dividends Rec. - Mohawk | 432 573 62 | |
| 130 Accts. Rec. - Customer | 15 941 303 75 | |
| 131 Res. for Disc. - Cust. | (159 000 00) | |
| 132 Res. for Cont. - Cust. | (635 505 57) | |
| 133 Notes Rec. - Customer | 209 672 46 | |
| 134 Accts. Rec. - Wood D'lrs. | | |
| 135 Accts. Rec. - Misc. | 117 518 22 | |
| 136 Accts. Rec. - Fr. Claims | | 50 181 69 |
| 137 Accts. Rec. - Comm. Found. | | 10 341 19 |
| 138 Accts. Rec. - Employees | 166 87 | |
| 140 Accts. Rec. - Ins. Claims | 127 712 00 | 1 575 13 |
| Total Accts. Rec. | 16 054 441 59 | 61 898 01 |

RIEGEL PAPER CORPORATION
TRIAL BALANCE
PERIOD 13   DATE 1/2/72

| Acct | Description | CONTROLLER | PAPER-NJ |
|---|---|---|---|
| 144 | ACCTS. REC. - INTRA-CO. | | |
| 146 | Accts. Rec. - Laminex | 258 270 52 | |
| 148 | Accts. Rec. - Mohawk | 985 721 03 | |
| 149 | Accts. Rec. - Techbuilt | 458 301 02 | |
| 145 | Accts. Rec. - Comm. Con. | 34 947 68 | |
| 145 | Accts. Rec. - Rexham | | |
| | INVENTORIES | | |
| 150 | Raw Materials Inventory | | 2 626 40 12 |
| 155 | Operating Supplies | 30 559 00 | |
| 160 | Product Inventories | ( 400 127 04) | 3 056 760 00 |
| 160M | Model Homes | | |
| 166 | Materials In Transit | | 58 515 04 |
| 167 | Res. For Chg. in Std. Cost | | |
| 168 | Res. For Price Var. | | |
| 170 | Res. For LIFO | | |
| 171 | Res. Intra Div. Pft. Inv. | ( 202 000 00) | ( 101 222 00) |
| 172 | Res. Inter Div. Pft. Inv. | ( 617 000 00) | |
| | Total Inventories | (1 188 568 04) | 5 640 93 16 |
| | PREPAID EXPENSES | | |
| 180 | Fire & Other Ins. | 1 093 242 65 | |
| 181 | Rents Prepaid | 39 246 34 | |
| 182 | Airline Deposit | 425 00 | |
| 183 | Employee Cash Advances | 1 667 76 | |
| 184 | Vouch. Undist. - Short Term | | 12 375 00 |
| 186 | Riegel Text. - Clearing | 864 18 | |
| 187 | Group Ins. - Prepaid | | |
| | Total Prepaid Expenses | 1 135 445 91 | 12 375 00 |
| | TOTAL CURRENT ASSETS | 25 869 403 87 | 3 740 139 74 |
| | NOTES PAYABLE | | |
| 190 | Notes Payable | ( 188 630 00) | |
| | ACCOUNTS PAY. - EMPLOYEES | | |
| 200 | Res. - Vacations | ( 28 838 00) | ( 501 000 40) |
| 201 | Res. - Holiday Pay | | |
| 202 | Res. - Christmas Bonus | | |
| 203 | Res. - Incentive Pay | ( 50 118 50) | |

RIEGEL PAPER CORPORATION
TRIAL BALANCE
PERIOD 13  DATE 1/2/72

| | | CONTROLLER | PAPER-NJ |
|---|---|---|---|
| 204 | Res. - Special Pay | | |
| 205 | Res. - Emp. Welfare | | |
| 206 | Res. - Pensions | | |
| 207 | Salaries & Wages Pay. | (1 223 000 00) | |
| 208 | Commissions Payable | ( 316 076 14) | |
| 209 | Res. For SUI | | |
| 210 | Res. For FUI | (1 485 00) | (7 546 36) |
| 211 | Res. For FOAB | 48 537 00 | (23 292 45) |
| 212 | Col. - SUI | (7 496 38) | (45 195 69) |
| 213 | Col. - FOAB | (1 005 56) | |
| 214 | Col. - Disab. Ins. | (24 737 94) | |
| 215 | Col. - Withholding | (5 408 60) | |
| 216 | Col. - Union Dues | (223 728 14) | |
| 217 | Col. - Emp. Savings | (3 011 50) | |
| 218 | Col. - Hospital Plan | | |
| 219 | Col. - State Inc. Tax | (1 18 597 52) | |
| 220 | Col. - Christmas Club | | |
| 221 | Col. - Fed. Credit Union | (25 383 73) | |
| 222 | Col. - Savings Bond | | (4 064 11) |
| 223 | Col. - R'wood Housing | | |
| 224 | Col. - Un. Comm. Fd. & Other | | |
| 225 | Col. - R'wood Country Club | (75 00) | |
| 226 | Col. - Garnishees | | |
| 227 | Col. - Employee Uniforms | | |
| 228 | Col. - City W./ H Tax | (2 189 53) | |
| 229 | Col. - Pensions | (18 662 93) | |
| 230 | Col. - Stock Option | | |
| 240 | ACCOUNTS PAY. - TRADE | | |
| 241 | Accts. Payable | (785 224 48) | (1 295 311 55) |
| 242 | Accts. Pay. - Other | | (20 182 00) |
| 243 | Freight Payable | | (26 334 45) |
| 244 | Accrued Power | | (66 350 95) |
| | Professional Services | | |