Exhibit H

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 2

IN THE MATTER OF:

Crown Vantage Landfill Superfund Site
Alexandria Township, Hunterdon County, NJ


Georgia-Pacific Consumer Products, LP ,


Settling Party.

ADMINISTRATIVE SETTLEMENT
AGREEMENT AND ORDER ON
CONSENT FOR REMEDIAL
INVESTIGATION/FEASIBILITY STUDY

U.S. EPA Region 2
CERCLA Docket No. 02-2007-2023

Proceeding Under Sections 104, 107 and
122 of the Comprehensive Environmental
Response, Compensation, and Liability Act,
as amended, 42 U.S.C. §§ 9604, 9607 and
9622.

## ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT FOR REMEDIAL INVESTIGATION AND FEASIBILITY STUDY

I.        INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.       JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.      PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.       STATEMENT OF PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.        DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

VI.       EPA FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VII.      EPA CONCLUSIONS OF LAW AND DETERMINATIONS . . . . . . . . . . . . . 9

III.      NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IX.       SETTLEMENT AGREEMENT AND ORDER . . . . . . . . . . . . . . . . . . . . . . 10

X.        DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS  . 10

XI.       WORK TO BE PERFORMED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

XII.      EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . 20

XIII.     QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION 22

XIV.      SITE ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . . 24

XV.       COMPLIANCE WITH OTHER LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XVI.      RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XVII.     DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XVIII.    STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

XIX.      FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

XX.       PAYMENT OF RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

XXI.      COVENANT NOT TO SUE BY EPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

XXII.    RESERVATIONS OF RIGHTS BY EPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XXIII.    COVENANT NOT TO SUE BY SETTLING PARTY . . . . . . . . . . . . . . . . . . . 35

XXIV.    OTHER CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XXV.    CONTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XXVI.    INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

XXVII.    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

XXVIII.    FINANCIAL ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

XXIX.    INTEGRATION/APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

XXX.    ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

XXXI.    EFFECTIVE DATE AND SUBSEQUENT MODIFICATION . . . . . . . . . . . . 40

XXXII.    NOTICE OF COMPLETION OF WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

iii

## I. INTRODUCTION

1.      This Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency ("EPA") and Georgia-Pacific Consumer Products, LP ("GPCP" or "Settling Party"). The Settlement Agreement concerns the preparation and performance of a remedial investigation and feasibility study ("RI/FS") at the Crown Vantage Landfill Superfund Site located in Alexandria Township, Hunterdon County, New Jersey ("Site") and the reimbursement for future response costs incurred by EPA in connection with the RI/FS.

## II. JURISDICTION

2.      This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9607 and 9622 ("CERCLA"). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (Jan. 29, 1987), and further delegated to the Regional Administrators on May 11, 1994, by EPA Delegation Nos. 14-14-C and 14-14-D. This authority was further redelegated on November 23, 2004 by the Regional Administrator of EPA Region 2 to the Director of the Emergency and Remedial Response Division by EPA Region 2 Delegation Nos. 14-14-C and 14-14-D.

3.      In accordance with Sections 104(b)(2) and 122(j)(1) of CERCLA, 42 U.S.C. §§ 9604(b)(2) and 9622(j)(1), EPA notified the Federal and State of New Jersey natural resources trustees of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal and/or State trusteeship.

4.      EPA and Settling Party recognize that this Settlement Agreement has been negotiated in good faith and that neither the actions undertaken by Settling Party in accordance with this Settlement Agreement nor the execution of this Settlement Agreement constitutes an admission of any liability. Settling Party does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in Sections VI and VII of this Settlement Agreement. Settling Party agrees to comply with and be bound by the terms of this Settlement Agreement and further agrees that it will not contest the basis or validity of this Settlement Agreement or its terms.

5.      This Settlement Agreement does not require the Settling Party to implement the remedial alternative selected by EPA in the Record of Decision for the Site.

1

### III. PARTIES BOUND

6.    This Settlement Agreement applies to and is binding upon EPA and upon Settling Party and their successors and assigns. Any change in ownership or corporate status of Settling Party including, but not limited to, any transfer of assets or real or personal property shall not alter Settling Party's responsibilities under this Settlement Agreement.

7.    Settling Party shall ensure that its contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Settling Party shall be responsible for any noncompliance with this Settlement Agreement by any of its contractors, subcontractors, and representatives.

8.    The undersigned representative of Settling Party certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind Settling Party to this Settlement Agreement.

### IV. STATEMENT OF PURPOSE

9.    In entering into this Settlement Agreement, the objectives of EPA and Settling Party are: (a) to determine the nature and extent of contamination and any threat to the public health, welfare, or the environment caused by the release or threatened release of hazardous substances, pollutants or contaminants at or from the Site, by conducting a Remedial Investigation as more specifically set forth in the Statement of Work ("SOW") attached as Attachment A to this Settlement Agreement; (b) to identify and evaluate remedial alternatives to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site, by conducting a Feasibility Study as more specifically set forth in the SOW in Attachment A to this Settlement Agreement; and (c) to recover Future Response Costs incurred by EPA with respect to this Settlement Agreement.

10.    The Work conducted under this Settlement Agreement is subject to approval by EPA and is intended to provide all appropriate and necessary information to assess Site conditions and evaluate alternatives to the extent necessary to select a remedy that will be consistent with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 ("NCP"). Settling Party shall conduct all Work under this Settlement Agreement in compliance with CERCLA and the NCP.

### V. DEFINITIONS

11.    Unless otherwise expressly provided herein, the terms used in this Settlement Agreement that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement Agreement or in the appendices hereto and incorporated hereunder, the following definitions shall apply:

2

a.    "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*

b.    "Day" shall mean a calendar day unless expressly stated to be a Working Day.   In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next Working Day.

c.    "Effective Date" shall be the effective date of this Settlement Agreement as Provided in Section XXXI.

d.    "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e.    "Engineering Controls" shall mean constructed containment barriers or systems that control one or more of the following: direct exposure to contaminants; downward migration; infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time.  Examples include, without limitation, caps, engineered bottom barriers, immobilization processes, and vertical barriers.

f.    "Future Response Costs" shall mean all costs including, but not limited to, direct and indirect costs, that the United States incurs after the Effective Date in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, Agency for Toxic Substances and Disease Registry ("ATSDR") costs, the costs incurred pursuant to Paragraph 51(b) (conducting community relations), Paragraph 71 (costs and attorneys' fees and any monies paid to secure access, including the amount of just compensation), and Paragraph 57 (Emergency Response), and Paragraph 101 (Work Takeover). Future Response Costs shall not include any costs FJOC is obligated to pay pursuant to Section XVIII of Administrative Agreement and Order on Consent For Removal Action, CERCLA Docket No. 02-2005-2017.

g.    "Institutional controls" shall mean non-engineered instruments, such as administrative and/or legal controls, that help to minimize the potential for human exposure to contamination and/or protect the integrity of a remedy by limiting land and/or resource use.  Examples of institutional controls include, but are not limited to, easements and covenants, zoning restrictions, special building permit requirements, and well drilling prohibitions.

3

h.    "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

i.    "NJDEP" shall mean the New Jersey Department of Environmental Protection.

j.    "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

k.    "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral. References to paragraphs in the SOW will be so identified (for example, "SOW paragraph 15").

l.    "Parties" shall mean the United States Environmental Protection Agency and Settling Party.

m.    "RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.*

n.    "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

o.    "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, the SOW, all appendices attached hereto (listed in Section XXIX) and all documents incorporated by reference into this document including, without limitation, EPA-approved submissions. EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by EPA. In the event of conflict between this Settlement Agreement and any appendix or other incorporated documents, this Settlement Agreement shall control.

p.    "Settling Party" shall mean Georgia-Pacific Consumer Products, LP.

q.    "Site" or "Crown Vantage Landfill Superfund Site" shall mean the areal extent of contamination from the release or disposal of hazardous substances, pollutants or contaminants at the Crown Vantage Landfill encompassing as much as ten acres in Alexandria Township, Hunterdon County, New Jersey, as well as all suitable areas in close proximity to the contamination necessary for implementation of response actions. The Site is depicted generally on the map attached as Appendix B.

4

r.    "Statement of Work" or "SOW" shall mean the Statement of Work for development of a RI/FS for the Site, as set forth in Appendix A to this Settlement Agreement. The Statement of Work is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement as are any modifications made thereto in accordance with this Settlement Agreement.

s.    "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any mixture containing any of the constituents noted in (1),(2) or (3), above

t.    "Work" shall mean all activities Settling Party is required to perform under this Settlement Agreement, except those required by Section XVI (Retention of Records).

u.    "Working Day" shall mean a day other than a Saturday, Sunday or federal holiday.

## VI. EPA FINDINGS OF FACT

12.    The Site is an abandoned, inactive landfill located off of Milford-Frenchtown Road, just south of a vacant paper mill, in Alexandria Township, Hunterdon County, New Jersey. The approximately ten-acre landfill has an estimated 1,500 feet of frontage directly on the eastern shore of the Delaware River. The Site is adjacent to the northernmost section of the Delaware Raritan Canal State Park. The Delaware and Raritan Canal foot path and a corn field bound the Site to the east.

13.    The landfill was utilized by the adjacent paper mill, known as the Milford mill, as well as by other nearby paper mills (located in Riegelsville, Warren Glen, and Hughesville) for the disposal of waste, including ash, rolls of paper, and drummed materials, beginning in the late 1930's through the early 1970's. A packaging facility located nearby in Flemington also disposed of waste at the Site beginning in the early 1960's through the early 1970's. Some municipal solid waste may have also been deposited into the landfill. Aerial photographs of the Site beginning in 1938 reveal a path leading from Milford-Frenchtown Road to the Site.

14.    Under the direction of NJDEP, GPCP, then known as James River Paper Company, Inc., conducted initial investigation activities, starting with a Preliminary Site Investigation in September 1991. In December 1991 and January 1992, GPCP removed over 450 drums from the Site. In October 1992, GPCP prepared a Wetlands Delineation Report concerning potential wetland areas at the Site. GPCP also installed eight groundwater monitoring wells and conducted monitoring at the Site, in October and November 1994.

5

15.     NJDEP conducted investigations at the Site between 2002 and 2003, including the excavation of test pits and the removal and disposal of waste material and containers discovered at the surface and in the subsurface of the landfill. Analysis of samples collected from the drums for disposal purposes identified that a majority of the samples exceeded the regulatory limits for the RCRA-characteristic of ignitability and that a portion of the samples exceeded the regulatory level for the RCRA-characteristic of toxicity for compounds such as benzene, tetrachloroethene, trichloroethane and heptachlor. NJDEP also reported that surface soil samples collected from the exposed face of the landfill alongside the river showed exceedences of both the state residential and nonresidential standards for metals and semivolatiles in many of the samples.

16.     On June 25, 2003, EPA received a request from NJDEP to evaluate the Site for CERCLA Removal Action consideration. Several site visits were conducted by EPA between June and November, 2003. During the site visits, pigment waste was observed on the surface of the landfill, solvent odors were identified emanating from cracks and fissures in the landfill and from locations near subsidences where test pits previously had been excavated by NJDEP, and badly degraded drums of waste were observed present near the surface of the landfill. Flood waters from the Delaware River had overflowed the western toe of the landfill and scoured the face revealing buried drums, some of which contained blue pigment and had leaked their contents near the river. A sample of this material collected by EPA confirmed the presence of elevated levels of lead. EPA also noted that the fence which NJDEP had installed around the Site had been severely damaged along the river due to elevated water and flow level, allowing access by the public to the Site.

17.     In July and November 2003, EPA sampled waste (including flyash and the contents of degraded drums), air, surface soil, sediment and surface water.

18.     The analytical results from the sampling performed by NJDEP and EPA indicated that significantly elevated levels of a variety of CERCLA-designated Hazardous Substances, as listed in 40 C.F.R. Table 302.4 are present throughout the Site. Some of the substances found include poly-aromatic hydrocarbons ("PAH"), lead, pesticides, PCBs and chromium.

19.     EPA concluded that a CERCLA Removal Action was warranted at the Site to stabilize the exposed landfill face in order to eliminate the potential for containers and other waste materials to be released into the Delaware River. EPA also recommended the removal of drums and other waste materials along the face of the landfill and other exposed areas, as well as the implementation of Site security measures. These findings are described in EPA's Removal Site Evaluation ("RSE"), dated May 25, 2004, which was prepared in accordance with the NCP, 40 C.F.R. 300.410.

20.     EPA conducted an additional site visit on September 20, 2004 after the remnants of Hurricane Ivan resulted in the Delaware River rising well above flood stage. It was determined that the river had crested above the face of the landfill. EPA observed a

portion of the landfill face that had experienced some erosion due to the flood waters collapse into the Delaware River. The portion of the landfill that collapsed had previously been sampled by EPA and contained elevated levels of PAHs, heavy metals, PCBs, and pesticides. As the water level subsided over the next two weeks and the entire face of the landfill face became accessible and visible, additional areas of the landfill face were observed to have suffered significant erosional damage.

21. EPA proposed the Site to be listed on the National Priorities List on September 23, 2004.

22. After having received verbal authorization on September 23, 2004, on September 29, 2004, EPA initiated an emergency removal action to stabilize areas of the landfill face that were severely impacted by the flooding. Rip-rap was placed on these areas to prevent additional releases into the river. In addition, EPA collected some waste material which had been released from the landfill, including several drums of organic solvent, pigments and other colored, solid material. The waste material was characterized and disposed of off-site, consistent with EPA's CERCLA Offsite Policy set forth in 40 C.F.R. § 300.440. These removal activities continued through November 2004.

23. EPA approved an Action Memorandum/Enforcement for Crown Vantage Landfill Site on February 10, 2005 concluding that the actual or threatened release of hazardous substances from the Site, if not addressed by implementing the recommended response action, may present an imminent and substantial endangerment to public health, welfare, or the environment. This document was prepared in accordance with the "Superfund Removal Procedures Action Memorandum Guidance" (OSWER Directive No. 9360.3-01, December 1990). The removal activities included in the February 10, 2005 Action Memorandum included stabilization of the landfill face; completion of the search for drums and containers across the surface of the landfill; completion of fencing along the river and placement of warning signs; and maintenance of the barrier, fencing and signage until the permanent remedy for the Site is in place.

24. On March 18, 2005, EPA approved a second Action Memorandum documenting the September 23, 2004 verbal authorization for the emergency removal activities performed at the Site in the fall of 2004.

25. On April 27, 2005, the Site listing on the NPL became final.

26. EPA and GPCP's predecessor, Fort James Operating Company, entered into an Administrative Agreement and Order on Consent for Removal Action, CERCLA Docket No. 02-2005-2017, effective May 26, 2005, pursuant to which GPCP committed to design and build a wall to stabilize the face of the landfill as well as to secure the Site and to search for and remove drums and other containers which are visible on the landfill surface.

7

27.   During the time in which the Site was utilized for the disposal of waste, from the early 1930s to December 1971, it was owned and operated by Riegel Paper Company, later renamed Riegel Paper Corporation. Riegel Paper Corporation also owned and operated the adjacent paper mill located in Milford, three additional paper mills located in Riegelsville, Warren Glen, and Hughesville, New Jersey, and a facility located in Flemington, New Jersey, opened in 1963, that made packaging materials. All of these plants generated hazardous waste which was disposed of at the Site.

28.   Beginning in 1971, a series of corporate transactions took place that resulted in the transfer of ownership of the Site, the adjacent mill ("Milford mill"), the Riegelsville, Warren Glen and Hughesville mills, and the Flemington packaging facility. On September 23, 1971, Riegel Paper Corporation, Federal Paper Board Company, Inc. and Rexham Corporation entered into a Plan and Agreement of Reorganization ("Reorganization Plan"). Pursuant to the Reorganization Plan, certain assets and liabilities of Riegel Paper Corporation, including the facility in Flemington, New Jersey, were transferred to Rexham Corporation, a newly formed subsidiary of Riegel, while the shareholders of Riegel Paper Corporation received stock in Rexham Corporation. Subsequently, Riegel Paper Corporation merged with and into Federal Paper Board Company, Inc., with Federal Paper Board Company, Inc. as the surviving corporation. Federal Paper Board Company, Inc. retained ownership of the Site as well as the Milford, Riegelsville, Warren Glen and Hughesville mills. In January 1972 Rexham Corporation listed its stock on the New York stock exchange.

29.   In November 1987, RX Acquisition Corp., a wholly-owned subsidiary of Knightsbridge Holdings Inc., now known as Rexam Inc., purchased all outstanding shares of Rexham Corporation. RX Acquisition Corp. was merged into Rexham Corporation, and in 1988 Rexham Corporation was merged into R-8 Holdings, Inc., another wholly-owned subsidiary of Knightsbridge Holdings Inc. Through a series of name changes, the surviving entity came to be known as Rexam Image Products, Inc. In June 2002, Rexam Image Products, Inc. converted to an LLC and was sold by Rexam Inc. to Sun Coating Acquisition Corp. The former Rexam Image Products, Inc. is now known as InteliCoat Technologies, LLC.

30.   Pursuant to a Purchase Agreement dated February 23, 1972, Federal Paper Board Company, Inc. sold certain assets, including the Milford mill and the Site, as well as the Riegelsville, Warren Glen, and Hughesville paper mills, to a newly-formed company, Riegel Products Corporation. On the same day, Southwest Forest Industries acquired 100% of the stock of Riegel Products Corporation, which became a wholly-owned subsidiary of Southwest Forest Industries, Inc.

31.   On April 3, 1972, Federal Paper Board Company, Inc. and Riegel Products Corporation entered into an Assumption agreement pursuant to which Riegel Products Corporation assumed certain debts and liabilities of Federal Paper Board Company, Inc. directly

8

attributable to the New Jersey mills and facilities, "as the same exist" as of the date of the Assumption.

32.    On November 8, 1977, Fort James Corporation, which was then named James River Corporation, purchased the stock of Riegel Products Corporation from Southwest Forest Industries.  The stock transaction included the Site and the Milford, Riegelsville, Warren Glen and Hughesville paper mills.

33.    On April 29, 1989, Riegel Products Corporation and James River U.S. Holdings, Inc., both subsidiaries of James River Corporation, were merged into a newly-named company, James River Paper Company, Inc.  This transaction resulted in James River Paper Company, Inc. becoming the owner of the Site and the Milford, Riegelsville, Warren Glen and Hughesville paper mills.  In 1997, James River Paper Company, Inc. was merged with Fort Howard, the newly-formed entity being named Fort James Operating Company.

34.    On August 15, 1995, James River Corporation and James River Paper Company, Inc. executed a corporate spin-off in which Crown Vantage, Inc. and its subsidiary, Crown Paper Company, received certain assets of James River Corporation and James River Paper Company, Inc., including the Milford mill and the Site, and certain liabilities.

35.    Federal Paper Board Company, Inc. was merged with International Paper Company in March 1996. Georgia-Pacific Corporation acquired Fort James Corporation in July of 2000.

36.    In 2001, the Site was formally abandoned by Crown Vantage, Inc. as part of a bankruptcy filing under Chapter 11 of the United States Bankruptcy Code, pursuant to an agreement with NJDEP.  This proceeding had the effect of removing the landfill from the bankruptcy estate with ownership of the landfill reverting to the debtor, Crown Vantage, Inc.

## VII.  EPA CONCLUSIONS OF LAW AND DETERMINATIONS

Based on EPA's Findings of Fact set forth above, EPA has determined that:

37.    The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

38.    Wastes sent to the Site, disposed of at the Site, and/or transported to the Site identified in Paragraphs 13, 15, 16, 17 and 22 are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or constitute "any pollutant or contaminant" that may present an imminent and substantial danger to public health or welfare under Section 104(a)(1) of CERCLA.

9

39. The presence of hazardous substances at the Site or the past, present or potential migration of hazardous substances currently located at or emanating from the Site, constitute actual and/or threatened "releases" as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

40. Settling Party is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

41. Settling Party is a responsible party under Sections 104, 107 and 122 of CERCLA, 42 U.S.C. §§ 9604, 9607 and 9622. Settling Party is a person who owned and/or operated the Site at the time of disposal or generated the hazardous substances found at the Site. Settling Party therefore may be liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

42. The actions required by this Settlement Agreement are necessary to protect the public health, welfare or the environment, are in the public interest, 42 U.S.C. § 9622(a), are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), 9622(a), and will expedite effective remedial action and minimize litigation, 42 U.S.C. § 9622(a).

43. EPA has determined that Settling Party is qualified to conduct the RI/FS within the meaning of Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), and will carry out the Work properly and promptly, in accordance with Sections 104(a) and 122(a) of CERCLA, 42 U.S.C. §§ 9604(a) and 9622(a), if Settling Party complies with the terms of this Settlement Agreement.

### III. NOTICE

44. By providing a copy of this Settlement Agreement to the State of New Jersey ("State"), EPA is notifying the State that this Settlement Agreement is being issued and that EPA is the lead agency for coordinating, overseeing, and enforcing the response action required by the Settlement Agreement.

### IX. SETTLEMENT AGREEMENT AND ORDER

45. Based upon the foregoing Findings of Fact and Conclusions of Law and Determinations, it is hereby agreed that Settling Party shall comply with all provisions of this Settlement Agreement, including, but not limited to, all attachments to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

### X. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

46. Selection of Contractors, Personnel. All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Within fourteen (14) days of the Effective Date of this Settlement Agreement, Settling Party shall

notify EPA in writing of the names and qualifications of the contractors, subcontractors, consultants and laboratories to be used in carrying out such Work. Settling Party shall also notify EPA of the names and qualifications of any other contractors, subcontractors, consultants and laboratories to be used in carrying out the Work at least ten (10) days prior to their commencement of their particular aspect of the Work. The qualifications of the contractors, subcontractors, consultants and laboratories undertaking the Work for Settling Party shall be subject to EPA's review, for verification that such contractors, subcontractors, consultants and laboratories meet minimum technical background and experience requirements. With respect to any proposed contractor, Settling Party shall demonstrate that the proposed contractor has a quality system that complies with ANSI/ASIC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995, or most recent version), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"), prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001 or subsequently issued guidance) or equivalent documentation as determined by EPA. This Settlement Agreement is contingent on Settling Party's demonstration to EPA's satisfaction that Settling Party is qualified to perform properly and promptly the actions set forth in this Settlement Agreement. If EPA disapproves in writing of any of the technical qualifications of any contractors, subcontractors, consultants and laboratories, Settling Party shall notify EPA of the identity and qualifications of the replacements within thirty (30) days of the written notice. If EPA subsequently disapproves of the replacement, EPA reserves the right to terminate this Settlement Agreement and to conduct a complete RI/FS, and to seek reimbursement for costs and penalties from Settling Party. During the course of the RI/FS, Settling Party shall notify EPA in writing of any changes or additions in the contractors, subcontractors, consultants and laboratories used to carry out such Work, providing their names and qualifications. EPA shall have the same right to disapprove changes and additions to contractors, subcontractors, consultants and laboratories as it has hereunder regarding the initial notification.

47. Within fourteen (14) days after the Effective Date, Settling Party shall designate a Project Coordinator who shall be responsible for administration of all actions by Settling Party required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during Site Work. EPA retains the right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Settling Party shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number and qualifications within fourteen (14) days following EPA's disapproval. Settling Party shall have the right to change its Project Coordinator, subject to EPA's right to disapprove. Settling Party shall notify EPA fourteen (14) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notification. Receipt by Settling Party's Project Coordinator of any

11

notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Settling Party.

48.    EPA has designated Tanya Mitchell of the New Jersey Remediation Branch, Region II as its Project Coordinator. EPA will notify Settling Party of a change of its designated Project Coordinator, in writing and if possible, fourteen (14) days before such a change is made. Except as otherwise provided in this Settlement Agreement, Settling Party shall send all submissions required by this Settlement Agreement by certified mail, return receipt requested, or by UPS or Federal Express, to the Project Coordinator at:

> New Jersey Remediation Branch
> Emergency and Remedial Response Division
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway, 19th Floor
> New York, New York 10007-1866
> Attn: Tanya Mitchell, Crown Vantage RPM

49.    EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, EPA's Project Coordinator shall have the authority consistent with the NCP, to halt any Work required by this Settlement Agreement, and to take any necessary response action when s/he determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the EPA Project Coordinator from the area under study pursuant to this Settlement Agreement shall not be cause for the stoppage or delay of Work.

50.    EPA shall arrange for a qualified person to assist in its oversight and review of the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. Section 9604(a). Such person shall have the authority to observe Work and make inquiries in the absence of EPA, but shall not modify the RI/FS Work Plan.

## XI.  WORK TO BE PERFORMED

51.    Settling Party shall conduct the RI/FS in accordance with the provisions of this Settlement Agreement, the SOW, CERCLA, the NCP and EPA guidance, including, but not limited to the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01, October 1988 or subsequently issued guidance), "Guidance for Data Useability in Risk Assessment" (OSWER Directive #9285.7-05, October 1990 or subsequently issued guidance), and guidance referenced therein, and guidances referenced in the SOW, as may be amended or modified by EPA. The Remedial Investigation ("RI") shall consist of collecting data to characterize Site conditions, determining the nature and extent of the contamination at or from the Site, assessing risk to human health and the environment and conducting treatability testing as necessary to evaluate the potential performance and cost of the

treatment technologies that are being considered.  The Feasibility Study ("FS") shall determine and evaluate (based on treatability testing, where appropriate) alternatives for remedial action to prevent, mitigate or otherwise respond to or remedy the release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site.  The alternatives evaluated must include, but shall not be limited to, the range of alternatives described in the NCP, and shall include remedial actions that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable.  In evaluating the alternatives, Settling Party shall address the factors required to be taken into account by Section 121 of CERCLA, 42 U.S.C. § 9621, and Section 300.430(e) of the NCP, 40 C.F.R. § 300.430(e).  Upon request by EPA, Settling Party shall submit in electronic form all portions of any report or other deliverable Settling Party is required to submit pursuant to provisions of this Settlement Agreement.

_____ a.    Task I - RI/FS Work Plan.  EPA has determined the Site-specific objectives of the RI/FS and devised a general management approach for the Site, as set forth in the attached SOW.  Settling Party shall compile and review all existing data for the Site and shall conduct scoping activities as described in the attached SOW.  At the conclusion of the project planning phase, Settling Party shall provide EPA with the following plans, reports and other deliverables for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions):

   i.    Preliminary Conceptual Site Model.  Within forty-five (45) days after the Effective Date of this Settlement Agreement, Settling Party shall submit to EPA a Preliminary Conceptual Site Model ("PCSM") to support the development of the RI/FS Work Plan.  The preliminary conceptual site model shall be prepared in accordance with the SOW, this Settlement Agreement, and applicable EPA guidance.

   ii.   RI/FS Work Plan.  Within seventy-five (75) days after EPA's written authorization to proceed based on the PCSM, Settling Party shall submit to EPA a detailed Work Plan for the completion of the RI/FS.  Upon approval or modification by EPA pursuant to Section XII (EPA Approval of Plans and Other Submissions), the RI/FS Work Plan shall be incorporated into and become enforceable under this Settlement Agreement.  The RI/FS Work Plan shall be prepared in accordance with the SOW, this Settlement Agreement and applicable EPA guidance and shall include a Quality Assurance/Quality Control Project Plan ("QAPP"), Field Sampling and Analysis Plan ("FSP"), and a Health and Safety Plan ("HSP"), as described in Paragraphs 51(a)(ii)(1)-(3).

      1.    Quality Assurance/Quality Control Project Plan.  The QAPP shall be prepared in accordance with the SOW, this Settlement Agreement and EPA guidance, including, without limitation, "EPA

13

Guidance for Quality Assurance Project Plans (QA/G-5)"(EPA/240/R-009), and "EPA Requirements for Quality Assurance Project Plans (QA/G-5)" (EPA 240/B-01/003, March 2001 or subsequently issued guidance). The QAPP shall also be prepared consistent with the Uniform Federal Policy for Quality Assurance Project Plans (UFP-QAPP), Parts 1, 2 and 3, EPA-505-B-04-900A, B and C, March 2005 or newer, and other guidance documents referenced in the aforementioned guidance documents. The UFP documents may be found at: http://www.epa.gov/fedfac/documents/qualityassurance.htm. In addition, the guidance and procedures located in the EPA Region 2 DESA/HWSB web site: http://www.epa.gov/region02/qa/documents.htm, as well as other OSWER directives and EPA Region 2 policies should be followed, as appropriate.

2.  Field Sampling and Analysis Plan. The FSP shall be prepared in accordance with the SOW, this Settlement Agreement and applicable EPA guidance.

3.  Health and Safety Plan. The HSP for the Site shall ensure the protection of on-Site workers and the public during performance of on-Site Work under this Settlement Agreement, and shall include procedures for emergency response and notification of releases. The HSP shall be prepared in accordance with the SOW, this Settlement Agreement and applicable EPA guidance, including, without limitation, EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992 or subsequently issued guidance ). In addition, the HSP shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning.

b.  Task II - Community Relations Plan. EPA will prepare a community relations plan for the Site, coordinating with the Settling Party to the extent reasonably possible. As requested by EPA, Settling Party shall provide information relating to the Work at the Site to the public and shall participate in the preparation of all appropriate information to be disseminated to the public and shall participate in public meetings which may be held or sponsored by EPA to explain activities at or concerning the Site.

c.  Task III - Site Characterization. Following EPA approval or modification of the RI/FS Work Plan pursuant to Section XII (EPA Approval of Plans and Other

14

Submissions), Settling Party shall implement the provisions of the RI/FS Work Plan to characterize the nature, quantity, and concentrations of hazardous substances, pollutants, or contaminants at the Site. Settling Party shall complete the Site characterization and submit all plans, reports and other deliverables in accordance with the schedules and deadlines established in this Settlement Agreement, the SOW, and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports and other deliverables shall be submitted by Settling Party for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions).

d.      Task IV - Identification of Candidate Technologies. Settling Party shall submit an Identification of Candidate Technologies Memorandum to EPA within forty-five (45) days of Settling Party's submission to EPA of the last set of validated analytical results. Where appropriate, the candidate technologies identified by Settling Party shall include innovative treatment technologies. The Identification of Candidate Technologies Memorandum shall be prepared by Settling Party in accordance with the SOW, this Settlement Agreement and applicable EPA guidance.

e.      Task V - Treatability Studies. Settling Party shall conduct treatability studies if so requested in writing by EPA. The major components of the treatability studies are described in the SOW. Treatability studies shall be performed according to the SOW, this Settlement Agreement and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports, and other deliverables shall be submitted by Settling Party for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions). If so requested, Settling Party shall submit a Treatability Testing Work Plan within forty-five (45) days of such notice. Settling Party shall submit a Treatability Study Evaluation Report within forty-five (45) days after completion of treatability testing under the Treatability Testing Work Plan.

f.      Task VI - Baseline Risk Assessment. Settling Party will perform the Baseline Risk Assessment ("Risk Assessment") in accordance with the SOW, this Settlement Agreement and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports and other deliverables shall be submitted by Settling Party for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions). The Baseline Risk Assessment performed by Settling Party shall include the following:

i.      Baseline Human Health Risk Assessment. Within sixty (60) days of EPA's approval or modification of the RI/FS Work Plan, Settling Party shall submit to EPA a Memorandum on Exposure Scenarios and Assumptions pursuant to the SOW and applicable EPA guidance. Within sixty (60) days of Settling Party's submission to EPA of the last set of validated data, Settling Party shall submit to EPA a Pathways Analysis

15

Report prepared in accordance with the SOW, this Settlement Agreement and applicable EPA guidance. Within sixty (60) days of EPA's approval of the Pathways Analysis Report pursuant to Section XII (EPA Approval of Plans and Other Submissions), Settling Party shall submit to EPA a draft Baseline Human Health Risk Assessment ("BHHRA"), for inclusion in the RI Report upon approval or modification pursuant to Section XII.

ii.    <u>Baseline Ecological Risk Assessment</u>. Within sixty (60) days of Settling Party's submission to EPA of the last set of validated data, Settling Party shall submit to EPA a Screening-Level Ecological Risk Assessment in accordance with the SOW, this Settlement Agreement and applicable EPA guidance. EPA will notify Settling Party in writing if EPA determines that a full Baseline Ecological Risk Assessment ("BERA") is required, and if so notified by EPA, Settling Party shall perform a full BERA in accordance with the SOW, this Settlement Agreement and applicable EPA guidance. Within forty-five (45) days of such notice, Settling Party shall submit a Scope of Work for a full BERA. Settling Party shall submit a draft BERA Report within sixty (60) days after submission to EPA of the last set of BERA-related validated data, for inclusion in the RI Report upon approval or modification pursuant to Section XII.

g.    <u>Task VII - Remedial Investigation Report</u>. Pursuant to the EPA-approved or modified RI/FS Work Plan, Settling Party shall submit a draft RI Report to EPA in accordance with the SOW, this Settlement Agreement and approved EPA guidance. Within sixty (60) days of receiving EPA's comments on the draft RI Report, Settling Party shall submit a final RI Report to EPA for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions).

h.    <u>Task VIII - Development and Screening of Remedial Alternatives</u>. Settling Party shall develop an appropriate range of remedial action objectives that will be evaluated through the development and screening of alternatives, as provided in the SOW and the EPA-approved or modified RI/FS Work Plan. Within forty-five (45) days after EPA's approval of the BHHRA or BERA, or within forty-five (45) days of EPA's approval of Treatability Study Evaluation Report (if treatability studies are required), whichever is later, Settling Party shall prepare and submit to EPA for EPA approval pursuant to Section XII (EPA Approval of Plans and Other Submissions) a Development and Screening of Remedial Alternatives Technical Memorandum in accordance with the SOW, this Settlement Agreement and applicable EPA guidance. The Development and Screening of Remedial Alternatives Technical Memorandum shall summarize the development and screening of remedial alternatives. Within twenty-one (21) days of Settling Party's submission of the Development and Screening of Remedial Alternatives Technical Memorandum, Settling Party shall make a presentation to EPA and the

16

State identifying the remedial action objectives and summarizing the development and preliminary screening of alternatives.

    i.    <u>Task IX - Feasibility Study Report</u>.  Settling Party shall submit a draft FS Report to EPA for EPA approval pursuant to Section XII (EPA Approval of Plans and Other Submissions) within sixty (60) days after EPA's approval of the Development and Screening of Remedial Alternatives Technical Memorandum. Within fourteen (14) days of Settling Party's submission of the draft FS Report, Settling Party will present to EPA and the State a summary of the findings of the draft FS Report and discuss EPA's and the State's preliminary comments and concerns with respect to the draft FS Report.  Within forty-five (45) days of receiving EPA's comments on the draft FS Report, Settling Party shall submit the final FS Report to EPA for EPA's approval pursuant to Section XII (EPA Approval of Plans and Other Submissions).

52.    Upon receipt of the draft FS report, EPA will evaluate, as necessary, the estimates of the risk to the public and environment that are expected to remain after a particular remedial alternative has been completed and will evaluate the durability, reliability and effectiveness of any proposed Institutional Controls.

53.    <u>Modification of the RI/FS Work Plan</u>.

    a.    If at any time during the RI/FS process, Settling Party identifies a need for additional data, Settling Party shall submit a memorandum documenting the need for additional data to the EPA Project Coordinator within thirty (30) days of identification.  EPA in its discretion will determine whether the additional data will be collected by Settling Party and whether it will be incorporated into reports and deliverables.

    b.    In the event of unanticipated or changed circumstances at the Site, Settling Party shall notify the EPA Project Coordinator by telephone within twenty-four (24) hours of discovery by Settling Party of the unanticipated or changed circumstances.  In addition to the authorities in the NCP, in the event that EPA determines that the unanticipated or changed circumstances warrant changes in the RI/FS Work Plan, EPA shall modify or amend the RI/FS Work Plan in writing accordingly.  Settling Party shall perform the RI/FS Work Plan as modified or amended.

    c.    EPA may determine that in addition to tasks defined in the initially approved RI/FS Work Plan, other additional Work may be necessary to accomplish the objectives of the RI/FS.  Upon written notice by EPA of the additional Work, subject to its right, per Subparagraph 53.d, to seek dispute resolution pursuant to Section XVII (Dispute Resolution), Settling Party agrees to perform these response actions in addition to those required by the initially approved RI/FS

Work Plan, including any approved modifications, if EPA determines that such actions are necessary for a complete RI/FS.

d.  Settling Party shall confirm its willingness to perform the additional Work in writing to EPA within ten (10) days of receipt of the EPA request.  If Settling Party objects to any modification determined by EPA to be necessary pursuant to this Paragraph, Settling Party may seek dispute resolution pursuant to Section XVII (Dispute Resolution).

e.  Within twenty-one (21) days of receipt of EPA's notice that additional Work is necessary to accomplish the objectives of the RI/FS, or final resolution of the dispute, whichever is later, Settling Party shall submit the SOW and/or RI/FS Work Plan modified in accordance with EPA's determination or in accordance with the final resolution of the dispute.

f.  Settling Party shall complete the additional Work according to the standards, specifications, and schedule set forth or approved by EPA in a written modification to the RI/FS Work Plan or written RI/FS Work Plan supplement. EPA reserves the right to conduct the Work itself at any point, to seek reimbursement from Settling Party, and/or to seek any other appropriate relief.

g.  Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions at the Site.

54.  Off-Site Shipment of Waste Material.

a.  Settling Party shall, prior to any off-site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to EPA's Designated Project Coordinator.

b.  Settling Party shall include in the written notification required by Subparagraph 54(a) the following information:  (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Settling Party shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

c.  The identity of the receiving facility and state will be determined by Settling Party following the award of the contract for the remedial investigation and feasibility study.  Settling Party shall provide the information required by Subparagraphs

18

54(b) and 54(d) as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

d.  Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Settling Party shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Settling Party shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

55. <u>Meetings</u>.  Settling Party shall make presentations at, and participate in, meetings at the request of EPA during the initiation, conduct, and completion of the RI/FS.  In addition to discussion of the technical aspects of the RI/FS, topics will include anticipated problems or new issues.  Meetings will be scheduled at reasonable times and at EPA's discretion.

56. <u>Progress Reports</u>.  In addition to the deliverables set forth in the Settlement Agreement and SOW, Settling Party shall provide to EPA monthly progress reports by the tenth (10th) day of the following month (or on any other schedule agreed to in writing by the EPA Project Coordinator).  At a minimum, with respect to the preceding month, these progress reports shall (1) describe the actions which have been taken to comply with this Settlement Agreement during that month, (2) describe Work planned for the next forty-five (45) days with schedules relating such Work to the overall project schedule for RI/FS completion, and (3) describe all problems encountered and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

57. <u>Emergency Response and Notification of Releases</u>.

a.  In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Settling Party shall immediately take all appropriate action.  Settling Party shall take these actions in accordance with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release.  Settling Party shall also immediately notify the Emergency Spill Reporting Hotline at (732) 548-8730 and the EPA Project Coordinator or, in the event of his/her unavailability, the Chief of the Northern New Jersey Remediation Section of the Emergency and Remedial Response Division of EPA Region II at (212) 637-4380 of the incident or Site conditions.  In the event that Settling Party fails to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Settling

Party shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XX (Payment of Response Costs).

b.    In addition, in the event of any release of a hazardous substance from the Site, Settling Party shall immediately notify the EPA Project Coordinator, the Chief of the Northern New Jersey Remediation Section of the Emergency and Remedial Response Division of EPA Region II by telephone (212-637-4380) and the National Response Center at (800) 424-8802.  Settling Party shall submit a written report to EPA within 7 days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release.  This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## XII.  EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

58.    After review of any plan, report or other item that is required to be submitted for approval pursuant to this Settlement Agreement EPA shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Settling Party modify the submission; or (e) any combination of the above. However, EPA shall not modify a submission without first providing Settling Party at least one notice of deficiency and an opportunity to cure within 14 days, except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects.

59.    In the event of approval, approval upon conditions, or modification by EPA, pursuant to Subparagraphs 58(a), (b), (c) or (e), Settling Party shall proceed to take any action required by the plan, report or other item, as approved or modified by EPA subject only to its right to invoke the Dispute Resolution procedures set forth in Section XVII (Dispute Resolution) with respect to the modifications or conditions made by EPA.  Following EPA approval or modification of a submittal or portion thereof, Settling Party shall not thereafter alter or amend such submittal or portion thereof unless directed by EPA.  In the event that EPA modifies the submission to cure the deficiencies pursuant to Subparagraph 58(c) and the submission so modified is a resubmission of the same plan, report or other deliverable, which EPA is modifying due to a material defect, EPA retains the right to seek stipulated penalties, as provided in Paragraph 62 and Section XVIII (Stipulated Penalties).

60.    Resubmission of Plans.

    a.    Upon receipt of a notice directing that Settling Party modify or correct a plan, report or other item, Settling Party shall, within the time specified in the SOW, or if no time is specified in the SOW for the item in question, within thirty (30) days or such other time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties that might be applicable to the submission, as provided in Paragraph 62 and Section XVIII, shall accrue during the thirty (30)-day period or otherwise specified period but shall not become due and payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 58 and 59.

    b.    Notwithstanding the receipt of a notice of disapproval, Settling Party shall proceed to take any action required by any non-deficient portion of the submission, unless otherwise directed by EPA. Implementation of any non-deficient portion of a submission shall not relieve Settling Party of any liability for stipulated penalties under Section XVIII (Stipulated Penalties).

    c.    Settling Party shall not proceed further with any subsequent activities or tasks until receiving EPA approval for the following deliverables: PCSM, RI/FS Work Plan, Draft RI Report, Treatability Testing Work Plan and Sampling and Analysis Plan, and Draft Feasibility Study Report. While awaiting EPA approval on these deliverables, Settling Party shall proceed with all other tasks and activities which may be conducted independently of these deliverables, in accordance with the schedule set forth in this Settlement Agreement.

    d.    For all remaining deliverables not enumerated above in Subparagraph 60(c), Settling Party shall proceed with all subsequent tasks, activities and deliverables without awaiting EPA approval on the submitted deliverable. EPA reserves the right to stop Settling Party from proceeding further, either temporarily or permanently, on any task, activity or deliverable at any point during the RI/FS.

61.    If EPA disapproves a resubmitted plan, report or other item, or portion thereof, EPA may again direct Settling Party to correct the deficiencies. EPA shall also retain the right to modify or develop the plan, report or other item. Settling Party shall implement any such plan, report, or item as corrected, modified or developed by EPA, subject only to its right to invoke the procedures set forth in Section XVII (Dispute Resolution).

62.    If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, Settling Party shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Settling Party invokes the dispute resolution procedures in accordance with Section XVII (Dispute Resolution) and EPA's action is revoked or substantially modified pursuant to a Dispute Resolution decision issued by EPA or superseded by an agreement reached pursuant to that Section. The provisions of

21

Section XVII (Dispute Resolution) and Section XVIII (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is not otherwise revoked, substantially modified or superseded as a result of a decision or agreement reached pursuant to the Dispute Resolution process set forth in Section XVII, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XVIII.

63.    In the event that EPA takes over some of the tasks, but not the preparation of the RI Report or the FS Report, Settling Party shall incorporate and integrate information supplied by EPA into the final reports.

64.    All plans, reports, and other items submitted to EPA under this Settlement Agreement shall, upon approval or modification by EPA, be incorporated into and enforceable under this Settlement Agreement. In the event EPA approves or modifies a portion of a plan, report, or other item submitted to EPA under this Settlement Agreement, the approved or modified portion shall be incorporated into and enforceable under this Settlement Agreement.

65.    Neither failure of EPA to expressly approve or disapprove of Settling Party's submissions within a specified time period, nor the absence of comments, shall be construed as approval by EPA. Whether or not EPA gives express approval for Settling Party's deliverables, Settling Party is responsible for preparing deliverables acceptable to EPA.

XIII.  QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION

66.    Quality Assurance. Settling Party shall assure that Work performed, samples taken and analyses conducted conform to the requirements of the SOW, the QAPP and guidances identified therein. Settling Party will assure that field personnel used by Settling Party are properly trained in the use of field equipment and in chain of custody procedures. Settling Party shall only use laboratories which have a documented quality system that complies with "EPA Requirements for Quality Management Plans for Environmental Data Operations (QA/R-5)" (EPA/240/B-01/003, March 2001) or equivalent documentation as determined by EPA.

67.    Sampling.

       a.    All results of sampling, tests, modeling or other data (including raw data) generated by Settling Party, or on Settling Party's behalf, during the period that this Settlement Agreement is effective, shall be submitted to EPA pursuant to Section IV. (Task III - Site Characterization) of the SOW. EPA will make available to Settling Party validated data generated by EPA unless it is exempt from disclosure by any federal or state law or regulation.

22

b.  Settling Party shall verbally notify EPA at least fourteen (14) days prior to conducting significant field events as described in the SOW, RI/FS Work Plan or sampling and analysis plan. At EPA's verbal or written request, or the request of EPA's oversight assistant, Settling Party shall allow split or duplicate samples to be taken by EPA (and its authorized representatives) of any samples collected in implementing this Settlement Agreement. All split samples taken by Settling Party shall be analyzed by the methods identified in the QAPP.

68.  <u>Access to Information</u>.

a.  Settling Party shall provide to EPA, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Settling Party shall also make available to EPA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work. Such persons shall be made available at reasonable times and upon reasonable request of EPA.

b.  Settling Party may assert business confidentiality claims covering part or all of the documents or information submitted to EPA under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to EPA, or if EPA has notified Settling Party that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Settling Party. Settling Party shall segregate and clearly identify all documents or information submitted under this Settlement Agreement for which Settling Party asserts business confidentiality claims.

c.  Settling Party may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Settling Party asserts such a privilege in lieu of providing documents, it shall provide EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Settling Party. However, no documents, reports or other information created or generated

23

pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

    d.    No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

69.    In entering into this Settlement Agreement, Settling Party waives any objections to any data gathered, generated, or evaluated by EPA, the State or Settling Party in the performance or oversight of the Work that has been verified according to the quality assurance/quality control ("QA/QC") procedures required by the Settlement Agreement or any EPA-approved RI/FS Work Plans or Sampling and Analysis Plan. If Settling Party objects to any other data relating to the RI/FS, Settling Party shall submit to EPA a report that specifically identifies and explains its objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to EPA within thirty (30) days of the monthly progress report containing the data.

## XIV. SITE ACCESS AND INSTITUTIONAL CONTROLS

70.    If the Site, or any other property where access is needed to implement this Settlement Agreement, is owned or controlled by Settling Party, Settling Party shall, commencing on the Effective Date, provide EPA, and its representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Settlement Agreement.

71.    Where any action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Settling Party, Settling Party shall use its best efforts to obtain all necessary access agreements within ninety (90) days after the Effective Date, or as otherwise specified in writing by the EPA Project Coordinator. If additional areas to which access is necessary are identified after the Effective Date, Settling Party shall use its best efforts to obtain access agreements within sixty (60) days after learning of the need for the additional access. Settling Party shall immediately notify EPA if after using its best efforts it is unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access, unless the owner of the property in question is a potentially responsible party under Section 107(a) of CERCLA. Settling Party shall describe in writing its efforts to obtain access. If Settling Party cannot obtain access agreements within the time allowed, EPA and Settling Party will discuss a strategy for gaining access in the most expeditious and cost-effective manner, after which EPA may either (i) obtain access for Settling Party or assist Settling Party in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate; (ii) perform those tasks or activities with EPA contractors; or

(iii) terminate the Settlement Agreement.  Settling Party shall reimburse EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XX (Payment of Response Costs).  If EPA performs those tasks or activities with EPA contractors and does not terminate the Settlement Agreement, Settling Party shall perform all other activities not requiring access to that property, and shall reimburse EPA for all costs incurred in performing such activities.  Settling Party shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.  Termination by EPA of the Settlement Agreement under this Paragraph because Settling Party has been unable, despite its best efforts, to obtain necessary access agreements shall not give rise to a stipulated penalty under Paragraph 84.

72.     Notwithstanding any provision of this Settlement Agreement, EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XV.  COMPLIANCE WITH OTHER LAWS

73.     Settling Party shall comply with all applicable local, state and federal laws and regulations when performing the RI/FS.  No local, state, or federal permit shall be required for any portion of any action conducted entirely on-site (which means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the Work) including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621.  Where any portion of the Work is to be conducted off-site and requires a federal or state permit or approval, Settling Party shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals.  If Settling Party is experiencing difficulties obtaining permits and approvals required to conduct the Work, Settling Party shall so advise EPA, and Settling Party and EPA will discuss a strategy for obtaining the permits in the most expeditious and cost-effective manner.  This Settlement Agreement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XVI.  RETENTION OF RECORDS

74.     During the pendency of this Settlement Agreement and for a minimum of ten (10) years after commencement of construction of any remedial action, Settling Party shall preserve and retain all non-identical copies of  records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary.  Until ten (10) years after commencement of construction of any remedial action, Settling Party shall also instruct its contractors and

agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

75.   At the conclusion of this document retention period, Settling Party shall notify EPA at least ninety (90) days prior to the destruction of any such records or documents, and, upon request by EPA, Settling Party shall deliver any such records or documents to EPA. Settling Party may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Settling Party asserts such a privilege, it shall provide EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Settling Party.  However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

76.   Settling Party hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XVII.  DISPUTE RESOLUTION

77.   Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement.  The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

78.   If Settling Party objects to any EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, it shall notify EPA in writing of its objection(s) within twenty-one (21) days of such action, unless the objection(s) has/have been resolved informally.  EPA and Settling Party shall have thirty (30) days from EPA's receipt of Settling Party's written objection(s) to resolve the dispute (the "Negotiation Period").  The Negotiation Period may be extended at the sole discretion of EPA.  Such extension may be granted verbally but must be confirmed in writing.

79.   Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement Agreement.  If the Parties are unable to reach an agreement within the

Negotiation Period, an EPA management official at the Chief of the New Jersey Remediation Superfund Branch of the Emergency and Remedial Response Division, EPA Region II (hereinafter, the "Chief") level or higher will issue a written decision. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Settling Party's obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Settling Party shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs, and regardless of whether Settling Party agrees with the decision.

## XVIII.  STIPULATED PENALTIES

80.  Settling Party shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 81 to 83 for failure to comply with any of the requirements of this Settlement Agreement specified below unless excused under Section XIX (Force Majeure). "Compliance" by Settling Party shall include completion of the Work under this Settlement Agreement included but not limited to activities contemplated under any RI/FS Work Plan or other plan approved under this Settlement Agreement identified below, in accordance with all applicable requirements of law, this Settlement Agreement, the SOW, and any plans or other documents approved by EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

81.  For the following major deliverables, stipulated penalties shall accrue in the amount of:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 1,500.00 | 1st through 14th day |
| $ 2,500.00 | 15th through 30th day |
| $ 5,000.00 | 31st day and beyond |

a.  Submission of name of the Project Coordinator to EPA pursuant to Section X of this Settlement Agreement;

b.  Submission of RI/FS Work Plan;

c.  Submission of BERA Scope of Work (if required by EPA);

d.  Submission of Draft RI Report;

e.  Submission of RI Report;

f.  Submission of Draft FS Report;

g.  Submission of FS Report.

82.   For the following interim deliverables, stipulated penalties shall accrue in the amount of:

Penalty Per Violation Per Day          Period of Noncompliance

$ 1,000.00                             1st through 14th day
$ 1,500.00                             15th through 30th day
$ 2,500.00                             31st day and beyond

a.    Submission of Preliminary Conceptual Site Model;

b.    Submission of Site Characterization Summary Report;

c.    Submission of Fate and Transport Model Memorandum;

d.    Submission of Identification of Candidate Technologies Memorandum;

e.    Submission of Treatability Testing Work Plan (if required by EPA);

f.    Submission of Treatability Testing Evaluation Report (if required by EPA);

g.    Submission of Memorandum on Exposure Scenarios and Assumptions;

h.    Submission of Pathway Analysis Report;

i.    Submission of Baseline Human Health Risk Assessment;

j.    Submission of Screening Level Ecological Risk Assessment;

k.    Submission of Baseline Ecological Risk Assessment (if required by EPA); and

l.    Submission of Development and Screening of Remedial Alternatives
      Technologies Memorandum.

83.   For failure to make timely payments pursuant to Section XX, or failure to submit timely
      or adequate monthly progress reports, or any other violations of this Settlement
      Agreement not specified above, stipulated penalties shall accrue in the amount of:

Penalty Per Violation Per Day          Period of Noncompliance

$ 500.00                               1st through 14th day
$ 1,000.00                             15th through 30th day
$ 2,500.00                             31st day and beyond

28

84.    In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 101 of Section XXII (Reservation of Rights by EPA), Settling Party shall be liable for a stipulated penalty in the amount of $500,000.

85.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue: (1) with respect to a deficient submission under Section XII (EPA Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Party of any deficiency; and (2) with respect to a decision by the EPA Management Official designated in Paragraph 79 of Section XVII (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA Management Official issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

86.    Following EPA's determination that Settling Party has failed to comply with a requirement of this Settlement Agreement, EPA may give Settling Party written notification of the same and describe the noncompliance.  EPA may send Settling Party a written demand for the payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Settling Party of a violation.

87.    All penalties accruing under this Section shall be due and payable to EPA within 30 days of Settling Party's receipt from EPA of a demand for payment of the penalties, unless Settling Party invokes the dispute resolution procedures in accordance with Section XVII (Dispute Resolution).  All payments to EPA under this Section shall be paid in accordance with the procedures set forth in Paragraph 95(a), and shall indicate that the payment is for stipulated penalties.  At the time of payment, Settling Party shall send notice that payment has been made to the EPA Project Coordinator, Site Attorney and Cincinnati Finance Center in accordance with Paragraph 95(b).

88.    The payment of penalties shall not alter in any way Settling Party's obligation to complete performance of the Work required under this Settlement Agreement.

89.    Penalties shall continue to accrue as provided in Paragraph 85 during any dispute resolution period, but need not be paid until fifteen (15) days after the dispute is resolved by agreement or by receipt of EPA's decision.

90.    If Settling Party fails to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest.  Settling Party shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 87.

29

91.    Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Settling Party's violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).  Provided, however, that EPA shall not seek civil penalties pursuant to Section 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of willful violation of this Settlement Agreement or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XXII (Reservation of Rights by EPA), Paragraph 101.  Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.  In considering whether to exercise its discretion to waive stipulated penalties, EPA may take into account, *inter alia*, whether, having submitted an interim deliverable in an untimely manner, Settling Party nevertheless has produced the associated final deliverable in less time than allowed by the schedule in this Agreement and the SOW, and has thereby been able to submit the final deliverable timely.

## XIX.  FORCE MAJEURE

92.    Settling Party agrees to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, *force majeure* is defined as any event arising from causes beyond the control of Settling Party or of any entity controlled by Settling Party, including but not limited to its contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Settling Party's best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

93.    If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Settling Party shall notify EPA orally within forty-eight (48) hours of when Settling Party first knew that the event might cause a delay.  Within seven (7) days thereafter, Settling Party shall provide to EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Party's rationale for attributing such delay to a *force majeure* event if it intend to assert such a claim; and a statement as to whether, in the opinion of Settling Party, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Settling Party from asserting any

claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

94.    If EPA agrees that the delay or anticipated delay is attributable to *a force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Settling Party in writing of its decision. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Settling Party in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XX.  PAYMENT OF RESPONSE COSTS

95.    Payment of Future Response Costs.

a.    Settling Party shall pay EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis, EPA will send Settling Party a bill requiring payment that includes a printout of cost data in EPA's financial management system, known as a SCORPIOS report, and a calculation of EPA's indirect costs. Settling Party shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 96 of this Settlement Agreement. Settling Party shall make all payments required by this Paragraph by remitting the amount of the payments to EPA by Electronic Funds Transfer ("EFT") to the Federal Reserve Bank of New York, accompanied by a statement providing the following information:

(i)     Amount of payment
(ii)    Title of Federal Reserve Bank Account to receive the payment: **EPA**
(iii)   Account Code for Federal Reserve Bank Account receiving the payment: **68010727**
(iv)    Federal Reserve Bank ABA Routing Number: **021030004**
(v)     Name and address of Settling Party
(vi)    Docket Number **CERCLA-02-2007-2023**
(viii)  Site/Spill Identifier: **02-UF**
(ix)    Field Tag 4200 of the Fedwire message: D 68010727 Environmental Protection Agency
(x)     SWIFT address: FRNYUS33
        33 Liberty Street
        New York, NY  10045

31

b.    To ensure that a payment is properly recorded, a letter should be sent, within seven working days of the EFT, that references the date of the EFT, the payment amount, that the payment is for Future Response Costs, the name of the Site, the Docket number, and the name and address of the party making payment to the United States, to the EPA Project Coordinator, Site Attorney and Financial Management Center, as follows:

> New Jersey Remediation Branch
> Emergency and Remedial Response Division
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway, 19th Floor
> New York, New York 10007-1866
> Attn: Crown Vantage Landfill Site Remedial Project Manager

> New Jersey Remediation Branch
> Emergency and Remedial Response Division
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway, 17th Floor
> New York, New York 10007-1866
> Attn: Crown Vantage Landfill Site Attorney

> U.S. Environmental Protection Agency
> Cincinnati Finance Center, MS: NWD
> 26 W. Martin Luther King Drive
> Cincinnati, Ohio 45268
> Attn: Finance (Joseph Doogan)
> AcctsReceivable.CINWD@epa.gov

c.    The total amount to be paid by Settling Party pursuant to Subparagraph 95(a) shall be deposited in the Crown Vantage Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

96.    If Settling Party does not pay Future Response Costs within 30 days of Settling Party's receipt of a bill, Settling Party shall pay Interest on the unpaid balance of Future Response Costs. The Interest on unpaid Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. If EPA receives a partial payment, Interest shall accrue on any unpaid balance. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Settling Party's failure to make timely payments under this Section, including but not limited to, payments of stipulated penalties pursuant to Section XVIII. Settling Party shall make all payments required by this Paragraph in the manner described in Paragraph 95.

97.    Settling Party may contest payment of any Future Response Costs under Paragraph 95 if it determines that EPA has made a mathematical error or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with the NCP.  Such objection shall be made in writing within thirty (30) days of receipt of the bill and must be sent to the EPA Project Coordinator.  Any such objection shall specifically identify the contested Future Response Costs and the basis for objection.  In the event of an objection, Settling Party shall within the thirty (30) day period pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 95.  Simultaneously, Settling Party shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of New Jersey and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs.  Settling Party shall send to the EPA Project Coordinator a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account.  Simultaneously with establishment of the escrow account, Settling Party shall initiate the Dispute Resolution procedures in Section XVII (Dispute Resolution).  If EPA prevails in the dispute, within seven (7) Working Days of the resolution of the dispute, Settling Party shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 95.  If Settling Party prevails concerning any aspect of the contested costs, Settling Party shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to EPA in the manner described in Paragraph 95.  Settling Party shall be disbursed any balance of the escrow account.  The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XVII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Party's obligation to reimburse EPA for its Future Response Costs.

## XXI. COVENANT NOT TO SUE BY EPA

98.    In consideration of the actions that will be performed and the payments that will be made by Settling Party under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Settling Party pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work and Future Response Costs. This covenant not to sue shall take effect on the Effective Date of this Settlement Agreement.  This covenant not to sue is conditioned upon the complete and satisfactory performance by Settling Party of all obligations under this Settlement Agreement, including, but not limited to, payment of all Future Response Costs pursuant to Section XX.  This covenant not to sue extends only to Settling Party and does not extend to any other person.

33

## XXII. RESERVATIONS OF RIGHTS BY EPA

99. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Settling Party in the future to perform additional activities pursuant to CERCLA or any other applicable law.

100. The covenant not to sue set forth in Section XXI above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Settling Party with respect to all other matters, including, but not limited to:

    a.    claims based on a failure by Settling Party to meet a requirement of this Settlement Agreement;

    b.    liability for costs not included within the definition of Future Response Costs;

    c.    liability for performance of response action other than the Work;

    d.    criminal liability;

    e.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

    f.    liability arising from the past, present, or future disposal, release or threat of release of Waste Material outside of the Site; and

    g.    liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

101. Work Takeover. In the event EPA determines that Settling Party has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or is implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portion of the Work as EPA determines necessary. Settling Party may invoke the procedures set forth in Section XVII (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. Costs incurred by EPA in performing the Work pursuant to this Paragraph shall be considered Future Response Costs that Settling Party shall pay pursuant to Section XX (Payment of

34

Response Costs). Notwithstanding any other provision of this Settlement Agreement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXIII.  COVENANT NOT TO SUE BY SETTLING PARTY

102.   Settling Party covenants not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, or this Settlement Agreement, including, but not limited to:

   a.   any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

   b.   any claim arising out of the Work or arising out of the response actions for which Future Response Costs will be incurred, including any claim under the United States Constitution, the New Jersey Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

   c.   any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

103.   These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 100 (b), (c), and (e) - (g), but only to the extent that Settling Party's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

104.   The Settling Party reserves, and this Settlement Agreement is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, any such claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on EPA's selection of response actions, or the oversight or approval of the Settling Party's plans or activities. The foregoing applies only to claims which are brought

35

pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

105.  Nothing in this Settlement Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXIV.  OTHER CLAIMS

106.  By issuance of this Settlement Agreement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Settling Party.

107.  Except as expressly provided in Section XXI (Covenant Not to Sue by EPA), nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Settling Party or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

108.  No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

109.  Except as expressly provided in this Settlement Agreement, Settling Party reserves any rights and defenses that it may have, including any right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in Sections VI and VII of this Settlement Agreement.

## XXV.  CONTRIBUTION

110.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that Settling Party is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work and Future Response Costs.

111.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), pursuant to which Settling Party has, as of the Effective Date, resolved its liability to the United States for the Work and Future Response Costs.

36

112.    Except as provided in Section XXIII (Covenant Not to Sue by Settling Party) of this Settlement Agreement, nothing in this Settlement Agreement precludes the United States or Settling Party from asserting any claims, causes of action, or demands for indemnification, contribution, or cost recovery against any persons not parties to this Settlement Agreement. Nothing herein diminishes the right of the United States, pursuant to Sections 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

## XXVI.  INDEMNIFICATION

113.    Settling Party shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Settling Party agrees to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, subcontractors and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Settling Party in carrying out activities pursuant to this Settlement Agreement. Neither Settling Party nor any such contractor shall be considered an agent of the United States.

114.    The United States shall give Settling Party notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Settling Party prior to settling such claim.

115.    Settling Party waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any Settling Party and any person for performance of Work on or relating to the Site. In addition, Settling Party shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Party and any person for performance of Work on or relating to the Site.

## XXVII.  INSURANCE

116.    At least fifteen (15) days prior to commencing any On-Site Work under this Settlement Agreement, Settling Party shall secure, and shall maintain for the duration of this

37

Settlement Agreement, comprehensive general liability insurance and automobile insurance with limits of three (3) million dollars, combined single limit, naming the EPA as an additional insured.  Within the same period, Settling Party shall provide EPA with certificates of such insurance and a copy of each insurance policy.  Settling Party shall submit such certificates and copies of policies each year on the anniversary of the Effective Date.  In addition, for the duration of the Settlement Agreement, Settling Party shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Party in furtherance of this Settlement Agreement.  If Settling Party demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Settling Party need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXVIII.  FINANCIAL ASSURANCE

117.    Within sixty (60) days of the Effective Date, Settling Party shall establish and maintain financial security for the benefit of EPA in the amount of two (2) million dollars in one or more of the following forms, in order to secure the full and final completion of Work by Settling Party:

a.    a surety bond unconditionally guaranteeing payment and/or performance of the Work;

b.    one or more irrevocable letters of credit, payable to or at the direction of EPA, issued by financial institution(s) acceptable in all respects to EPA equaling the total estimated cost of the Work;

c.    a trust fund administered by a trustee acceptable in all respects to EPA;

d.    a policy of insurance issued by an insurance carrier acceptable in all respects to EPA, which ensures the payment and/or performance of the Work;

e.    a corporate guarantee to perform the Work provided by one or more parent corporations or subsidiaries of Settling Party, or by one or more related or unrelated corporations that have a substantial business relationship with Settling Party; including a demonstration that any such company satisfies the financial test requirements of 40 C.F.R. Part 264.143(f); and/or

f.    a corporate guarantee to perform the Work by Settling Party, including a demonstration that Settling Party satisfies the requirements of 40 C.F.R. Part 264.143(f).

118.    Any and all financial assurance instruments provided pursuant to this Section shall be in form and substance satisfactory to EPA, determined in EPA's sole discretion. In the event that EPA determines at any time that the financial assurances provided pursuant to this Section (including, without limitation, the instrument(s) evidencing such assurances) are inadequate, Settling Party shall, within thirty (30) days of receipt of notice of EPA's determination, obtain and present to EPA for approval one of the other forms of financial assurance listed in Paragraph 117, above. In addition, if at any time EPA notifies Settling Party that the anticipated cost of completing the Work has increased, then, within 30 days of such notification, Settling Party shall obtain and present to EPA for approval a revised form of financial assurance (otherwise acceptable under this Section) that reflects such cost increase. Settling Party's inability to demonstrate financial ability to complete the Work shall in no way excuse performance of any activities required under this Settlement Agreement.

119.    If Settling Party seeks to ensure completion of the Work through a guarantee pursuant to Subparagraph 117(e) or 117(f) of this Settlement Agreement, Settling Party shall (i) demonstrate to EPA's satisfaction that the guarantor satisfies the requirements of 40 C.F.R. Part 264.143(f); and (ii) resubmit sworn statements conveying the information required by 40 C.F.R. Part 264.143(f) annually, on, or within thirty (30) days before, the anniversary of the Effective Date, to EPA. For the purposes of this Settlement Agreement, wherever 40 C.F.R. Part 264.143(f) references "sum of current closure and post-closure costs estimates and the current plugging and abandonment costs estimates," the current cost estimate of $2 million for the Work at the Site shall be used in relevant financial test calculations.

120.    If, after the Effective Date, Settling Party can show that the estimated cost to complete the remaining Work has diminished below the amount set forth in Paragraph 117 of this Section, Settling Party may, on any anniversary date of the Effective Date, or at any other time agreed to by the Parties, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining Work to be performed. Settling Party shall submit a proposal for such reduction to EPA, in accordance with the requirements of this Section, and may reduce the amount of the security after receiving written approval from EPA. In the event of a dispute, Settling Party may seek dispute resolution pursuant to Section XVII (Dispute Resolution). Settling Party may reduce the amount of security in accordance with EPA's written decision resolving the dispute.

121.    Settling Party may change the form of financial assurance provided under this Section at any time, upon notice to and prior written approval by EPA, provided that EPA determines that the new form of assurance meets the requirements of this Section. In the event of a dispute, Settling Party may change the form of the financial assurance only in accordance with the written decision resolving the dispute.

## XXIX.  INTEGRATION/APPENDICES

122.    This Settlement Agreement, as defined in Paragraph 12(o), constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement.  The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the SOW.

"Appendix B" is the Map of the Site.

## XXX.  ADMINISTRATIVE RECORD

123.    EPA will determine the contents of the administrative record file for selection of the remedial action.  Settling Party shall submit to EPA documents developed during the course of the RI/FS upon which selection of the response action may be based. Upon request of EPA, Settling Party shall provide copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports and other reports.  Upon request of EPA, Settling Party shall additionally submit any previous studies conducted under state, local or other federal authorities relating to selection of the response action, and all communications between Settling Party and state, local or other federal authorities concerning selection of the response action.  At EPA's discretion, Settling Party shall establish a community information repository at or near the Site, to house one copy of the administrative record.

## XXXI.  EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

124.    This Settlement Agreement shall be effective on the date that it is signed by the EPA Region 2 Director, Emergency and Remedial Response Division, or his delegatee (the "Effective Date").

125.    This Settlement Agreement may be amended by mutual agreement of EPA and Settling Party.  Amendments shall be in writing and shall be effective when signed by EPA.  EPA Project Coordinators do not have the authority to sign amendments to the Settlement Agreement.

126.    No informal advice, guidance, suggestion, or comment by the EPA Project Coordinator or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Settling Party shall relieve Settling Party of its obligation to obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.