UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGIA-PACIFIC CONSUMER PRODUCTS,
LP,

              Plaintiff,

      -against-

INTERNATIONAL PAPER COMPANY,

            Defendant.

07 Civ. 9627 (SHS)

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Ingo W. Sprie, Jr.
David G. Kleiman
Arnold & Porter LLP
399 Park Avenue
New York, New York  10022-4690
Tel:  (212) 715-1000

*Counsel for Plaintiff Georgia-Pacific Consumer
Products, LP*

December 17, 2007

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................1

Statement Of Background Facts ..................................................................................3

    Federal's Ownership Of The New Jersey Operations And Its Sale Of The
        Operations To RPC ......................................................................................3

    Environmental Contamination At The New Jersey Operations...........................5

    The Parties' Dispute...........................................................................................6

    This Lawsuit........................................................................................................7

Argument ......................................................................................................................8

I.      INTERNATIONAL PAPER BEARS THE BURDEN OF PROVING AN
        UNMISTAKABLE INTENT TO ASSUME CERCLA LIABILITIES .............................8

II.     THE PARTIES DID NOT HAVE AN UNMISTAKABLE INTENT THAT RPC
        ASSUME FEDERAL'S FUTURE LIABILITIES ARISING UNDER CERCLA ...........10

    A.    The Agreements Are Not Broad Enough To Include CERCLA Liabilities
        Because The Parties Excluded Liabilities Arising After The Closing Date ..........11

        1.    The Agreements Limit RPC's Assumption Of Liabilities To Those
            Existing On The Closing Date ...............................................................11

        2.    CERCLA Liabilities Did Not Exist On The Closing Date ......................16

    B.    The Agreements Do Not Specifically Provide For The Assumption Of
        Environmental Liabilities........................................................................22

III.    INTERNATIONAL PAPER'S ADDITIONAL ARGUMENTS ARE WITHOUT
        MERIT ..................................................................................................23

    A.    This Action Is Not Premature ..............................................................23

    B.    International Paper's Argument Based On The "Equities" Cannot Stave
        Off Summary Judgment.........................................................................24

Conclusion .................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

*A-C Reorganization Trust v. E. I. DuPont de Nemours & Co.,*
No. 94-C-574, 1997 WL 381962 (E.D. Wis. Mar. 10, 1997) ............................................. 15, 21

*Aluminum Co. of Am. v. Beazer East, Inc.,*
124 F.3d 551 (3d Cir. 1997) ........................................................................................... 21

*Barker v. Goldberg,*
705 F. Supp. 102 (E.D.N.Y. 1989) ................................................................................... 8

*Beazer East, Inc. v. Mead Corp.,*
34 F.3d 206 (3d Cir. 1994) ............................................................................................ 10

*BP Amoco Chem. Co. v. Sun Oil Co.,*
166 F. Supp. 2d 984 (D. Del. 2001) ........................................................................... 10, 19

*Buffalo Color Corp. v. AlliedSignal, Inc.,*
139 F. Supp. 2d 409 (W.D.N.Y. 2001) ........................................................................ 9, 10

*Chrysler Corp. v. Ford Motor Co.,*
972 F. Supp. 1097 (E.D. Mich. 1997) ......................................................................... 17, 18

*Columbia Propane, L.P. v. Wisconsin Gas Co.,*
661 N.W.2d 776 (Wis. 2003) ...................................................................................... 18, 19

*Commander Oil Corp. v. Advance Food Serv. Equip.,*
991 F.2d 49 (2d Cir. 1993) ..................................................................................... 9, 10, 12

*Dietz v. Compass Prop. Mgmt. Corp.,*
794 N.Y.S.2d 766 (4th Dep't 2005) .................................................................................. 9

*Dolman v. U.S. Trust Co. of N.Y.,*
157 N.Y.S.2d 537 (N.Y. 1956) ....................................................................................... 19

*55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.,*
No. CV 91-0968 (CBA), 1994 WL 241104 (E.D.N.Y. Feb. 2, 1994) ................................. 10

*GNB Battery Techs., Inc. v. Gould, Inc.,*
65 F.3d 615 (7th Cir. 1995) ........................................................................................... 20

*Goldwasser v. Geller,*
718 N.Y.S.2d 349 (1st Dep't 2001) ................................................................................... 8

*Gopher Oil Co. v. Bunker,*
84 F.3d 1047 (8th Cir. 1996) ......................................................................................... 18

*Grant-Howard Assocs. v. Gen. Housewares Corp.,*
482 N.Y.S.2d 225 (N.Y. 1984) ....................................................................................... 14

*Haynes v. Kleinewefers & Lembo Corp.,*
921 F.2d 453 (2d Cir. 1990) ............................................................................................ 9

*Heimbach v. Metro. Transp. Auth.,*
553 N.Y.S.2d 653 (N.Y. 1990) ......................................................................................... 8

*Hooper Assocs., Ltd. v. AGS Computers, Inc.,*
    549 N.Y.S.2d 365 (N.Y. 1989) ................................................................8

*HSBC Bank USA v. Nat'l Equity Corp.,*
    719 N.Y.S.2d 20 (1st Dep't 2001) ........................................................13

*Huskission v. Sentry Ins.,*
    507 N.Y.S.2d 447 (2d Dep't 1986) ........................................................19

*John S. Boyd Co. v. Boston Gas Co.,*
    992 F.2d 401 (1st Cir. 1993) ..........................................................10, 18

*Malleolo v. Malleolo,*
    731 N.Y.S.2d 752 (2d Dep't 2001) ........................................................13

*North Shore Gas Co. v. Salomon Inc.,*
    152 F.3d 642 (7th Cir. 1998) ..........................................................18, 20

*Olin Corp. v. Consol. Aluminum Corp.,*
    5 F.3d 10 (2d Cir. 1993) ..........................................8, 9, 19-21, 24

*Phila. Elec. Co. v. Hercules, Inc.,*
    762 F.2d 303 (3d Cir. 1985) ..........................................................20, 21

*Preferred Accident Ins. Co. of N.Y. v. Grasso,*
    186 F.2d 987 (2d Cir. 1951) ................................................................8

*Purolator Prods. Corp. v. Allied-Signal, Inc.,*
    772 F. Supp. 124 (W.D.N.Y. 1991) ..................................................10, 21

*Redding v. Gulf Oil Corp.,*
    330 N.Y.S.2d 158 (2d Dep't 1972) ........................................................8, 9

*Scott v. NG U.S. 1 Inc.,*
    854 N.E.2d 981 (Mass. App. Ct. 2006) ....................................................18

*Taussig v. Clipper Group, L.P.,*
    787 N.Y.S.2d 10 (1st Dep't 2004) ..........................................................8

*This Is Me, Inc. v. Taylor,*
    157 F.3d 139 (2d Cir. 1998) ................................................................12

*United States v. Atl. Research Corp.,*
    127 S. Ct. 2331 (2007) ......................................................................23

*United States v. Vt. Am. Corp.,*
    871 F. Supp. 318 (W.D. Mich. 1994) ......................................................17

*Vigliarolo v. Sea Crest Constr. Corp.,*
    791 N.Y.S.2d 163 (2d Dep't 2005) ..........................................................9

*Williams v. J.P. Morgan & Co.,*
    248 F. Supp. 2d 320 (S.D.N.Y. 2003) ......................................................9

**Preliminary Statement**

Plaintiff Georgia-Pacific Consumer Products, LP ("Georgia-Pacific") respectfully submits this memorandum in support of its motion for summary judgment and in opposition to the motion to dismiss filed by defendant International Paper Company ("International Paper").

In 1972, Georgia-Pacific's alleged predecessor, Riegel Products Corporation ("RPC"), purchased certain assets from International Paper's predecessor, Federal Paper Board Company, Inc. ("Federal"). This declaratory judgment action presents the question whether, in connection with that purchase, RPC agreed to assume future liabilities that Federal might incur under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*, and other federal and state environmental statutes that had not yet been enacted at the time of the transaction (collectively, "CERCLA liabilities"). Georgia-Pacific and International Paper agree that this issue can be decided by the Court as a matter of law based on the Purchase Agreement and Assumption Agreement executed at the time of the transaction. However, contrary to International Paper's assertions, application of well-established principles of New York law to those agreements compels the conclusion that RPC did not assume Federal's future CERCLA liabilities and that Georgia-Pacific is therefore entitled to summary judgment.

In this case, even though it is nominally the defendant, International Paper bears the burden of proving that RPC assumed Federal's future CERCLA liabilities because International Paper would bear the burden of proof in any action to enforce the agreements. To meet its burden under controlling New York Court of Appeals authority, International Paper would have to demonstrate that there was an "unmistakable intention" of the parties that RPC assume Federal's future CERCLA liabilities. It is clear that International Paper cannot do so. Indeed, the agreements state in unequivocal language that RPC assumed only liabilities that existed at the time of the closing of the 1972 transaction. Specifically, the Purchase Agreement provides that

RPC would assume liabilities ". . . attributable to the New Jersey Operations *on the Closing Date* . . . ." and the Assumption Agreement, which expressly stated that it was implementing this assumption, provided that RPC was assuming liabilities ". . . as the same exist *on the date hereof* . . . " (emphasis added). The conclusion that RPC assumed only liabilities existing at the time of the closing flows not only from the plain language of the agreements, but is also the only interpretation that allows the agreements to be read consistently with each other and the only interpretation that gives effect to all of the provisions of the agreements. Because CERCLA did not become effective until December 11, 1980, any CERCLA liabilities of Federal did not exist at the time of the 1972 closing and therefore were not assumed by RPC. Numerous courts considering the effect of similar provisions in pre-CERCLA assumption or indemnity agreements have held that such language excludes CERCLA liabilities from the scope of the assumption or indemnity.

Georgia-Pacific believes that the operative agreements clearly and unequivocally exclude Federal's future CERCLA liabilities from the scope of liabilities assumed by RPC. But, even if the Court were to conclude that the agreements are ambiguous, Georgia-Pacific would nonetheless be entitled to summary judgment because International Paper would have failed to sustain its burden of demonstrating an "unmistakable intention" by the parties that RPC assume Federal's future CERCLA liabilities.

International Paper's motion to dismiss is without merit and should be denied for the same reasons that Georgia-Pacific's motion for summary judgment should be granted. International Paper's memorandum is long on strident language and adjectives directed to Georgia-Pacific's reading of the agreements, but it is short on analysis. It repeatedly asserts that RPC assumed "all liabilities" of Federal as if the key language limiting the assumption of liabilities to those existing on the closing date simply did not exist. International Paper does not

2

advance its own purported interpretation of that key language until a footnote toward the end of its memorandum, and then provides an interpretation that is contrary to the natural reading of the agreements, makes no sense, and fails to give effect to all terms of the agreements. Finally, International Paper misstates the law and selectively quotes cases in an effort to create the impression that courts construe pre-CERCLA indemnity agreements worded like the one at issue here to include CERCLA liabilities within the scope of the indemnity. The law is to the contrary.

The Court should grant summary judgment to Georgia-Pacific.

## Statement Of Background Facts

Georgia-Pacific provides the following statement of facts primarily to provide the Court with background to put the present dispute in context. Most of these facts, except those related to the contents of the operative agreements, are unnecessary to the resolution of the pending motions because those motions present an issue of contract construction that both parties agree the Court can decide as a matter of law. *See* IP Mem. at 10 (stating that the Court can interpret the contracts as a matter of law).[1]

### Federal's Ownership Of The New Jersey Operations And Its Sale Of The Operations To RPC

In December 1971, Federal purchased and merged with Riegel Paper Corporation ("Old Riegel"), an entity wholly separate and distinct from RPC (Riegel Products Corporation). Certificate Of Merger Of Federal Paper Board Company, Inc. And Riegel Paper Corporation Into Federal Paper Board Company, Inc. (Sprie Decl. ¶ 7, Ex. E).[2] By virtue of the merger, Federal succeeded by operation of law to all liabilities of Old Riegel. Old Riegel's assets included the

---

[1]    References to "IP Mem." are to Defendant International Paper's Memorandum Of Law In Support Of Its Motion To Dismiss, dated December 3, 2007.

[2]    References to "Sprie Decl." are to the Declaration of Ingo W. Sprie, Jr., dated December 17, 2007.

"New Jersey Operations." *See* Purchase Agreement ¶ 1, dated February 23, 1972 (Sprie Decl.

¶ 4, Ex. B).  The New Jersey Operations consisted of four paper mills in New Jersey, known as

the "Milford Mill," the "Warren Mill," the "Hughesville Mill," and the "Riegelsville Mill," and

related properties.  *Id.* at Schedule A ¶ A(1).  Assets related to the business conducted at these

mills included several parcels of land in addition to the properties on which the mills were

located.  *Id.* at Schedule A ¶ A(2).  One of these additional parcels of land is the location of a

landfill that Old Riegel began to use in 1938 to receive wastes from the four mills.

Administrative Settlement Agreement And Order On Consent For Remedial Investigation And

Feasibility Study ("AOC") (Sprie Decl. ¶ 10, Ex. H) ¶ 13.  This property is currently known as

the "Crown Vantage Landfill."

Subsequent to the merger between Federal and Old Riegel, Federal and RPC entered into

a Purchase Agreement, whereby Federal agreed to sell the assets comprising the New Jersey

Operations to RPC in exchange for $6,770,018.00 (subject to certain adjustments specified in the

agreement) and the assumption by RPC of certain liabilities of Federal.  Purchase Agreement ¶ 1.

Unlike Federal's purchase of Old Riegel, which was structured as a merger, RPC's purchase of

the New Jersey Operations was carefully structured as an asset purchase.  *Id.*  Because RPC

engaged in an asset purchase, it did not automatically succeed to any liabilities of Federal and,

instead, succeeded only to those liabilities that it voluntarily agreed to assume.

The Purchase Agreement provided that the consideration paid by RPC would include:

> . . . the assumption by RPC of the liabilities of Federal directly
> attributable to the New Jersey Operations **on the Closing Date**,
> including, but not by way of limitation, those listed in Schedule B
> attached hereto and made a part hereof but excluding those
> expressly excluded in this Agreement or listed in Schedule C
> attached hereto and made a part hereof.

*Id.* (emphasis added). The Purchase Agreement further stated that, at the closing, RPC would provide "a written instrument of assumption by RPC of the liabilities and obligations of Federal to be assumed pursuant to Section 1 hereof in the form attached hereto as Annex A." *Id.* ¶ 2. Attached as Annex A was a form Assumption Agreement. *Id.* Annex A.

On the closing date, April 3, 1972, RPC executed the Assumption Agreement in the form attached as Annex A to the Purchase Agreement. Assumption Agreement, dated April 3, 1972 (Sprie Decl. ¶ 5, Ex. C). The Assumption Agreement provided in relevant part that RPC would assume:

> . . . (a) all of Federal's debts and liabilities of every kind, character or description, whether known or unknown, whether disclosed or undisclosed, whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against in Schedules A or B to the Agreement and which are directly attributable to the New Jersey Operations, **as the same exist on the date hereof**, and does hereby agree to pay, perform and discharge, when due, all of the said debts and liabilities; . . . .

*Id.* at 1-2 (emphasis added).

In 1996, Federal merged into International Paper and International Paper thereby succeeded to all of the liabilities of Federal. *See* Excerpt from Int'l Paper Co., Registration Statement Under the Securities Act of 1933 (Form S-4) (Feb. 9, 1996) (Sprie Decl. ¶ 8, Ex. F). International Paper contends that, as a result of a series of transactions, Georgia-Pacific succeeded to the liabilities of RPC. *See* IP Mem. at 1. Georgia-Pacific does not currently own any of the properties comprising the New Jersey Operations. Complaint ¶ 20.

**Environmental Contamination**
**At The New Jersey Operations**

The EPA has determined that hazardous substances were disposed of at the Crown Vantage Landfill and that investigation and clean-up activities are required at the site. The EPA believes that Georgia-Pacific is a potentially responsible party under CERCLA for clean-up of

the Crown Vantage Landfill.  Georgia-Pacific maintains that it has no liability for clean-up of the

Crown Vantage Landfill because RPC did not dispose of any wastes at the site and did not

assume any CERCLA liabilities of Federal.  *See* AOC ¶¶ 12-36, 38, 41.

In an effort to be environmentally responsible and a good corporate citizen, Georgia-

Pacific entered into an Administrative Settlement Agreement and Order on Consent with the

EPA concerning the Crown Vantage Landfill on September 27, 2007.  Pursuant to that

agreement, Georgia-Pacific must conduct a Remedial Investigation and Feasibility Study to

investigate the nature and extent of the contamination at the site and to develop and evaluate

potential remediation alternatives, and it must pay all of the EPA's oversight costs.  *Id.* ¶¶ 51-57,

95.  The EPA has determined that environmental contamination likely to require clean-up also

exists at the Milford Mill site.

The EPA has determined that International Paper also is a potentially responsible party

under CERCLA for clean-up costs to be incurred for the Crown Vantage Landfill and Milford

Mill.  *See* General Notice Letter from Deborah Mellott, Acting Strategic Integration Manager,

Emergency and Remedial Response Division, EPA, to John V. Faraci, Chairman & CEO,

International Paper Company (Apr. 12, 2005) (Sprie Decl. ¶ 9, Ex. G) (addressing Crown

Vantage Landfill).  The EPA has attempted to negotiate a settlement with International Paper

with respect to the Crown Vantage Landfill and sought International Paper's participation in the

September 27, 2007 Administrative Order on Consent.  International Paper, to date, has refused

to settle or participate in negotiations with the EPA.  *See* IP Mem. at 15 (noting that International

Paper has not discharged any of Federal's CERCLA liabilities).

**The Parties' Dispute**

Georgia-Pacific and International Paper disagree concerning their respective liabilities for

CERCLA clean-up costs for the properties that comprise the New Jersey Operations, including

6

the Crown Vantage Landfill. Georgia-Pacific contends that it has no liability for the Crown

Vantage Landfill because it is not a potentially responsible party within the meaning of

CERCLA and because RPC did not assume Federal's CERCLA liabilities for the site. It also

contends that it is entitled to bring a cost recovery action against, or seek contribution from,

International Paper to the extent it pays or has paid more than its equitable share of CERCLA

response costs for any properties that comprise the New Jersey Operations.

International Paper contends that Georgia-Pacific has no entitlement to bring a cost

recovery action against, or seek contribution from, International Paper because RPC assumed the

CERCLA liabilities of Federal. International Paper also contends that, to the extent it might be

held liable for response costs by the EPA, Georgia-Pacific has a duty to indemnify it because

RPC assumed the CERCLA liabilities of Federal. *See* IP Mem. at 5 ("To the extent International

Paper must discharge these assumed liabilities, Georgia-Pacific should reimburse and indemnify

International Paper.").

**This Lawsuit**

Georgia-Pacific has brought this action to seek a declaration with respect to the parties'

rights under the Purchase Agreement and Assumption Agreement. Specifically, Georgia-Pacific

seeks a declaration that (1) RPC did not assume Federal's liability under CERCLA or any other

applicable environmental clean-up statute enacted after April 3, 1972 with respect to the New

Jersey Operations under the Purchase Agreement and Assumption Agreement, and

(2) International Paper is not entitled to indemnification from Georgia-Pacific for clean-up costs

for the New Jersey Operations to the extent any claim for indemnification is based on a

contention that RPC assumed the liabilities of Federal under CERCLA or any other federal or

state environmental clean-up statute enacted after April 3, 1972.

**Argument**

I.  **INTERNATIONAL PAPER BEARS THE BURDEN OF PROVING
    AN UNMISTAKABLE INTENT TO ASSUME CERCLA LIABILITIES**

International Paper bears the burden of proving that RPC assumed Federal's future

CERCLA liabilities because it is International Paper that would bear the burden of proof in any

action to enforce the Assignment Agreement.  *See Preferred Accident Ins. Co. of N.Y. v. Grasso*,

186 F.2d 987, 991 (2d Cir. 1951) (where insurance company brings declaratory judgment action

seeking declaration of non-liability on policy, burden is on the insured to prove coverage);

*Barker v. Goldberg*, 705 F. Supp. 102, 103-04 (E.D.N.Y. 1989) (same).

International Paper's burden is a high one.  New York law requires that an assignment or

indemnity agreement be read narrowly in order "to avoid reading into it a duty which the parties

did not intend to be assumed."  *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 549 N.Y.S.2d 365,

367 (N.Y. 1989) (citations omitted).[3]  The New York Court of Appeals has held that "contractual

language would have to . . . evince[ ] an *'unmistakable intention'* to indemnify before a court

would enforce such an obligation."  *Heimbach v. Metro. Transp. Auth.*, 553 N.Y.S.2d 653, 657

(N.Y. 1990) (citations omitted, emphasis added); *see also Goldwasser v. Geller*, 718 N.Y.S.2d

349, 350 (1st Dep't 2001) ("there must be an *'unmistakable intention'* to indemnify") (citation

omitted, emphasis added); *Taussig v. Clipper Group, L.P.*, 787 N.Y.S.2d 10, 11 (1st Dep't 2004)

("Indemnity agreements should be *strictly construed*, and a promise to indemnify should not be

found unless *clearly implied* in the language of the Agreement.") (citing *Hooper*, emphasis

added); *Redding v. Gulf Oil Corp.*, 330 N.Y.S.2d 158, 160 (2d Dep't 1972) ("An indemnity

---

[3]    Federal common law governs the determination of whether an assumption agreement covers CERCLA liability. *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993). Federal common law incorporates the law of the state in which the court adjudicating the controversy sits. *Id.* New York law gives effect to the choice of law clause in the Purchase Agreement, which provides that the agreement is to be governed by New York law. *See* Purchase Agreement ¶ 20(e).

clause must reflect the *unmistakable intent* of the parties as to the scope of its coverage.")
(citation omitted, emphasis added).[4]

  This means that, if an assignment or indemnity agreement is ambiguous with respect to
whether it applies to a given liability, judgment must be entered against the party seeking
indemnity. *See, e.g., Williams v. J.P. Morgan & Co.*, 248 F. Supp. 2d 320, 329 (S.D.N.Y. 2003)
(granting summary judgment against party seeking indemnity because the contract did not
"import an unmistakable intent to indemnify"); *Dietz v. Compass Prop. Mgmt. Corp.*, 794
N.Y.S.2d 766, 767 (4th Dep't 2005) (reversing order of indemnification for damages paid to
contractor's injured employee because there was no "unmistakable intention to indemnify" for
such liabilities); *Vigliarolo v. Sea Crest Constr. Corp.*, 791 N.Y.S.2d 163, 164 (2d Dep't 2005)
(affirming summary judgment dismissing indemnity claim because "it cannot be said that
indemnification for [the claims at issue] was 'the unmistakable intent of the parties'" (citation
omitted)).

  There can be no doubt that the rule requiring strict construction of assumption and
indemnity agreements applies in determining whether such agreements include CERCLA
liabilities. *See, e.g., Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 14-15 (2d Cir. 1993)
(applying principles of New York law to interpret the indemnification agreement); *Commander
Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) (stating that under New
York law, which governed whether CERCLA liability was covered by the indemnity agreement,
"a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable

---

[4] This rule of contract interpretation applies regardless of whether the agreement is labeled an
"indemnification" or an "assumption" agreement. *See, e.g., Haynes v. Kleinewefers & Lembo Corp.*, 921
F.2d 453, 455 (2d Cir. 1990) (applying rule to an assumption agreement that provided "for the assumption
by [the Buyer] of certain enumerated liabilities as well as other obligations  and liabilities arising in the
ordinary course of the . . . Business . . ."); *Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F. Supp. 2d 409,
421 (W.D.N.Y. 2001) (applying rule to an assumption agreement).

intent' to indemnify") (citation omitted); *Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F. Supp.

2d 409, 420 (W.D.N.Y. 2001) (stating that a court cannot "find a duty to indemnify [for

CERCLA liability] absent manifestation of clear and unmistakable intent to indemnify") (citation

omitted).[5]

As demonstrated below, application of these principles in this case compels the

conclusion that RPC did not assume Federal's future CERCLA liabilities pursuant to the

Purchase Agreement and Assumption Agreement.

## II.    THE PARTIES DID NOT HAVE AN UNMISTAKABLE INTENT THAT RPC ASSUME FEDERAL'S FUTURE LIABILITIES ARISING UNDER CERCLA

Numerous courts have considered what standard to apply in determining whether parties

to an assumption or indemnity agreement that was executed before the enactment of CERCLA

evidenced a clear or "unmistakable" intent to include future CERCLA liabilities within the scope

of the assumption or indemnity.  Those courts have held that such an intent can be found only

under one of two circumstances:  (1) where the agreement "is broad enough to encompass *any*

*and all* claims," or (2) where the indemnity "clearly refers" to the type of environmental liability

at issue.  *Purolator Prods. Corp. v. Allied-Signal, Inc.*, 772 F. Supp. 124, 132 (W.D.N.Y. 1991)

(emphasis added); *see also Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 216-17 (3d Cir. 1994);

*John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 406 (1st Cir. 1993); *Buffalo Color*, 139

F. Supp. 2d at 420; *BP Amoco Chem. Co. v. Sun Oil Co.*, 166 F. Supp. 2d 984, 996 (D. Del.

2001).  Neither circumstance exists here.

---

[5]    *See also 55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, No. CV 91-0968 (CBA), 1994 WL 241104, at *3
(E.D.N.Y. Feb. 2, 1994) (finding that "[the indemnitee] can prevail on this motion [for summary judgment] only if it
shows that the Agreement unequivocally, clearly and unmistakably insulates [it] from [CERCLA] liability")
(footnote omitted); *Purolator Prods. Corp. v. Allied-Signal, Inc.*, 772 F. Supp. 124, 130-31 (W.D.N.Y. 1991)
(indemnification for CERCLA liability should only be found where it is "the clear and unmistakable intent of the
parties") (citation omitted).

A.  **The Agreements Are Not Broad Enough To Include CERCLA Liabilities
    Because The Parties Excluded Liabilities Arising After The Closing Date**

International Paper cannot show that RPC undertook an assumption broad enough to include CERCLA liabilities because RPC assumed only liabilities existing on the closing date and Federal's future CERCLA liabilities did not exist at that time.

1.  **The Agreements Limit RPC's Assumption Of
    Liabilities To Those Existing On The Closing Date**

The Purchase Agreement and Assumption Agreement unmistakably evidence the parties' intent that RPC assume only obligations attributable to the New Jersey Operations that existed on the closing date.

The Purchase Agreement clearly and unequivocally provides for

> . . . assumption by RPC of the liabilities of Federal directly attributable to the New Jersey Operations **on the Closing Date**, including, but not by way of limitation, those listed in Schedule B attached hereto and made a part of hereof but excluding those expressly excluded in this Agreement or listed in Schedule C attached hereto and made a part hereof.

Purchase Agreement ¶ 1 (emphasis added). The only possible reading of this provision is that "on the Closing Date" modifies the phrase "the liabilities of Federal directly attributable to the New Jersey Operations." In other words, RPC was to assume only liabilities that existed on the closing date (except for certain liabilities excluded on Schedule C).

Consistent with the language of the Purchase Agreement, the Assumption Agreement provides that RPC would assume:

> . . . (a) all of Federal's debts and liabilities of every kind, character or description, whether known or unknown, whether disclosed or undisclosed, whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against in Schedules A or B to the Agreement and which are directly attributable to the New Jersey Operations, **as the same exist on the date hereof**, and does hereby agree to pay, perform and discharge, when due, all of the said debts and liabilities; . . . .

11

*Id.* at 1-2 (emphasis added). Again, natural and ordinary usage dictates that the phrase "as the same exist on the date hereof" be read to modify and limit the preceding conjunctive phrase ". . . Federal's debts and liabilities of every kind, character or description . . . and which are directly attributable to the New Jersey Operations, . . . ." In other words, RPC assumed only liabilities existing at the time of the closing.

Further, the parties expressly stated their intent that the Assumption Agreement merely implement the assumption of liabilities that RPC agreed to undertake in paragraph 1 of the Purchase Agreement. The Purchase Agreement described the Assumption Agreement as "a written instrument of assumption by RPC of the liabilities and obligations of Federal *to be assumed pursuant to Section 1 hereof.*" Purchase Agreement ¶ 2 (emphasis added). Similarly, the Assumption Agreement itself stated that the liabilities assumed by RPC in the agreement were being assumed *"pursuant to Section 1 of the Agreement."* Assumption Agreement at 1 (emphasis added). In other words, the parties expressly stated that the Assumption Agreement was to have exactly the same scope as paragraph 1 of the Purchase Agreement. The Purchase Agreement has only one reasonable interpretation -- that RPC assumed only liabilities existing on the closing date -- and the Assumption Agreement must be given that interpretation as well.

New York rules of contract construction likewise require the Purchase Agreement and Assumption Agreement to be read together. The Second Circuit has explained:

> Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously. . . . Even if the writings are executed at different times, however, Williston tells us that contracts should be interpreted together if "the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken."

*Commander Oil*, 991 F.2d at 53 (citations omitted); *see also This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir. 1998). Here, the parties clearly "assented to all the promises as a whole." The

12

Assumption Agreement was expressly referenced in the Purchase Agreement and attached, in unexecuted form, as Annex A. Further, the assumption of certain liabilities constituted consideration for the sale of the New Jersey Operations, and the Purchase Agreement required execution of the Assumption Agreement at the Closing. Purchase Agreement ¶¶ 1, 2.

When reading the two agreements together, the Court must read them in a manner to make them consistent and provide meaning to all of their provisions. *See Malleolo v. Malleolo*, 731 N.Y.S.2d 752, 753 (2d Dep't 2001) ("Where possible, a contract should be interpreted to avoid inconsistencies and to give meaning to all of its provisions . . . .") (citation omitted); *HSBC Bank USA v. Nat'l Equity Corp.*, 719 N.Y.S.2d 20, 22 (1st Dep't 2001) (same).

Here, even if the phrase "as the same exist on the date hereof" in the Assumption Agreement were ambiguous considered in isolation (which Georgia-Pacific does not believe), the Assumption Agreement must be read together with the Purchase Agreement. Since the Purchase Agreement is subject to only one interpretation -- that RPC assumed only liabilities existing on the closing date -- the Assumption Agreement must be read to have the same meaning.

International Paper's efforts to avoid this result make no sense and are contrary to established rules of New York contract construction. International Paper's primary argument is that Georgia-Pacific does not give full effect to the phrase "all liabilities" at the beginning of the paragraph in the Assumption Agreement identifying the liabilities to be assumed. IP Mem. at 7-12. But the observation that a sentence begins with the words "all liabilities" begs the question of the extent to which that phrase is limited by subsequent words in the same sentence. International Paper admits -- as it must -- that the term "all liabilities" is limited by the later phrase "New Jersey Operations," so that the assumption applies only to liabilities related to those operations. IP Mem. at 13 n.7. International Paper offers no support whatsoever for its assertion, which is contrary to the plain meaning of the agreements, that the term "all liabilities"

13

is not also limited in the Purchase Agreement by the phrase "on the Closing Date" and, in the Assumption Agreement, by the phrase "as the same exist on the date hereof."

It is common for courts interpreting assumption agreements to find seemingly broad introductory phrases like "all liabilities" to be significantly narrowed by subsequent temporal limitations. For example, in *Grant-Howard Associates v. General Housewares Corp.*, 482 N.Y.S.2d 225 (N.Y. 1984), the New York Court of Appeals held that a provision providing for the assumption of "*all* of the obligations and liabilities of [Holt Howard] which exist at the Closing Date" did not apply to a tort claim asserted after the closing date. *Id.* at 226 (emphasis added). Indeed, several courts have held that assumption agreements executed prior to the enactment of CERCLA and beginning with the phrase "all liabilities" excluded CERCLA liabilities because of temporal limitations placed on the phrase "all liabilities." *See* pp. 16-19 below. That is exactly the case here.

International Paper also suggests that RPC assumed liabilities under yet-to-be-enacted environmental statutes because such liabilities were not specifically listed in Schedule C of the Purchase Agreement, which excluded certain liabilities that otherwise would have been within the scope of the assumption set forth in paragraph 1 of the Purchase Agreement. IP Mem. at 9. This argument is without merit because such liabilities were already excluded from the assumption by the temporal limitation in paragraph 1. To illustrate, International Paper concedes that RPC did not assume liabilities that were unrelated to the New Jersey Operations, even though those liabilities were not listed as specifically excluded in Schedule C; there was no need to list those liabilities in Schedule C because they were already excluded by the text of paragraph 1. In the same way, there was no need to list liabilities under yet-to-be-enacted environmental statutes in Schedule C, because such liabilities were already excluded by the "on the Closing Date" limitation in paragraph 1.

14

International Paper effectively confesses that it is asking the Court to ignore the temporal limitation in the agreements when it asserts that "a purported limitation on when such claims arose is, as a matter of law, immaterial." IP Mem. at 14. The single case that International Paper cites for the remarkable proposition that the Court should ignore an important contractual provision -- *A-C Reorganization Trust v. E.I. DuPont de Nemours & Co.*, No. 94-C-574, 1997 WL 381962 (E.D. Wis. Mar. 10, 1997) -- is contrary to the overwhelming weight of authority and New York law, which requires that all terms of a contract be given effect. *See* p. 21 below (discussing decision).

Betraying the fallacy of its position, International Paper buries its own purported interpretation of the Assumption Agreement in footnote 7 toward the end of its memorandum. Focusing on the Assumption Agreement, International Paper asserts that the liabilities assumed by RPC were those "directly attributable to the New Jersey Operations as such operations existed on the Closing Date." IP Mem. At 13 n.7. The phrase "as such operations existed" is a concoction of International Paper -- the phrase exists nowhere in the agreements. International Paper fails to explain how it comes to its purported position and ignores the more natural reading of the Assumption Agreement, in which the phrase "as the same exist on the date hereof" modifies and places limits on the preceding conjunctive phrase ". . . Federal's debts and liabilities of every kind, character or description . . . and which are directly attributable to the New Jersey Operations, . . . ."

Further, International Paper's interpretation of the Assumption Agreement violates at least two New York rules of contract construction. As discussed above, the Purchase Agreement and Assumption Agreement must be read together in a consistent manner. Even if the Assumption Agreement considered in isolation were potentially subject to different interpretations (which Georgia-Pacific does not believe), the Purchase Agreement is subject to

15

just one interpretation and the Assumption Agreement therefore must be read the same way,

particularly since the agreements provide that the Assumption Agreement implements paragraph

1 of the Purchase Agreement. *See* p. 13 above. Second, International Paper's purported

interpretation makes no sense. The phrase "New Jersey Operations" is precisely defined in the

Purchase Agreement to constitute the specific mills and pieces of property identified in Schedule

A of the Purchase Agreement. Purchase Agreement ¶ 1 and Schedule A. Thus, under

International Paper's view, the phrase "as the same exist on the date hereof" would be

unnecessary and meaningless. The phrase "on the Closing Date" in the Purchase Agreement

likewise would be rendered superfluous. Interpretations that would render words in a contract

meaningless are to be avoided. *See* p. 13 above.

In short, International Paper's efforts to cast doubt on the plain meaning of the Purchase

Agreement and Assumption Agreement fail. Those agreements state in clear and unmistakable

terms that the parties intended RPC to assume only certain liabilities of Federal that existed "on

the Closing Date."[6]

### 2.    CERCLA Liabilities Did Not Exist On The Closing Date

Any liabilities that Federal might someday have under CERCLA did not exist on the

closing date because CERCLA did not become effective until December 11, 1980 -- more than

eight years after the closing date. *See* 42 U.S.C. § 9652(a). Accordingly, they were not assumed

---

[6]    Georgia-Pacific believes that it is entitled to summary judgment based on the agreements, without reference to extrinsic evidence. If, however, the Court were to find it necessary to consider such evidence, the Court should consider the letter of intent signed by the parties with respect to RPC's purchase of the New Jersey Operations. That letter provided:

> RPC will assume the outstanding obligations, commitments, contracts and liabilities of Federal **at the effective time of purchase** which are directly related to the New Jersey Operations, other than . . . .

Letter of Intent from William M. Riegel to John R. Kennedy, Jr., Federal Paper Board Company, Inc. (Sprie Decl. ¶ 6, Ex. D) (emphasis added). This letter constitutes further proof that the parties intended RPC to assume liabilities of Federal only to the extent that such liabilities existed at the time of the closing.

by RPC. Numerous courts interpreting pre-CERCLA contracts with temporal limitations similar

to the one at issue here have reached the same conclusion.

In *United States v. Vermont American Corp.*, 871 F. Supp. 318 (W.D. Mich. 1994), the

court interpreted an agreement executed eight months before CERCLA was enacted. The buyer

agreed to assume:

> "All additional debts, obligations, and liabilities of the Seller,
> *whether or not matured and whether or not contingent, existing on*
> *the Closing Date . . . ."*

*Id.* at 321 (emphasis in original). Like the Assumption Agreement in the present case, the

assumption clause in *Vermont American* began with the broad language "[a]ll additional debts,

obligations, and liabilities of the Seller, whether or not matured and whether or not contingent."

*Id.* However, like the agreement in the present case, the *Vermont American* agreement placed a

significant limitation on that language by stating that the liabilities had to exist on the closing

date. The district court found "as a matter of law" that "there is no question that the CERCLA

liability was not a liability that existed on the closing date." *Id.* It therefore held that "[t]here is

no question of fact that the CERCLA liability was not assumed under the Assumption

Agreement." *Id.*

Similarly, in *Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097 (E.D. Mich. 1997),

the buyer agreed in 1956 to assume

> ". . . all liabilities of [the seller] Kaiser . . . existing on the closing
> date of every nature whatsoever, whether absolute of [sic]
> contingent, . . ."

*Id.* at 1108. Again, like the assumption agreement in the present case, the *Chrysler* agreement

started with a broad reference to "all liabilities" and referred to liabilities "of every nature

whatsoever." *Id.* But the agreement qualified that reference by saying that the liabilities had to

exist "on the closing date." *Id.* The court rejected the indemnitee's argument that environmental

17

liabilities were contingent liabilities that existed on the closing date because a "liability is nonexistent until it is created by law" and the indemnity contained no reference to "future-arising liability." *Id.* at 1109.

In *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642 (7th Cir. 1998), the Seventh Circuit held that a buyer of assets in 1941 did not assume CERCLA liabilities when it assumed the seller's "'*liabilities and obligations of every kind and character . . . accrued to or existing on the date of transfer.*'" *Id.* at 652 (emphasis in original). It held that the parties' "use of the word 'existing' 'fairly obviously forecloses the possibility that [the purchaser] agreed to assume any contingent liabilities, much less the environmental liabilities at issue here.'" *Id.* (quoting *John S. Boyd Co.*, 992 F.2d at 407).

Likewise, the First Circuit held that a gas company did not assume CERCLA liabilities when it agreed in a closing agreement prior to the effective date of CERCLA to assume liabilities "as then existing" and agreed in an assumption agreement to assume liabilities "'outstanding at the date hereof.'" *John S. Boyd Co.*, 992 F.2d at 407. The court held that "[s]uch language fairly obviously forecloses the possibility that [the buyer] Boston Gas agreed to assume any contingent liabilities, much less the environmental liabilities at issue here." *Id.*

Several other courts have reached similar conclusions. *See Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1052 (8th Cir. 1996) (affirming decision giving collateral estoppel effect to a state appellate court ruling that a 1973 indemnity for liabilities "existing at closing" excluded liability under later-enacted state environmental statutes, and explaining "the phrase, 'existing at closing' also precludes liability under the environmental laws of CERCLA, enacted seven years after the agreement"); *Scott v. NG U.S. 1, Inc.*, 854 N.E.2d 981, 984, 992 (Mass. App. Ct. 2006) (interpreting the same agreement that was at issue in *John S. Boyd* and concluding that the reference to liabilities "'as then existing'" excluded CERCLA liabilities); *see also Columbia*

18

*Propane, L.P. v. Wisconsin Gas Co.*, 661 N.W.2d 776, 784-85 (Wis. 2003) (finding that a buyer's assumption of liabilities "'then outstanding'" did not encompass future liabilities); *BP Amoco Chem. Co.*, 166 F. Supp. 2d at 995-96 (finding that a warranty that included "'liabilities of any nature, whether absolute, accrued, contingent, or otherwise, . . .'" did not encompass CERCLA liability because it did not include "language that purports to cover future events and liabilities").[7]

International Paper attempts to create the illusion that the case law is otherwise by misstating and selectively quoting certain decisions that are, in fact, fully consistent with the cases discussed above. For example, International Paper relies heavily on *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10 (2d Cir. 1993), and suggests that the decision proves that "the timing of CERCLA's enactment" is irrelevant. IP Mem. at 11. In fact, the case demonstrates just the opposite. International Paper omits from its discussion of *Olin* the key language from the 1973 operative agreements on which the Second Circuit relied. Specifically, the parties executed a purchase agreement that provided for the assumption of all liabilities "'as they exist on the Closing Date *or arise thereafter*.'" *Id.* at 15 (emphasis in original). The assumption agreement similarly provided for the assumption of liabilities "'as they exist on the Effective Time *or arise thereafter . . . .*'" *Id.* (emphasis in original). And a release provided for the release of all claims that seller "'*now has or hereafter could have against Olin.*'" *Id.* (emphasis in original). Thus, unlike this case, the parties in *Olin* expressly agreed that the buyer

---

[7]    These decisions are consistent with the general rule of New York law that parties are presumed to enter into a contract with existing law in mind, and courts must interpret the contract in accordance with the law in existence at the time of the contract's execution. *See Dolman v. U.S. Trust Co. of N.Y.*, 157 N.Y.S.2d 537, 541-42 (N.Y. 1956). To construe a contract in accordance with statutes that were not in existence at the contract date, New York courts demand a clear and unambiguous expression of the parties' intent to be bound by such future enactments. *See, e.g., Huskission v. Sentry Ins.*, 507 N.Y.S.2d 447, 449 (2d Dep't 1986) ("A court may not construe an agreement so that it is modified by a subsequent statutory enactment which changes the rights and obligations of the parties absent a clear expression in the contract that such is the parties' intention." (citations omitted)).

would assume liabilities that may arise in the future. The fact that the Second Circuit italicized the above language clearly indicates that the court thought the language was important to its decision and that it was relying on that language in reaching its result. International Paper may wish that Federal had obtained an indemnity like the one at issue in *Olin*, but Federal failed to do so, and International Paper cannot now, thirty-five years later, rewrite the indemnity for which the parties bargained.

International Paper's suggestion that *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615 (7th Cir. 1995), supports its position is likewise wrong. *See* IP Mem. at 9, 13. To be sure, the court in that case held that CERCLA liabilities were included within the scope of an indemnity that covered "all obligations and liabilities . . . incurred by [the seller] Gould or the Divisions prior to the Effective Date, . . . ." *GNB Battery*, 65 F.3d at 622 n.7; IP Mem. at 13. But International Paper again neglects the key fact: the indemnity agreement in *GNB Battery* was signed in 1983 -- *after* CERCLA was enacted. *See GNB Battery*, 65 F.3d at 618. Thus, it was clear that the CERCLA liabilities in *GNB Battery* existed as of "the Effective Date," and that, under those circumstances, there was no basis for concluding that CERCLA liabilities were excluded from the indemnity. This holding is fully consistent with the law, as set forth in *North Shore* and the other decisions discussed above, that a *pre*-CERCLA indemnity agreement that limits liabilities to those existing on the date of the agreement *excludes* CERCLA liabilities.

International Paper's reliance on *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985), is equally unavailing. Contrary to International Paper's assertion that the court in that case decided that a 1974 indemnity "transferr[ed] CERCLA liability" (IP Mem. at 9), the court, in fact, held only that the terms of the indemnity applied to liability under public and private nuisance theories. *Id.* at 306, 308, 319. The law of public and private nuisance was clearly in existence on the closing date of the 1974 transaction. The case thus has no bearing on

whether the "on the Closing Date" provision in the agreement at issue in this case excluded liabilities under statutes that did not exist at the time.

Most of the CERCLA cases cited by International Paper involve assumption or indemnity agreements that impose no temporal limitations on the liabilities assumed. Those cases stand for the straightforward proposition that an assumption agreement entered prior to the enactment of CERCLA will be construed to cover CERCLA liabilities if it contains extremely broad language that subsumes "all liabilities" and if it contains no temporal limitations. *See, e.g., Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 565-66 (3d Cir. 1997); *Purolator Prods.*, 772 F. Supp. at 130-32. Those cases do not address the proper interpretation of agreements with language similar to that at issue in this case.

International Paper also cites *A-C Reorganization Trust v. E.I. DuPont de Nemours & Co.*, No. 94-C-574, 1997 WL 381962 (E.D. Wis. Mar. 10, 1997), which did conclude that a purchaser of assets prior to enactment of CERCLA assumed CERCLA liabilities even though the agreement provided that the liabilities were to be those as "shall exist at the Closing Date." *Id.* at *6; IP Mem. at 14. This decision is contrary to the weight of authority discussed above and contrary to New York law. The court purported to rely on *Olin*, finding that "[t]here is no significant difference between the indemnification agreement in this case and that in Olin." *A-C Reorganization Trust*, 1997 WL 381962, at *6. But this ignores the fact that the Second Circuit itself obviously viewed the phrase "arise thereafter" in the *Olin* agreements as quite important, as the court emphasized that language in its opinion. *See* pp. 19-20 above. Furthermore, the Wisconsin court's interpretation of the assumption agreement in *A-C Reorganization Trust* deprived the phrase "as all the same shall exist at the Closing Date" of any meaning whatsoever, in clear contravention of the New York rule requiring all contractual terms to be given meaning.

21

Particularly in light of the New York rule that an indemnity will not be found unless there

was an "unmistakable intent" to indemnify, this Court should follow the weight of authority

described above and hold that the RPC did not assume Federal's future CERCLA liabilities.

**B.     The Agreements Do Not Specifically Provide For
        The Assumption Of Environmental Liabilities**

As noted above, a pre-CERCLA Assumption Agreement can reach CERCLA liabilities

when it "clearly refers" to environmental liabilities of the type at issue.  Here, neither the

Purchase Agreement nor the Assumption Agreement "clearly refers" to the assumption by RPC

of any liabilities for environmental contamination -- let alone liabilities under any environmental

remediation statute.

International Paper seeks to imply differently by citing to Exhibit 2 to Schedule B of the

Purchase Agreement, entitled "Contracts and Agreements."  IP Mem. at 9-10.  The Purchase

Agreement provided that RPC was to assume Federal's contractual obligations arising from

those agreements.  Purchase Agreement ¶ 1.  International Paper identifies, from among those

contracts, a lease agreement with Atlantic Richfield Co. concerning "underground tank and

pump" (item 37), a contract with Air Products and Chemical, Inc., for the "purchase of various

gases" (item 46), a contract with the Borough of Alpha, Warren County, New Jersey concerning

"garbage dumping" (item 36), an agreement with New Jersey Power & Light Co. and National

Energy Leasing Co. for "installation of a power complex" at Milford, New Jersey (item 4) and a

contract with National Energy Leasing Co. for "steam service at Milford, N.J." (item 5).

International Paper then claims that these contracts "involv[e] undeniable environmental

exposure for the New Jersey Operations."  IP Mem. at 10.

Plainly, however, the fact that RPC agreed to assume Federal's *contractual* obligations

under certain *agreements* does not constitute an assumption of Federal's liabilities to clean up

environmental contamination on its properties. Moreover, even if the Purchase Agreement or

Assumption Agreement had, contrary to fact, specifically mentioned any type of environmental

liability, future CERCLA liabilities would be excluded because they did not exist "on the

Closing Date." *See* pp. 16-22 above.

## III.    INTERNATIONAL PAPER'S ADDITIONAL ARGUMENTS ARE WITHOUT MERIT

International Paper asserts two additional arguments in support of its motion to dismiss.

First, it asserts that Georgia-Pacific's action is premature. IP Mem. at 15-16. Second, it asserts

that the equities favor judgment in favor of International Paper. *Id.* at 2-3. Both arguments are

make-weights and should be rejected.

### A.    This Action Is Not Premature

There is no merit to International Paper's suggestion that this declaratory judgment action

is premature. The EPA has determined that environmental contamination is present on some of

the properties constituting the New Jersey Operations, and it has entered an Administrative Order

on Consent with respect to the Crown Vantage Landfill.

A declaration by this Court that RPC did not assume the future CERCLA liabilities of

Federal will greatly facilitate Georgia-Pacific's discussions with the EPA. Under CERCLA,

Georgia-Pacific can bring an action against International Paper for the amount by which

Georgia-Pacific's clean-up expenditures exceed its equitable share. *See United States v. Atl.*

*Research Corp.*, 127 S. Ct. 2331 (2007). However, Georgia-Pacific cannot know whether that

remedy is a meaningful one without a resolution of whether RPC indemnified Federal for future

CERCLA liabilities. If RPC did indemnify Federal for such liabilities (and if Georgia-Pacific is

the successor to RPC), Georgia-Pacific would not have a meaningful remedy because it would

have to indemnify International Paper for any award; in other words, Georgia-Pacific would have

23

to pay itself. If, however, this Court holds that RPC did not indemnify Federal, Georgia-Pacific can proceed with its discussions with the EPA comforted with the knowledge that it has meaningful remedies against International Paper. This will facilitate not only Georgia-Pacific's discussions with EPA, but also facilitate ultimate clean-up of the sites. Moreover, Georgia-Pacific should not be forced to live under the threat by International Paper that it may seek indemnity from Georgia-Pacific.[8]

### B.    International Paper's Argument Based On The "Equities" Cannot Stave Off Summary Judgment

International Paper suggests that the "equities" weigh in its favor because Federal owned the New Jersey Operations for only three months. IP Mem. at 3. The length of Federal's ownership of the facilities has no bearing on the proper interpretation of the agreements, which is purely an issue of New York law.

To the extent that the equities are relevant, however, International Paper has matters precisely backwards. Federal knowingly succeeded to all of the liabilities of Old Riegel when it chose to merge with Old Riegel, and International Paper knowingly succeeded to all liabilities of Federal not assumed by RPC when it chose to merge with Federal. International Paper is now trying to escape the consequences of these voluntary decisions. In the process, it is attempting to deprive Georgia-Pacific of the benefit of a contract bargained for by RPC. Furthermore, all of the substances disposed of at the Crown Vantage Landfill, and most of the substances disposed of at the other properties, were disposed of before RPC bought assets from Federal. In other words, the vast majority of contamination at the sites was caused by International Paper's

---

[8]    International Paper's reliance on the *Olin* decision is misplaced. In *Olin*, the court said that a declaratory judgment claim by one of the parties was premature because there was no evidence that a claim for environmental clean-up would be made with respect to the properties at issue. 5 F.3d at 17. Here, the EPA has concluded that contamination exists at the New Jersey Operations and is in discussions with Georgia-Pacific. Thus, this action presents a ripe and justiciable controversy.

predecessors, not by RPC. Finally, it is Georgia-Pacific that is voluntarily cooperating with the EPA, while International Paper has refused to cooperate.

Thus, the equities, to the extent they are relevant, weigh overwhelmingly in favor of Georgia-Pacific.

### Conclusion

The Court should grant summary judgment to Georgia-Pacific and deny International Paper's motion to dismiss.

Dated:　December 17, 2007

Respectfully submitted,

By: _____
Ingo W. Sprie, Jr.
David G. Kleiman
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022-4690
Tel:  (212) 715-1000
Fax:  (212) 715-1399
Ingo.Sprie@aporter.com

*Counsel for Plaintiff Georgia-Pacific Consumer Products, LP*