Exhibit F



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II

290 BROADWAY

NEW YORK, NEW YORK 10007-1866

December 31, 2007

<u>BY EMAIL & OVERNIGHT DELIVERY</u>

Brian Heim, Esq.
Senior Counsel, Environment, Health and Safety
International Paper Company
Legal Department
International Place II
6400 Poplar Avenue
Memphis, TN 38197

Re:    Crown Vantage Landfill Superfund Site - Unilateral Administrative Order

Dear Mr. Heim:

Enclosed please find a Unilateral Administrative Order ("UAO") issued to International Paper Company ("IP") under Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a). The enclosed UAO, CERCLA Docket No. 02-2008-2006, was signed by the Director of the Emergency and Remedial Response Division of the United States Environmental Protection Agency, Region 2 ("EPA") on December 27, 2007, and by its terms, will become effective January 14, 2008 unless IP requests a conference pursuant to UAO Section XXVI.

The UAO requires IP to participate in the performance of the remedial investigation and feasibility study ("RI/FS") at the Crown Vantage Landfill Superfund Site ("Site"), as well as certain removal activities. Prior to issuing the UAO, EPA requested that IP enter into a settlement agreement for the performance of the RI/FS, but IP declined to enter into the agreement on terms acceptable to EPA.

In accordance with Section XXVII of the UAO (Notice of Intent to Comply), please provide, within 14 calendar days after the effective date of this UAO, written notice to EPA stating whether or not you will comply with this UAO.

In accordance with Section XXVI of the UAO (Opportunity to Confer), you or your representative may confer with EPA to discuss issues involving the implementation of the UAO and the extent to which you intend to comply with the UAO. You must request a conference within 10 days of your receipt of the UAO. If a conference is requested, it must be held within 14 days of the request, and the UAO will be effective three days following the conference.

Brian Heim, Esq.
December 31, 2007
Page 2


Please do not hesitate to call me at 212-637-3136 if you have any questions concerning the UAO.

Sincerely,

Sarah P. Flanagan
Assistant Regional Counsel


Enclosure

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 2

IN THE MATTER OF:

Crown Vantage Landfill Superfund Site
Alexandria Township, Hunterdon County, NJ

U.S. EPA Region 2
CERCLA Docket No. 02-2008-2006

International Paper Company,

Proceeding Under Section 106(a) of the
Comprehensive Environmental Response,
Compensation, and Liability Act,
as amended, 42 U.S.C. § 9606(a).

Respondent.

## UNILATERAL ADMINISTRATIVE ORDER FOR REMOVAL ACTION, AND REMEDIAL INVESTIGATION/FEASIBILITY STUDY

CONTENTS

I.        INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.       JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.      PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.       STATEMENT OF PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

V.        DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

VI.       EPA FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

VII.      EPA CONCLUSIONS OF LAW AND DETERMINATIONS . . . . . . . . . . . . . 8

III.      NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IX.       ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

X.        PARTICIPATION AND COOPERATION . . . . . . . . . . . . . . . . . . . . . . . 10

XI.       DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS . 11

XII.      REMOVAL ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

XIII.     REMEDIAL INVESTIGATION AND FEASIBILITY STUDY . . . . . . . . . . . 13

XIV.      EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . 20

XV.       QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION 22

XVI.      SITE ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . 24

XVII.     COMPLIANCE WITH OTHER LAWS . . . . . . . . . . . . . . . . . . . . . . . . . 25

XVIII.    RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XIX.      DELAY IN PERFORMANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XX.       UNITED STATES NOT LIABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XXI.      INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

XXII.    FINANCIAL ASSURANCE ........................................... 27

XXIII.   ADMINISTRATIVE RECORD ...................................... 28

XXIV.    ENFORCEMENT AND RESERVATIONS ........................ 28

XXV.     EFFECTIVE DATE AND COMPUTATION OF TIME ............. 29

XXVI.    OPPORTUNITY TO CONFER .................................... 29

XXVII.   NOTICE OF INTENT TO COMPLY ............................. 30

XXVIII.  TERMINATION AND SATISFACTION .......................... 30

iii

# I. INTRODUCTION

1.  This Administrative Order ("Order") is issued by the United States Environmental
    Protection Agency ("EPA") to International Paper Company ("Respondent"). This Order
    concerns performance of a removal action and a remedial investigation and feasibility
    study ("RI/FS") at the Crown Vantage Landfill Superfund Site located in Alexandria
    Township, Hunterdon County, New Jersey ("Site").

# II. JURISDICTION

2.  This Order is issued under the authority vested in the President of the United States by
    Section 106(a), of the Comprehensive Environmental Response, Compensation, and
    Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a). This authority was
    delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580,
    52 Fed. Reg. 2926 (Jan. 29, 1987), and further delegated to the Regional Administrators
    on September 13, 1987, by EPA Delegation No. 14-14-B. This authority was further
    redelegated on November 23, 2004 by the Regional Administrator of EPA Region 2 to
    the Director of the Emergency and Remedial Response Division by EPA Region 2
    Delegation No. 14-14-B.

# III. PARTIES BOUND

3.  This Order applies to and is binding upon Respondent and its successors and assigns.
    Any change in ownership or corporate status of Respondent including, but not limited to,
    any transfer of assets or real or personal property shall not alter Respondent's
    responsibilities under this Order.

4.  Respondent shall ensure that its contractors, subcontractors, and representatives receive a
    copy of this Order and comply with this Order. Respondent shall be responsible for any
    noncompliance with this Order by any of its contractors, subcontractors, and
    representatives.

# IV. STATEMENT OF PURPOSE

5.  The objectives of this Order are: (a) to maintain the stabilized landfill face and secure the
    Site against unauthorized access; (b) to determine the nature and extent of contamination
    and any threat to the public health, welfare, or the environment caused by the release or
    threatened release of hazardous substances, pollutants or contaminants at or from the Site,
    by conducting a RI as more specifically set forth in the Statement of Work ("SOW")
    attached as Appendix A to this Order; and (c) to identify and evaluate remedial
    alternatives to prevent, mitigate or otherwise respond to or remedy any release or
    threatened release of hazardous substances, pollutants, or contaminants at or from the
    Site, by conducting a FS as more specifically set forth in the SOW in Appendix A to this
    Order.

6. The Work conducted under this Order is subject to approval by EPA. The RI/FS is intended to provide all appropriate and necessary information to assess Site conditions and evaluate alternatives to the extent necessary to select a remedy that will be consistent with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 ("NCP"). Respondent shall conduct all Work under this Order in compliance with CERCLA and the NCP.

## V. DEFINITIONS

7. Unless otherwise expressly provided herein, the terms used in this Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Order or in the appendices hereto and incorporated hereunder, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq*.

b. "Day" shall mean a calendar day unless expressly stated to be a Working Day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next Working Day.

c. "Effective Date" shall be the effective date of this Order as provided in Section XXV.

d. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e. "Engineering Controls" shall mean constructed containment barriers or systems that control one or more of the following: direct exposure to contaminants; downward migration; infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time. Examples include, without limitation, caps, engineered bottom barriers, immobilization processes, and vertical barriers.

f. "Institutional controls" shall mean non-engineered instruments, such as administrative and/or legal controls, that help to minimize the potential for human exposure to contamination and/or protect the integrity of a remedy by limiting land and/or resource use. Examples of institutional controls include, but are not limited to, easements and covenants, zoning restrictions, special building permit requirements, and well drilling prohibitions.

2

g.     "NJDEP" shall mean the New Jersey Department of Environmental Protection.

h.     "National Contingency Plan" or "NCP" shall mean the National Oil and
       Hazardous Substances Pollution Contingency Plan promulgated pursuant to
       Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and
       any amendments thereto.

i.     "Paragraph" shall mean a portion of this Order identified by an Arabic numeral.
       References to paragraphs in the SOW will be so identified (for example, "SOW
       paragraph 15").

j.     "Parties" shall mean the United States Environmental Protection Agency and
       Respondent.

k.     "RCRA" shall mean the Resource Conservation and Recovery Act, also known as
       the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, et seq.

l.     "Section" shall mean a portion of this Order identified by a Roman numeral.

m.     "Order" shall mean this Administrative Order, the SOW, all appendices attached
       hereto and all documents incorporated by reference into this document including,
       without limitation, EPA-approved submissions. EPA-approved submissions
       (other than progress reports) are incorporated into and become a part of the Order
       upon approval by EPA. In the event of conflict between this Order and any
       appendix or other incorporated documents, this Order shall control.

n.     "Respondent" shall mean International Paper Company.

o.     "Site" or "Crown Vantage Landfill Superfund Site" shall mean the areal extent of
       contamination from the release or disposal of hazardous substances, pollutants or
       contaminants at the Crown Vantage Landfill encompassing as much as ten acres
       in Alexandria Township, Hunterdon County, New Jersey, as well as all suitable
       areas in close proximity to the contamination necessary for implementation of
       response actions. The Site is depicted generally on the map attached as Appendix
       B.

p.     "Statement of Work" or "SOW" shall mean the Statement of Work for
       development of a RI/FS for the Site, as set forth in Appendix A to this Order. The
       Statement of Work is incorporated into this Order and is an enforceable part of
       this Order as are any modifications made thereto in accordance with this Order.

q.     "Waste Material" shall mean (1) any "hazardous substance" under Section
       101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant
       under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste"

under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any mixture containing any of the constituents noted in (1),(2) or (3), above

r.    "Work" shall mean all activities Respondent is required to perform under this Order, except those required by Section XVIII (Retention of Records).

s.    "Working Day" shall mean a day other than a Saturday, Sunday or federal holiday.

## VI. EPA FINDINGS OF FACT

8.    The Site is an abandoned, inactive landfill located off of Milford-Frenchtown Road, just south of a vacant paper mill, in Alexandria Township, Hunterdon County, New Jersey. The approximately ten-acre landfill has an estimated 1,500 feet of frontage directly on the eastern shore of the Delaware River. The Site is adjacent to the northernmost section of the Delaware Raritan Canal State Park. The Delaware and Raritan Canal foot path and a corn field bound the Site to the east.

9.    The landfill was utilized by the adjacent paper mill, known as the Milford mill, as well as by other nearby paper mills (located in Riegelsville, Warren Glen, and Hughesville) for the disposal of waste, including ash, rolls of paper, construction and demolition debris and drummed materials, beginning in the late 1930's through the early 1970's. A packaging facility located nearby in Flemington also disposed of waste at the Site beginning in the early 1960's through the early 1970's. Some municipal solid waste may have also been deposited into the landfill. Aerial photographs of the Site beginning in 1938 reveal a path leading from Milford-Frenchtown Road to the Site.

10.   Under the direction of NJDEP, Georgia-Pacific Consumer Products, LP ("GPCP"), then known as James River Paper Company, Inc., conducted initial investigation activities, starting with a Preliminary Site Investigation in September 1991. In December 1991 and January 1992, GPCP removed over 450 drums from the Site. In October 1992, GPCP prepared a Wetlands Delineation Report concerning potential wetland areas at the Site. GPCP also installed eight groundwater monitoring wells and conducted monitoring at the Site, in October and November 1994.

11.   NJDEP conducted investigations at the Site between 2002 and 2003, including the excavation of test pits and the removal and disposal of waste material and containers discovered at the surface and in the subsurface of the landfill. Analysis of samples collected from the drums for disposal purposes identified that a majority of the samples exceeded the regulatory limits for the RCRA characteristic of ignitability and that a portion of the samples exceeded the regulatory level for the RCRA characteristic of toxicity for compounds such as benzene, tetrachloroethene, trichloroethane and heptachlor. NJDEP also reported that surface soil samples collected from the exposed face of the landfill alongside the river showed exceedences of both the state residential and nonresidential standards for metals and semivolatiles in many of the samples.

4

12.   On June 25, 2003, EPA received a request from NJDEP to evaluate the Site for CERCLA
      Removal Action consideration. Several site visits were conducted by EPA between June
      and November, 2003. During the site visits, pigment waste was observed on the surface
      of the landfill, solvent odors were identified emanating from cracks and fissures in the
      landfill and from locations near subsidences where test pits previously had been
      excavated by NJDEP, and badly degraded drums of waste were observed present near the
      surface of the landfill. Flood waters from the Delaware River had overflowed the western
      toe of the landfill and scoured the face revealing buried drums, some of which contained
      blue pigment and had leaked their contents near the river. A sample of this material
      collected by EPA confirmed the presence of elevated levels of lead. EPA also noted that
      the fence which NJDEP had installed around the Site had been severely damaged along
      the river due to elevated water and flow level, allowing access by the public to the Site.

13.   In July and November 2003, EPA sampled waste (including flyash and the contents of
      degraded drums), air, surface soil, sediment and surface water.

14.   The analytical results from the sampling performed by NJDEP and EPA indicated that
      significantly elevated levels of a variety of CERCLA-designated Hazardous Substances,
      as listed in 40 C.F.R. Table 302.4 are present throughout the Site. Some of the
      substances found include poly-aromatic hydrocarbons ("PAH"), lead, pesticides, PCBs
      and chromium.

15.   EPA concluded that a CERCLA Removal Action was warranted at the Site to stabilize
      the exposed landfill face in order to eliminate the potential for containers and other waste
      materials to be released into the Delaware River. EPA also recommended the removal of
      drums and other waste materials along the face of the landfill and other exposed areas, as
      well as the implementation of Site security measures. These findings are described in
      EPA's Removal Site Evaluation ("RSE"), dated May 25, 2004, which was prepared in
      accordance with the NCP, 40 C.F.R. 300.410.

16.   EPA conducted an additional site visit on September 20, 2004 after the remnants of
      Hurricane Ivan resulted in the Delaware River rising well above flood stage. It was
      determined that the river had crested above the face of the landfill. EPA observed a
      portion of the landfill face that had experienced some erosion due to the flood waters
      collapse into the Delaware River. The portion of the landfill that collapsed had
      previously been sampled by EPA and contained elevated levels of PAHs, heavy metals,
      PCBs, and pesticides. As the water level subsided over the next two weeks and the entire
      landfill face became accessible and visible, additional areas of the landfill face were
      observed to have suffered significant erosional damage.

17.   EPA proposed the Site to be listed on the National Priorities List on September 23, 2004.

18.  After having received verbal authorization on September 23, 2004, on September 29, 2004, EPA initiated an emergency removal action to stabilize areas of the landfill face that were severely impacted by the flooding. Rip-rap was placed on these areas to prevent additional releases into the river. In addition, EPA collected some waste material which had been released from the landfill, including several drums of organic solvent, pigments and other colored, solid material. The waste material was characterized and disposed of off-site, consistent with EPA's CERCLA Offsite Policy set forth in 40 C.F.R. § 300.440. These removal activities continued through November 2004.

19.  EPA approved an Action Memorandum/Enforcement for Crown Vantage Landfill Site on February 10, 2005 concluding that the actual or threatened release of hazardous substances from the Site, if not addressed by implementing the recommended response action, may present an imminent and substantial endangerment to public health, welfare, or the environment. This document was prepared in accordance with the "Superfund Removal Procedures Action Memorandum Guidance" (OSWER Directive No. 9360.3-01, December 1990). The removal activities included in the February 10, 2005 Action Memorandum included stabilization of the landfill face; completion of the search for drums and containers across the surface of the landfill; completion of fencing along the river and placement of warning signs; and maintenance of the barrier, fencing and signage until the permanent remedy for the Site is in place.

20.  On March 18, 2005, EPA approved a second Action Memorandum documenting the September 23, 2004 verbal authorization for the emergency removal activities performed at the Site in the fall of 2004. In addition, in response to renewed flooding in the Delaware River, EPA performed further removal activities in April, 2005 pursuant to this Action Memorandum.

21.  On April 27, 2005, the Site listing on the NPL became final.

22.  EPA and GPCP's predecessor, Fort James Operating Company, entered into an Administrative Agreement and Order on Consent for Removal Action, CERCLA Docket No. 02-2005-2017, effective May 26, 2005 (the "Removal Agreement"), pursuant to which GPCP committed to design and build a wall to stabilize the face of the landfill as well as to secure the Site and to search for and remove drums and other containers which are visible on the landfill surface. Respondent was given the opportunity to consent to perform the removal activities required by this Order by entering into the Removal Agreement but did not do so.

23.  During the time in which the Site was utilized for the disposal of waste, from the early 1930s to December 1971, it was owned and operated by Riegel Paper Company, later renamed Riegel Paper Corporation. Riegel Paper Corporation also owned and operated the adjacent paper mill located in Milford, three additional paper mills located in Riegelsville, Warren Glen, and Hughesville, New Jersey, and a facility located in Flemington, New Jersey, opened in 1963, that made packaging materials. All of these plants generated hazardous waste which was disposed of at the Site.

6

24.    Beginning in 1971, a series of corporate transactions took place that resulted in the
transfer of ownership of the Site, the adjacent mill ("Milford mill"), the Riegelsville,
Warren Glen and Hughesville mills, and the Flemington packaging facility. On
September 23, 1971, Riegel Paper Corporation, Federal Paper Board Company, Inc. and
Rexham Corporation entered into a Plan and Agreement of Reorganization
("Reorganization Plan"). Pursuant to the Reorganization Plan, certain assets and
liabilities of Riegel Paper Corporation, including the facility in Flemington, New Jersey,
were transferred to Rexham Corporation, a newly formed subsidiary of Riegel, while the
shareholders of Riegel Paper Corporation received stock in Rexham Corporation. In
January 1972 Rexham Corporation listed its stock on the New York stock exchange.

25.    Riegel Paper Corporation merged with and into Federal Paper Board Company, Inc., with
Federal Paper Board Company, Inc. as the surviving corporation. Federal Paper Board
Company, Inc. retained ownership of the Site as well as the Milford, Riegelsville, Warren
Glen and Hughesville mills.

26.    Pursuant to a Purchase Agreement dated February 23, 1972, Federal Paper Board
Company, Inc. sold certain assets, including the Milford mill and the Site, as well as the
Riegelsville, Warren Glen, and Hughesville paper mills, to a newly-formed company,
Riegel Products Corporation. On the same day, Southwest Forest Industries acquired
100% of the stock of Riegel Products Corporation, which became a wholly-owned
subsidiary of Southwest Forest Industries, Inc.

27.    On April 3, 1972, Federal Paper Board Company, Inc. and Riegel Products Corporation
entered into an Assumption agreement pursuant to which Riegel Products Corporation
assumed certain debts and liabilities of Federal Paper Board Company, Inc. directly
attributable to the New Jersey mills and facilities, "as the same exist" as of the date of the
Assumption.

28.    On November 8, 1977, Fort James Corporation, which was then named James River
Corporation, purchased the stock of Riegel Products Corporation from Southwest Forest
Industries. The stock transaction included the Site and the Milford, Riegelsville, Warren
Glen and Hughesville paper mills.

29.    On April 29, 1989, Riegel Products Corporation and James River U.S. Holdings, Inc.,
both subsidiaries of James River Corporation, were merged into a newly-named
company, James River Paper Company, Inc. This transaction resulted in James River
Paper Company, Inc. becoming the owner of the Site and the Milford, Riegelsville,
Warren Glen and Hughesville paper mills.

30.    On August 15, 1995, James River Corporation and James River Paper Company, Inc.
executed a corporate spin-off in which Crown Vantage, Inc. and its subsidiary, Crown

7

Paper Company, received certain assets of James River Corporation and James River Paper Company, Inc., including the Milford mill and the Site, and certain liabilities.

31. Federal Paper Board Company, Inc. was merged with International Paper Company in March 1996. In 1997, James River Paper Company, Inc. was merged with Fort Howard. The newly-formed entity, Fort James Operating Company, was a subsidiary of Fort James Corporation. Georgia-Pacific Corporation acquired Fort James Corporation in July of 2000.

32. In 2001, the Site was formally abandoned by Crown Vantage, Inc. as part of a bankruptcy filing under Chapter 11 of the United States Bankruptcy Code, pursuant to an agreement with NJDEP. This proceeding had the effect of removing the landfill from the bankruptcy estate with ownership of the landfill reverting to the debtor, Crown Vantage, Inc.

33. In November 1987, RX Acquisition Corp., now known as Rexam Inc., purchased all outstanding shares of Rexham Corporation. RX Acquisition Corp. was merged into Rexham Corporation, and in 1988 Rexham Corporation was merged into R-8 Holdings, Inc. Through a series of name changes, the surviving entity came to be known as Rexam Image Products, Inc. In June 2002, Rexam Image Products, Inc. converted to an LLC and was sold by Rexam Inc. to Sun Coating Acquisition Corp. The former Rexam Image Products, Inc. is now known as InteliCoat Technologies, LLC.

34. On August 10, 2006, EPA issued a Notice of Potential Liability, Request to Perform RI/FS, and Demand for Reimbursement of Past Costs to Respondent, GPCP and Rexam Inc.

35. EPA and GPCP entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study, CERCLA Docket No. 02-2007-2023, effective September 27, 2007 (the "RI/FS Agreement"), pursuant to which GPCP committed to perform an RI/FS for the Site.

36. Respondent was given the opportunity to consent to perform the RI/FS activities required by this Order by entering into the RI/FS Agreement but did not do so. Respondent would consent to execute the RI/FS Agreement only if GPCP would also consent to execute the RI/FS Agreement. GPCP would sign the RI/FS Agreement along with Respondent only if the two parties were able to reach an internal agreement as to how to share the implementation of the RI/FS. The parties were unable to reach an agreement, and only GPCP was willing to sign the RI/FS Agreement by itself.

## VII. EPA CONCLUSIONS OF LAW AND DETERMINATIONS

Based on EPA's Findings of Fact set forth above, EPA has determined that:

37. The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

38.     Wastes sent to the Site, disposed of at the Site, and/or transported to the Site identified in Paragraphs 9, 11-14 and 18 are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or constitute "any pollutant or contaminant" that may present an imminent and substantial danger to public health or welfare under Section 104(a)(1) of CERCLA.

39.     The presence of hazardous substances at the Site or the past, present or potential migration of hazardous substances currently located at or emanating from the Site, constitute actual and/or threatened "releases" as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

40.     Respondent is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

41.     Respondent is a responsible party under Sections 104, 107 and 122 of CERCLA, 42 U.S.C. §§ 9604, 9607 and 9622. Respondent is a person who owned and/or operated the Site at the time of disposal.  Respondent therefore may be liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

42.     Based upon the foregoing Findings of Fact and Conclusions of Law and Determinations, and the entirety of the Administrative Record, EPA has determined that the release or threatened release of hazardous substances from the Site may present an imminent and substantial endangerment to the public health or welfare or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

43.     The actions required by this Order are necessary to protect the public health, welfare or the environment, are in the public interest, 42 U.S.C. § 9622(a), are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), 9622(a), and will expedite effective remedial action and minimize litigation, 42 U.S.C. § 9622(a).

## VIII. NOTICE

44.     EPA has notified NJDEP of this Order pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

## IX. ORDER

45.     Based upon the foregoing, EPA hereby orders Respondent to comply with the following provisions, including but not limited to all attachments to this Order, all documents incorporated by reference into this Order, and all schedules and deadlines in this Order, attached to this Order, or incorporated by reference into this Order.

## X.  PARTICIPATION AND COOPERATION

46.   The Removal Agreement and the RI/FS Agreement require GPCP (hereinafter, including any of its officers, agents, parent corporations, subsidiaries, affiliates, successors or assigns engaged in conducting work required by the Removal Agreement and the RI/FS Agreement, the "Performing Party"), to conduct the same response actions as those required by this Order.  Respondent shall make best efforts to coordinate with Performing Party.  Best efforts to coordinate shall include, at a minimum:

  a.      Communication with Performing Party in writing within fourteen (14) days of the effective date of this Order as to Respondent's notice to EPA of its intent to comply with this Order, consistent with Section XXVII, below;

  b.      submission within twenty (20) days of the effective date of this Order of a good-faith offer to Performing Party to perform the Work, in whole or in part, or in lieu of performance to pay for the Work, in whole or in part; and

  c.      engaging in good-faith negotiations with Performing Party to perform, in whole or in part, or in lieu of performance to pay for the Work required by this Order, in whole or in part, if Performing Party refuses Respondent's first offer.

47.   To the extent that Performing Party is performing or has stated an intent to perform any requirement of this Order, pursuant to the Removal Agreement or the RI/FS Agreement, Respondent shall make best efforts to participate in the performance of the Work with the Performing Party.  Best efforts to participate shall include, at a minimum:

  a.      performance of the Work as agreed by Respondent and Performing Party to be undertaken by Respondent; and

  b.      payment of all amounts as agreed by Respondent and the Performing Party to be paid by Respondent if, in lieu of performance, Respondent has offered to pay for the Work required by this Order, in whole or in part.

48.   Respondent shall provide EPA with notice of its intent to comply with this Order, consistent with Section XXVII, below.  In addition, Respondent shall notify EPA in writing within five (5) days of the rejection, if any, by Performing Party of Respondent's offer to perform, in whole or in part, or, in lieu of performance, to pay for the Work, in whole or in part.

49.   The undertaking or completion of any requirement of this Order by any other person, with or without the participation of Respondent, shall not relieve Respondent of its obligation to perform each and every other requirement of this Order.

50.   Any failure to perform, in whole or in part, any requirement of this Order by any other
      person with whom Respondent is coordinating or participating in the performance of such
      requirement shall not relieve Respondent of its obligation to perform each and every
      requirement of this Order.

XI. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

51.   Selection of Contractors, Personnel.  All Work performed under this Order shall be under
      the direction and supervision of qualified personnel.  Within fourteen (14) days of the
      Effective Date of this Order, Respondent shall notify EPA in writing of the names and
      qualifications of the contractors, subcontractors, consultants and laboratories to be used in
      carrying out such Work.  Respondent shall also notify EPA of the names and
      qualifications of any other contractors, subcontractors, consultants and laboratories to be
      used in carrying out the Work at least ten (10) days prior to their commencement of their
      particular aspect of the Work.  The qualifications of the contractors, subcontractors,
      consultants and laboratories undertaking the Work for Respondent shall be subject to
      EPA's review, for verification that such contractors, subcontractors, consultants and
      laboratories meet minimum technical background and experience requirements.  With
      respect to any proposed contractor, Respondent shall demonstrate that the proposed
      contractor has a quality system that complies with ANSI/ASIC E4-1994, "Specifications
      and Guidelines for Quality Systems for Environmental Data Collection and
      Environmental Technology Programs," (American National Standard, January 5, 1995, or
      most recent version), by submitting a copy of the proposed contractor's Quality
      Management Plan ("QMP"), prepared in accordance with "EPA Requirements for Quality
      Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001 or subsequently issued
      guidance) or equivalent documentation as determined by EPA.  This Order is contingent
      on Respondent's demonstration to EPA's satisfaction that Respondent is qualified to
      perform properly and promptly the actions set forth in this Order.  If EPA disapproves in
      writing of any of the technical qualifications of any contractors, subcontractors,
      consultants and laboratories, Respondent shall notify EPA of the identity and
      qualifications of the replacements within thirty (30) days of the written notice.  If EPA
      subsequently disapproves of the replacement, EPA reserves the right to terminate this
      Order and to conduct a complete RI/FS, and to seek reimbursement for costs and
      penalties from Respondent.  During the course of the RI/FS, Respondent shall notify EPA
      in writing of any changes or additions in the contractors, subcontractors, consultants and
      laboratories used to carry out such Work, providing their names and qualifications.  EPA
      shall have the same right to disapprove changes and additions to contractors,
      subcontractors, consultants and laboratories as it has hereunder regarding the initial
      notification.

52.   Within fourteen (14) days after the Effective Date, Respondent shall designate a Project
      Coordinator who shall be responsible for administration of all actions by Respondent
      required by this Order and shall submit to EPA the designated Project Coordinator's
      name, address, telephone number, and qualifications. To the greatest extent possible, the

11

Project Coordinator shall be present on Site or readily available during on-Site Work. EPA retains the right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Respondent shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number and qualifications within fourteen (14) days following EPA's disapproval. Respondent shall have the right to change its Project Coordinator, subject to EPA's right to disapprove. Respondent shall notify EPA fourteen (14) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notification. Receipt by Respondent's Project Coordinator of any notice or communication from EPA relating to this Order shall constitute receipt by Respondent.

53. EPA has designated Tanya Mitchell of the New Jersey Remediation Branch, Region II as its Project Coordinator. EPA will notify Respondent of a change of its designated Project Coordinator, in writing and if possible, fourteen (14) days before such a change is made. Except as otherwise provided in this Order, Respondent shall send all submissions required by this Order by certified mail, return receipt requested, or by UPS or Federal Express, to the Project Coordinator at:

> New Jersey Remediation Branch
> Emergency and Remedial Response Division
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway, 19th Floor
> New York, New York 10007-1866
> Attn: Tanya Mitchell, Crown Vantage RPM

with a copy to:

> New Jersey Superfund Branch
> Office of Regional Counsel
> U.S. Environmental Protection Agency
> 290 Broadway, 17th Floor
> New York, New York 10007-1866
> Attn: Cornell-Dubilier Electronics Site Attorney

In the event that EPA requests more than the number of copies of any report or other documents required by this Order for itself or NJDEP, Respondent shall provide the number of copies requested.

54. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, EPA's Project Coordinator shall have the authority consistent with the NCP, to halt any Work required by this Order, and to take any necessary response action when s/he determines that conditions at the Site may present an immediate endangerment to public health or

12

welfare or the environment. The absence of the EPA Project Coordinator from the area under study pursuant to this Order shall not be cause for the stoppage or delay of Work.

55.   EPA shall arrange for a qualified person to assist in its oversight and review of the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. Section 9604(a). Such person shall have the authority to observe Work and make inquiries in the absence of EPA, but shall not modify the RI/FS Work Plan.

## XII. REMOVAL ACTION

56.   Respondent shall conduct the removal activities required hereunder in accordance with CERCLA, the NCP, relevant guidance that EPA identifies to Respondent, and the Removal Action Work Plan and Engineering Design Report approved by EPA, as they may be amended or modified by EPA. Relevant sections of the EPA-approved Removal Action Work Plan and the Engineering Design Report are attached hereto as Appendix C and Appendix D.

    a.    <u>Wall Inspection and Maintenance</u>. Respondent shall inspect and maintain the landfill wall following completion of the stabilization activities and planting of vegetation, as described in Section 3.10.4 of the Removal Action Work Plan and Section 7.0 of the Engineering Design Report.

    b.    <u>Site Security</u>.  Respondent shall inspect and maintain the fence surrounding the landfill and the warning signs, as described in Sections 2.1 to 2.1.6 of the Removal Action Work Plan.

## XIII. REMEDIAL INVESTIGATION/FEASIBILITY STUDY

57.   Respondent shall conduct the RI/FS in accordance with the provisions of this Order, the SOW, CERCLA, the NCP and EPA guidance, including, but not limited to the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01, October 1988 or subsequently issued guidance), "Guidance for Data Useability in Risk Assessment" (OSWER Directive #9285.7-05, October 1990 or subsequently issued guidance), and guidance referenced therein, and guidances referenced in the SOW, as may be amended or modified by EPA. The Remedial Investigation ("RI") shall consist of collecting data to characterize Site conditions, determining the nature and extent of the contamination at or from the Site, assessing risk to human health and the environment and conducting treatability testing as necessary to evaluate the potential performance and cost of the treatment technologies that are being considered. The Feasibility Study ("FS") shall determine and evaluate (based on treatability testing, where appropriate) alternatives for remedial action to prevent, mitigate or otherwise respond to or remedy the release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site. The alternatives evaluated must include, but shall not be limited to, the range of alternatives described in

13

the NCP, and shall include remedial actions that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. In evaluating the alternatives, Respondent shall address the factors required to be taken into account by Section 121 of CERCLA, 42 U.S.C. § 9621, and Section 300.430(e) of the NCP, 40 C.F.R. § 300.430(e). Upon request by EPA, Respondent shall submit in electronic form all portions of any report or other deliverable Respondent is required to submit pursuant to provisions of this Order.

a.    **Task I - RI/FS Work Plan.** EPA has determined the Site-specific objectives of the RI/FS and devised a general management approach for the Site, as set forth in the attached SOW. Respondent shall compile and review all existing data for the Site and shall conduct scoping activities as described in the attached SOW. At the conclusion of the project planning phase, Respondent shall provide EPA with the following plans, reports and other deliverables for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions):

     i.    Preliminary Conceptual Site Model. Within forty-five (45) days after the Effective Date of this Order, Respondent shall submit to EPA a Preliminary Conceptual Site Model ("PCSM") to support the development of the RI/FS Work Plan. The preliminary conceptual site model shall be prepared in accordance with the SOW, this Order, and applicable EPA guidance.

     ii.    RI/FS Work Plan. Within seventy-five (75) days after EPA's written authorization to proceed based on the PCSM, Respondent shall submit to EPA a detailed Work Plan for the completion of the RI/FS. Upon approval or modification by EPA pursuant to Section XIV (EPA Approval of Plans and Other Submissions), the RI/FS Work Plan shall be incorporated into and become enforceable under this Order. The RI/FS Work Plan shall be prepared in accordance with the SOW, this Order and applicable EPA guidance and shall include a Quality Assurance/Quality Control Project Plan ("QAPP"), Field Sampling and Analysis Plan ("FSP"), and a Health and Safety Plan ("HSP"), as described in Paragraphs 57(a)(ii)(1)-(3).

        1.    Quality Assurance/Quality Control Project Plan. The QAPP shall be prepared in accordance with the SOW, this Order and EPA guidance, including, without limitation, "EPA Guidance for Quality Assurance Project Plans (QA/G-5)"(EPA/240/R-009), and "EPA Requirements for Quality Assurance Project Plans (QA/G-5)" (EPA 240/B-01/003, March 2001 or subsequently issued guidance). The QAPP shall also be prepared consistent with the Uniform Federal Policy for Quality Assurance Project Plans (UFP-QAPP), Parts 1, 2 and 3, EPA-505-B-04-900A, B and C, March 2005 or newer, and other guidance documents referenced in

the aforementioned guidance documents. The UFP documents may be found at: http://www.epa.gov/fedfac/documents/qualityassurance.htm. In addition, the guidance and procedures located in the EPA Region 2 DESA/HWSB web site: http://www.epa.gov/region02/qa/documents.htm, as well as other OSWER directives and EPA Region 2 policies should be followed, as appropriate.

2.  Field Sampling and Analysis Plan. The FSP shall be prepared in accordance with the SOW, this Order and applicable EPA guidance.

3.  Health and Safety Plan. The HSP for the Site shall ensure the protection of on-Site workers and the public during performance of on-Site Work under this Order, and shall include procedures for emergency response and notification of releases. The HSP shall be prepared in accordance with the SOW, this Order and applicable EPA guidance, including, without limitation, EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992 or subsequently issued guidance ). In addition, the HSP shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning.

b.  Task II - Community Relations Plan. EPA will prepare a community relations plan for the Site, coordinating with the Respondent to the extent reasonably possible. As requested by EPA, Respondent shall provide information relating to the Work at the Site to the public and shall participate in the preparation of all appropriate information to be disseminated to the public and shall participate in public meetings which may be held or sponsored by EPA to explain activities at or concerning the Site.

c.  Task III - Site Characterization. Following EPA approval or modification of the RI/FS Work Plan pursuant to Section XIV (EPA Approval of Plans and Other Submissions), Respondent shall implement the provisions of the RI/FS Work Plan to characterize the nature, quantity, and concentrations of hazardous substances, pollutants, or contaminants at the Site. Respondent shall complete the Site characterization and submit all plans, reports and other deliverables in accordance with the schedules and deadlines established in this Order, the SOW, and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports and other deliverables shall be submitted by Respondent for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions).

15

d.    Task IV - Identification of Candidate Technologies. Respondent shall submit an Identification of Candidate Technologies Memorandum to EPA within forty-five (45) days of Respondent's submission to EPA of the last set of validated analytical results. Where appropriate, the candidate technologies identified by Respondent shall include innovative treatment technologies. The Identification of Candidate Technologies Memorandum shall be prepared by Respondent in accordance with the SOW, this Order and applicable EPA guidance.

e.    Task V - Treatability Studies. Respondent shall conduct treatability studies if so requested in writing by EPA. The major components of the treatability studies are described in the SOW. Treatability studies shall be performed according to the SOW, this Order and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports, and other deliverables shall be submitted by Respondent for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions). If so requested, Respondent shall submit a Treatability Testing Work Plan within forty-five (45) days of such notice. Respondent shall submit a Treatability Study Evaluation Report within forty-five (45) days after completion of treatability testing under the Treatability Testing Work Plan.

f.    Task VI - Baseline Risk Assessment. Respondent will perform the Baseline Risk Assessment ("Risk Assessment") in accordance with the SOW, this Order and/or the EPA-approved or modified RI/FS Work Plan. All plans, reports and other deliverables shall be submitted by Respondent for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions). The Baseline Risk Assessment performed by Respondent shall include the following:

    i.    Baseline Human Health Risk Assessment. Within sixty (60) days of EPA's approval or modification of the RI/FS Work Plan, Respondent shall submit to EPA a Memorandum on Exposure Scenarios and Assumptions pursuant to the SOW and applicable EPA guidance. Within sixty (60) days of Respondent's submission to EPA of the last set of validated data, Respondent shall submit to EPA a Pathways Analysis Report prepared in accordance with the SOW, this Order and applicable EPA guidance. Within sixty (60) days of EPA's approval of the Pathways Analysis Report pursuant to Section XIV (EPA Approval of Plans and Other Submissions), Respondent shall submit to EPA a draft Baseline Human Health Risk Assessment ("BHHRA"), for inclusion in the RI Report upon approval or modification pursuant to Section XIV.

    ii.    Baseline Ecological Risk Assessment. Within sixty (60) days of Respondent's submission to EPA of the last set of validated data, Respondent shall submit to EPA a Screening-Level Ecological Risk Assessment in accordance with the SOW, this Order and applicable EPA guidance. EPA will notify Respondent in writing if EPA determines that a

16

full Baseline Ecological Risk Assessment ("BERA") is required, and if so notified by EPA, Respondent shall perform a full BERA in accordance with the SOW, this Order and applicable EPA guidance. Within forty-five (45) days of such notice, Respondent shall submit a Scope of Work for a full BERA. Respondent shall submit a draft BERA Report within sixty (60) days after submission to EPA of the last set of BERA-related validated data, for inclusion in the RI Report upon approval or modification pursuant to Section XIV.

g.    Task VII - Remedial Investigation Report. Pursuant to the EPA-approved or modified RI/FS Work Plan, Respondent shall submit a draft RI Report to EPA in accordance with the SOW, this Order and approved EPA guidance. Within sixty (60) days of receiving EPA's comments on the draft RI Report, Respondent shall submit a final RI Report to EPA for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions).

h.    Task VIII - Development and Screening of Remedial Alternatives. Respondent shall develop an appropriate range of remedial action objectives that will be evaluated through the development and screening of alternatives, as provided in the SOW and the EPA-approved or modified RI/FS Work Plan. Within forty-five (45) days after EPA's approval of the BHHRA or BERA, or within forty-five (45) days of EPA's approval of Treatability Study Evaluation Report (if treatability studies are required), whichever is later, Respondent shall prepare and submit to EPA for EPA approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions) a Development and Screening of Remedial Alternatives Technical Memorandum in accordance with the SOW, this Order and applicable EPA guidance. The Development and Screening of Remedial Alternatives Technical Memorandum shall summarize the development and screening of remedial alternatives. Within twenty-one (21) days of Respondent's submission of the Development and Screening of Remedial Alternatives Technical Memorandum, Respondent shall make a presentation to EPA and NJDEP identifying the remedial action objectives and summarizing the development and preliminary screening of alternatives.

i.    Task IX - Feasibility Study Report. Respondent shall submit a draft FS Report to EPA for EPA approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions) within sixty (60) days after EPA's approval of the Development and Screening of Remedial Alternatives Technical Memorandum. Within fourteen (14) days of Respondent's submission of the draft FS Report, Respondent will present to EPA and NJDEP a summary of the findings of the draft FS Report and discuss EPA's and NJDEP's preliminary comments and concerns with respect to the draft FS Report. Within forty-five (45) days of receiving EPA's comments on the draft FS Report, Respondent shall submit the

17

final FS Report to EPA for EPA's approval pursuant to Section XIV (EPA Approval of Plans and Other Submissions).

58.     Upon receipt of the draft FS report, EPA will evaluate, as necessary, the estimates of the risk to the public and environment that are expected to remain after a particular remedial alternative has been completed and will evaluate the durability, reliability and effectiveness of any proposed Institutional Controls.

59.     Modification of the RI/FS Work Plan.

a.      If at any time during the RI/FS process, Respondent identifies a need for additional data, Respondent shall submit a memorandum documenting the need for additional data to the EPA Project Coordinator within thirty (30) days of identification. EPA in its discretion will determine whether the additional data will be collected by Respondent and whether it will be incorporated into reports and deliverables.

b.      In the event of unanticipated or changed circumstances at the Site, Respondent shall notify the EPA Project Coordinator by telephone within twenty-four (24) hours of discovery by Respondent of the unanticipated or changed circumstances. In addition to the authorities in the NCP, in the event that EPA determines that the unanticipated or changed circumstances warrant changes in the RI/FS Work Plan, EPA shall modify or amend the RI/FS Work Plan in writing accordingly. Respondent shall perform the RI/FS Work Plan as modified or amended.

c.      EPA may determine that in addition to tasks defined in the initially approved RI/FS Work Plan, other additional Work may be necessary to accomplish the objectives of the RI/FS. Within twenty-one (21) days of receipt of EPA's notice that additional Work is necessary to accomplish the objectives of the RI/FS, Respondent shall submit the SOW and/or RI/FS Work Plan modified in accordance with EPA's determination or in accordance with the final resolution of the dispute.

d.      Respondent shall complete the additional Work according to the standards, specifications, and schedule set forth or approved by EPA in a written modification to the RI/FS Work Plan or written RI/FS Work Plan supplement. EPA reserves the right to conduct the Work itself at any point, to seek reimbursement from Respondent, and/or to seek any other appropriate relief.

e.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions at the Site.

18

60.   Off-Site Shipment of Waste Material.

    a.   Respondent shall, prior to any off-site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to EPA's Designated Project Coordinator.

    b.   Respondent shall include in the written notification required by Subparagraph 60(a) the following information: (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Respondent shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

    c.   The identity of the receiving facility and state will be determined by Respondent following the award of the contract for the remedial investigation and feasibility study. Respondent shall provide the information required by Subparagraphs 60(b) and 60(d) as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

    d.   Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Respondent shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

61.   Meetings. Respondent shall make presentations at, and participate in, meetings at the request of EPA during the initiation, conduct, and completion of the RI/FS. In addition to discussion of the technical aspects of the RI/FS, topics will include anticipated problems or new issues. Meetings will be scheduled at reasonable times and at EPA's discretion.

62.   Progress Reports. In addition to the deliverables set forth in the Order and SOW, Respondent shall provide to EPA monthly progress reports by the tenth (10th) day of the following month (or on any other schedule agreed to in writing by the EPA Project Coordinator). At a minimum, with respect to the preceding month, these progress reports shall (1) describe the actions which have been taken to comply with this Order during that month, (2) describe Work planned for the next forty-five (45) days with schedules relating such Work to the overall project schedule for RI/FS completion, and (3) describe all problems encountered and any anticipated problems, any actual or anticipated delays,

19

and solutions developed and implemented to address any actual or anticipated problems or delays.

63.   Emergency Response and Notification of Releases.

    a.    In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action. Respondent shall take these actions in accordance with all applicable provisions of this Order, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondent shall also immediately notify the Emergency Spill Reporting Hotline at (732) 548-8730 and the EPA Project Coordinator or, in the event of his/her unavailability, the Chief of the Northern New Jersey Remediation Section of the Emergency and Remedial Response Division of EPA Region II at (212) 637-4380 of the incident or Site conditions. If Respondent fails to respond as required in this paragraph, EPA may respond to the release or endangerment and reserves the right to pursue cost recovery for all costs of response not inconsistent with the NCP.

    b.    In addition, in the event of any release of a hazardous substance from the Site, Respondent shall immediately notify the EPA Project Coordinator, the Chief of the Northern New Jersey Remediation Section of the Emergency and Remedial Response Division of EPA Region II by telephone (212-637-4380) and the National Response Center at (800) 424-8802. Respondent shall submit a written report to EPA within 7 days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, et seq.

## XIV. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

64.   After review of any plan, report or other item that is required to be submitted for approval pursuant to this Order EPA shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Respondent modify the submission; or (e) any combination of the above. However, EPA shall not modify a submission without first providing Respondent at least one notice of deficiency and an opportunity to cure within 14 days, except where to do so would cause

20

serious disruption to the Work or where previous submission(s) have been disapproved due to material defects.

65.    In the event of approval, approval upon conditions, or modification by EPA, pursuant to Subparagraphs 64(a), (b), (c) or (e), Respondent shall proceed to take any action required by the plan, report or other item, as approved or modified by EPA. Following EPA approval or modification of a submittal or portion thereof, Respondent shall not thereafter alter or amend such submittal or portion thereof unless directed by EPA. In the event that EPA modifies the submission to cure the deficiencies pursuant to Subparagraph 64(c) and the submission so modified is a resubmission of the same plan, report or other deliverable, which EPA is modifying due to a material defect, EPA retains the right to seek statutory penalties, as provided in Paragraph 95.

66.    Resubmission of Plans.

a.    Upon receipt of a notice directing that Respondent modify or correct a plan, report or other item, Respondent shall, within the time specified in the SOW, or if no time is specified in the SOW for the item in question, within thirty (30) days or such other time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any penalties that might be applicable to the submission, as provided in Paragraph 68, shall accrue during the thirty (30)-day period or otherwise specified period but shall not become due and payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 64 and 65.

b.    Notwithstanding the receipt of a notice of disapproval, Respondent shall proceed to take any action required by any non-deficient portion of the submission, unless otherwise directed by EPA. Implementation of any non-deficient portion of a submission shall not relieve Respondent of any liability for statutory penalties under Paragraph 95.

c.    Respondent shall not proceed further with any subsequent activities or tasks until receiving EPA approval for the following deliverables: PCSM, RI/FS Work Plan, Draft RI Report, Treatability Testing Work Plan and Sampling and Analysis Plan, and Draft Feasibility Study Report. While awaiting EPA approval on these deliverables, Respondent shall proceed with all other tasks and activities which may be conducted independently of these deliverables, in accordance with the schedule set forth in this Order.

d.    For all remaining deliverables not enumerated above in Subparagraph 66(c), Respondent shall proceed with all subsequent tasks, activities and deliverables without awaiting EPA approval on the submitted deliverable. EPA reserves the right to stop Respondent from proceeding further, either temporarily or permanently, on any task, activity or deliverable at any point during the RI/FS.

21

67.    If EPA disapproves a resubmitted plan, report or other item, or portion thereof, EPA may again direct Respondent to correct the deficiencies. EPA shall also retain the right to modify or develop the plan, report or other item. Respondent shall implement any such plan, report, or item as corrected, modified or developed by EPA.

68.    If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, Respondent shall be deemed to have failed to submit such plan, report, or item timely and adequately.

69.    In the event that EPA takes over some of the tasks, but not the preparation of the RI Report or the FS Report, Respondent shall incorporate and integrate information supplied by EPA into the final reports.

70.    All plans, reports, and other items submitted to EPA under this Order shall, upon approval or modification by EPA, be incorporated into and enforceable under this Order. In the event EPA approves or modifies a portion of a plan, report, or other item submitted to EPA under this Order, the approved or modified portion shall be incorporated into and enforceable under this Order.

71.    Neither failure of EPA to expressly approve or disapprove of Respondent's submissions within a specified time period, nor the absence of comments, shall be construed as approval by EPA. Whether or not EPA gives express approval for Respondent's deliverables, Respondent is responsible for preparing deliverables acceptable to EPA.

## XV. QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION

72.    Quality Assurance. Respondent shall assure that Work performed, samples taken and analyses conducted conform to the requirements of the SOW, the QAPP and guidances identified therein. Respondent will assure that field personnel used by Respondent are properly trained in the use of field equipment and in chain of custody procedures. Respondent shall only use laboratories which have a documented quality system that complies with "EPA Requirements for Quality Management Plans for Environmental Data Operations (QA/R-5)" (EPA/240/B-01/003, March 2001) or equivalent documentation as determined by EPA.

73.    Sampling.

a.     All results of sampling, tests, modeling or other data (including raw data) generated by Respondent, or on Respondent's behalf, during the period that this Order is effective, shall be submitted to EPA pursuant to Section IV (Task III - Site Characterization) of the SOW. EPA will make available to Respondent validated data generated by EPA unless it is exempt from disclosure by any federal or state law or regulation.

22

b.    Respondent shall verbally notify EPA at least fourteen (14) days prior to conducting significant field events as described in the SOW, RI/FS Work Plan or sampling and analysis plan. At EPA's verbal or written request, or the request of EPA's oversight assistant, Respondent shall allow split or duplicate samples to be taken by EPA (and its authorized representatives) of any samples collected in implementing this Order. All split samples taken by Respondent shall be analyzed by the methods identified in the QAPP.

74.    <u>Access to Information.</u>

a.    Respondent shall provide to EPA, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Respondent shall also make available to EPA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work. Such persons shall be made available at reasonable times and upon reasonable request of EPA.

b.    Respondent may assert business confidentiality claims covering part or all of the documents or information submitted to EPA under this Order to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to EPA, or if EPA has notified Respondent that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondent. Respondent shall segregate and clearly identify all documents or information submitted under this Order for which Respondent asserts business confidentiality claims.

c.    Respondent may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Respondent asserts such a privilege in lieu of providing documents, it shall provide EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondent. However, no documents, reports or other information created or generated

23

pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

    d.    No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

75.    If Respondent objects to any data relating to the RI/FS that it is submitting in a monthly progress report to EPA, Respondent shall submit to EPA a report that specifically identifies and explains its objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to EPA within thirty (30) days of the monthly progress report containing the data.

## XVI. SITE ACCESS AND INSTITUTIONAL CONTROLS

76.    If the Site, or any other property where access is needed to implement this Order, is owned or controlled by Respondent, Respondent shall, commencing on the Effective Date, provide EPA, and its representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Order.

77.    Where any action under this Order is to be performed in areas owned by or in possession of someone other than Respondent, Respondent shall use its best efforts to obtain all necessary access agreements within ninety (90) days after the Effective Date, or as otherwise specified in writing by the EPA Project Coordinator. If additional areas to which access is necessary are identified after the Effective Date, Respondent shall use its best efforts to obtain access agreements within sixty (60) days after learning of the need for the additional access. Respondent shall immediately notify EPA if after using its best efforts it is unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access, unless the owner of the property in question is a potentially responsible party under Section 107(a) of CERCLA. Respondent shall describe in writing its efforts to obtain access. If Respondent cannot obtain access agreements within the time allowed, EPA and Respondent will discuss a strategy for gaining access in the most expeditious and cost-effective manner, after which EPA may either (i) obtain access for Respondent or assist Respondent in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate; (ii) perform those tasks or activities with EPA contractors; or (iii) terminate the Order. If EPA performs those tasks or activities with EPA contractors and does not terminate the Order, Respondent shall perform all other activities not requiring access to that property. Respondent shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.

78.    Notwithstanding any provision of this Order, EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XVII. COMPLIANCE WITH OTHER LAWS

79.    Respondent shall comply with all applicable local, state and federal laws and regulations when performing the RI/FS. No local, state, or federal permit shall be required for any portion of any action conducted entirely on-site (which means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the Work) including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work is to be conducted off-site and requires a federal or state permit or approval, Respondent shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. If Respondent is experiencing difficulties obtaining permits and approvals required to conduct the Work, Respondent shall so advise EPA, and Respondent and EPA will discuss a strategy for obtaining the permits in the most expeditious and cost-effective manner. This Order is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XVIII. RETENTION OF RECORDS

80.    During the pendency of this Order and for a minimum of ten (10) years after commencement of construction of any remedial action, Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until ten (10) years after commencement of construction of any remedial action, Respondent shall also instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

81.    At the conclusion of this document retention period, Respondent shall notify EPA at least ninety (90) days prior to the destruction of any such records or documents, and, upon request by EPA, Respondent shall deliver any such records or documents to EPA. Respondent may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondent asserts such a privilege, it shall provide EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by

25

Respondent. However, no documents, reports or other information created or generated pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

82.    Within 90 days after the effective date of this Order, Respondent shall submit a written certification to EPA's RPM that it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability with regard to the Site since notification of potential liability by the United States or the State of New Jersey or the filing of suit against it regarding the Site. Respondent shall not dispose of any such documents without prior written approval by EPA. Respondent shall, upon EPA's request and at no cost to EPA, deliver the documents or copies of the documents to EPA.

## XIX. DELAY IN PERFORMANCE

83.    Any delay in performance of this Order that, in EPA's judgment, is not properly justified by Respondent under the terms of this Section shall be considered a violation of this Order. Any delay in performance of this Order shall not affect Respondent's obligations to fully perform all obligations under the terms and conditions of this Order.

84.    Respondent shall notify EPA of any delay or anticipated delay in performing any requirement of this Order. Such notification shall be made by telephone to EPA's RPM within 48 hours after Respondent first knew or should have known that a delay might occur. Respondent shall adopt all reasonable measures to avoid or minimize any such delay. Within seven days after notifying EPA by telephone, Respondent shall provide written notification fully describing the nature of the delay, any justification for delay, any reason why Respondent should not be held strictly accountable for failing to comply with any relevant requirements of this Order, the measures planned and taken to minimize the delay, and a schedule for implementing the measures that will be taken to mitigate the effect of the delay. Increased costs or expenses associated with implementation of the activities called for in this Order is not a justification for any delay in performance.

## XX. UNITED STATES NOT LIABLE

85.    The United States and EPA, by issuance of this Order, or by issuance of any approvals pursuant to this Order, assume no liability for any injuries or damages to persons or property resulting from acts or omissions by Respondent, or its directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out any action or activity pursuant to this Order, or Respondent's failure to perform properly or complete the requirements of this Order. Neither the United States nor EPA may be deemed to be a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, assigns, contractors, or consultants in carrying out any action or activity pursuant to this Order, and Respondent shall not

represent to anyone that the United States or EPA is or may be a party to any such contract.

86.    Respondent shall save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, or representatives for or from any and all claims or causes of action or other costs incurred by the United States including but not limited to attorney fees and other expenses of litigation and settlement arising from or on account of acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on behalf or under their control, in carrying out activities pursuant to this Order, including any claims arising from any designation of Respondent as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e).

87.    No action or decision by EPA pursuant to this Order shall give rise to any right to judicial review except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXI.  INSURANCE

88.    At least fifteen (15) days prior to commencing any On-Site Work under this Order, Respondent shall secure, and shall maintain for the duration of this Order, comprehensive general liability insurance and automobile insurance with limits of three (3) million dollars, combined single limit, naming the EPA as an additional insured.  Within the same period, Respondent shall provide EPA with certificates of such insurance and a copy of each insurance policy.  Respondent shall submit such certificates and copies of policies each year on the anniversary of the Effective Date.  In addition, for the duration of the Order, Respondent shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondent in furtherance of this Order.  If Respondent demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Respondent need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXII.  FINANCIAL ASSURANCE

89.    Respondent shall demonstrate its ability to complete the Work required by this Order and to pay all claims that arise from the performance of the Work by obtaining and presenting to EPA within 60 days after the effective date of this Order, one of the following: (1) a surety bond unconditionally guaranteeing payment and/or performance of the Work; (2) one or more irrevocable letters of credit, payable to or at the direction of EPA; (3) a trust fund; (4) a corporate guarantee to perform the Work provided by Respondent, or one or more parent corporations or subsidiaries of Respondent, or by one or more unrelated corporations that have a substantial business relationship with Respondent; including a demonstration that any such company satisfies the financial test requirements of 40 C.F.R. Part 264.143(f); or (5) a policy of insurance.  Any mechanism provided by

27

Respondent in satisfaction of this paragraph shall be in form and substance acceptable to EPA, as determined in EPA's sole discretion. Respondent shall demonstrate financial assurance in an amount no less than $2 million. If Respondent seeks to demonstrate ability to complete the remedial action by means of internal financial information, or by guarantee of a third party, it shall re-submit the required financial and other information annually, on the anniversary of the effective date of this Order. If EPA determines that such financial information is inadequate, Respondent shall, within 30 days after receipt of EPA's notice of such determination, obtain and present to EPA for approval one of the other forms of financial assurance listed above.

## XXIII.  ADMINISTRATIVE RECORD

90.     EPA will determine the contents of the administrative record file for selection of the remedial action. Respondent shall submit to EPA documents developed during the course of the RI/FS upon which selection of the response action may be based. Upon request of EPA, Respondent shall provide copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports and other reports. Upon request of EPA, Respondent shall additionally submit any previous studies conducted under state, local or other federal authorities relating to selection of the response action, and all communications between Respondent and state, local or other federal authorities concerning selection of the response action. At EPA's discretion, Respondent shall establish a community information repository at or near the Site, to house one copy of the administrative record.

## XXIV.  ENFORCEMENT AND RESERVATIONS

91.     EPA reserves the right to bring an action against Respondent under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of any response costs incurred by the United States related to this Order and/or for any other response costs which have been incurred or will be incurred by the United States relating to the Site. This reservation shall include but not be limited to past costs, direct costs, indirect costs, and the costs of oversight, the costs of compiling the cost documentation to support an oversight cost demand, as well as accrued interest as provided in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

92.     Nothing in this Order shall preclude EPA from taking any additional enforcement actions, including modification of this Order or issuance of additional Orders, and/or additional remedial or removal actions as EPA may deem necessary, or from requiring Respondent in the future to perform additional activities pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), or any other applicable law. Respondent shall be liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for the costs of any such additional actions.

93.     Notwithstanding any other provision of this Order, at any time during the response action, EPA may perform its own studies, complete the response action (or any portion of the

response action) as provided in CERCLA and the NCP, and seek reimbursement from Respondents for its costs, or seek any other appropriate relief.

94. Notwithstanding any provision of this Order, the United States hereby retains all of its information gathering, inspection and enforcement authorities and rights under CERCLA, RCRA and any other applicable statutes or regulations.

95. Respondent shall be subject to civil penalties under Section 106(b) of CERCLA, 42 U.S.C. § 9606(b), in the event that Respondent willfully violates, or fails or refuses to comply with this Order without sufficient cause. Such civil penalties shall be in an amount not greater than $32,500 per day, subject to possible further adjustments of this penalty maximum consistent with the Debt Collection and Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996), and the regulations promulgated thereunder, including the Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, and all amendments thereto. In addition, failure to properly carry out response actions under this Order, or any portion hereof, without sufficient cause, may result in liability under Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), for punitive damages in an amount at least equal to, and not more than three times the amount of any costs incurred by EPA as a result of such failure to take proper action.

96. Nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

97. If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated by the court's order.

## XXV. EFFECTIVE DATE AND COMPUTATION OF TIME

98. This Order shall be effective 15 days after execution by EPA, unless a conference is timely requested pursuant to Section XXVI, below. If such conference is timely requested, this Order shall become effective 3 days following the date the conference is held, unless the effective date is modified by EPA. All times for performance of ordered activities shall be calculated from this effective date.

## XXVI. OPPORTUNITY TO CONFER

99. Respondent may, within 10 days of the date that this Order is received by Respondent, request a conference with EPA to discuss this Order. If requested, the conference shall occur within 14 days of Respondent's request for a conference.